U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

**ENTERED**

TAWANA C. MARSHALL, CLERK
THE DATE OF ENTRY IS
ON THE COURT'S DOCKET



The following constitutes the ruling of the court and has the force and effect therein described.

_____

**United States Bankruptcy Judge**

Signed April 12, 2013

_____

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | CASE NO. 09-38306-sgj-7 |
| EQUIPMENT EQUITY HOLDINGS, INC., | § | (Chapter 7) |
| | § | |
| Debtor. | § | |

_____

| | | |
|---|---|---|
| HAROLD GERNSBACHER, ANDREW | § | |
| SCRUGGS, JAMES SCRUGGS, LEE | § | |
| SCRUGGS, WILLIAM SCRUGGS, | § | |
| ROBERT ZINTGRAFF, DAVID | § | |
| CAMPBELL, REED JACKSON, | § | Adversary No. 11-03362-sgj |
| CYNTHIA JACKSON, LYNDA | § | |
| CAMPBELL, JEFF GRANDY, JEFFREY | § | |
| VREELAND, WALTER ESKURI, | § | |
| ROGER VANG, REUBEN PALM, JAMES | § | |
| PALM, RICHARD PALM, MARK PALM, | § | |
| MICHAEL PALM, THOMAS PALM, | § | |
| SHANNON PALM, SUSAN PALM, | § | |
| MAUREEN PALM, PAMELA PALM, | § | |
| KRISTEN PALM, GENE LEE, STEPHEN | § | |
| HOWZE and STEPHEN REYNOLDS, | § | |

**AMENDED MEMORANDUM OPINION**                                                      **PAGE 1**

|  |  |
|---|---|
| | § |
| **Plaintiffs,** | § |
| **v.** | § |
| | § |
| **DAVID CAMPBELL, S. REED JACKSON,** | § |
| **ROBERT N. ZINTGRAFF, ANDREW** | § |
| **SCRUGGS, WALTER ESKURI, HAROLD** | § |
| **GERNSBACHER, GLENCOE GROWTH** | § |
| **CLOSELY-HELD BUSINESS FUND, L.P.,** | § |
| **STOCKWELL FUND, L.P.,** | § |
| **MASSACHUSETTS MUTUAL LIFE** | § |
| **INSURANCE COMPANY, MASSMUTUAL** | § |
| **HIGH YIELD PARTNERS II LLC,** | § |
| **GLENCOE CAPITAL PARTNERS II** | § |
| **L.P., THOMAS M. GARVIN, GLENCOE** | § |
| **CAPITAL PARTNERS II, THOMAS L.** | § |
| **BINDLEY REVOCABLE TRUST,** | § |
| **KEVIN BRUCE, ED POORE, and BILL** | § |
| **AISENBERG,** | § |
| | § |
| **Defendants.** | § |

### _A M E N D E D_[1] MEMORANDUM OPINION IN SUPPORT OF JUDGMENT: (1) DENYING PLAINTIFFS' CLAIMS FOR (A) SUBORDINATION UNDER SECTION 510 AND (B) RECHARACTERIZATION; BUT (2) TREATING CERTAIN PLAINTIFFS/SELLER NOTEHOLDERS AS _PARI PASSU_ WITH THE DEFENDANTS/NEW NOTEHOLDERS

_"Equity is a roguish thing. For law we have a measure, know what to trust to; Equity is according to the conscience of him that is Chancellor, and as that is larger or narrower, so is Equity."_

_-John Selden_[2]

The above-referenced adversary proceeding ("Adversary Proceeding") involves the

doctrines of equitable subordination (as set forth in section 510 of the Bankruptcy Code) and

---

[1] Amended only to make changes to Footnotes 100 & 117. The Judgment entered and docketed on April 9, 2013 at DE # 130 is not being amended. This Amended Memorandum Opinion supports such Judgment.

[2] JOHN SELDEN, TABLE-TALK: BEING THE DISCOURSES OF JOHN SELDEN, ESQ. (Jacobe Tonson, and Awsham and John Churchill eds., 3d ed. 1716).

recharacterization (a doctrine created in case law). Specifically, the Adversary Proceeding involves a dispute within a chapter 7 bankruptcy case between two different, sophisticated creditor groups wherein one creditor group (the plaintiffs) seeks to have the claims of the other creditor group (the defendants) either equitably subordinated to the plaintiffs' claims or recharacterized as equity. A chapter 7 trustee holds a pot of money (millions of dollars) that he cannot disburse until this Adversary Proceeding is resolved. As will be explained in detail below, the claims of the plaintiff-group, against the debtor-entity, originated first in time— having originated in connection with a so-called "roll up" of the plaintiffs' former, separate companies into the debtor-entity (*i.e.*, the debtor-entity was created in order to buy the plaintiffs' former companies, creating one big company, and the plaintiffs were each paid cash, notes payable, and stock for the purchase of their companies). The claims of the defendant-group that are sought to be subordinated or recharacterized were created much later, when the defendants made loans to the debtor-entity at a time when the debtor-entity was in serious financial distress (*i.e.*, unfortunately, the "roll up" did not create the synergies or profitable company that had been anticipated); moreover, the defendant-group loans were documented in such a way to entitle them to payment ahead of the plaintiff-group.

The court held a trial in the Adversary Proceeding over nine days in 2012. The court has decided to deny the requests for subordination and recharacterization. However, the court has decided that a subset of the Plaintiffs (who never executed certain documents—as later described herein) should be treated *pari passu* with the Defendants. The following are the court's findings of fact and conclusions of law pursuant to Fed. R. Bankr. P. 7052. Any finding of fact more appropriately regarded as a conclusion of law should be treated as such, and *vice versa*.

## I.     INTRODUCTION

This litigation began with the filing of an involuntary bankruptcy petition.  On December 1, 2009, six creditors[3] filed an involuntary chapter 7 bankruptcy petition against Equipment Equity Holdings, Inc., formerly named Strategic Equipment and Supply Corporation (referred to interchangeably herein as the "Debtor" or "SESC" or the "debtor-entity").  After initial opposition, the Debtor consented to an Order for Relief on May 25, 2010.  As of the Petition Date, the Debtor was no longer an operating company, as it had sold substantially all of its assets more than four years earlier.  Thus, upon the commencement of the bankruptcy case, the Debtor held, as its only remaining assets:  (a) approximately $3.6 million in cash; (b) certain alleged potential causes of action for fraudulent transfers and alleged breaches of fiduciary duty; and (c) a small minority equity interest in the Debtor's successor-in-interest, also known as Strategic Equipment and Supply Corporation ("New SESC").  New SESC is an operating restaurant and supply company, based in Dallas, and is majority owned by an affiliate of Brazos Private Equity Partners ("Brazos").

This Adversary Proceeding was filed on June 10, 2011, almost a year after the Order for Relief was entered.  The Adversary Proceeding, at its core, as alluded to above, is a dispute over the priority of payment among two groups of creditors:  (a) the individual holders of certain "Seller Notes" (the "Plaintiffs"); [4] and (b) the individual holders of certain "New Notes" (the

---

[3] The six petitioning creditors were Michael N. Palm, Shannon Palm, Kristen Palm, Harold Gernsbacher, Jr., Robert Zintgraff, and Zintgraff Investments, Ltd.

[4] Plaintiffs (who are also Counter-Defendants in this Adversary Proceeding) are: Harold Gernsbacher, Andrew Scruggs, James Scruggs, Lee Scruggs, William Scruggs, Robert Zintgraff, David Campbell, Reed Jackson, Cynthia Jackson, Lynda Campbell, Jeff Grandy, Jeffrey Vreeland, Walter Eskuri, Roger Vang, Reuben Palm, James Palm, Richard Palm, Mark Palm, Thomas Palm, Susan Palm, Maureen Palm, Pamela Palm, Kristen Palm, Gene Lee, Stephen Howze, and Stephen Reynolds, along with two additional individuals, Michael and Shannon Palm, who are proceeding *pro se* (when referred to individually, the "*Pro Se* Palms") (collectively, the "Plaintiffs").  Unless otherwise noted, any referral to the Plaintiffs will also encompass the *Pro Se* Palms.

"Defendants").[5]

The "Seller Notes" (herein so called) are those certain 9% Junior Subordinated Promissory Notes, issued by SESC. SESC issued Seller Notes in the aggregate principal amounts of $8,213,999.99 on or about January 14, 2000, then another $1,957,018.84 on or about September 12, 2000, and then another $5,111,816.73 on or about March 14, 2002, for a total of $15,282,825.70. The total outstanding balance of the Seller Notes as of May 25, 2010 (the date of the Order for Relief) was **$28,097,714.31**. The Plaintiffs collectively hold 100% of the Seller Notes.[6]

The "New Notes" (herein so called) are those certain 15% Junior Subordinated Promissory Notes issued by SESC on or about March 8, 2002, in the aggregate principal amount of $6 million (the "New Notes"). The total outstanding balance of the New Notes as of May 25, 2010 (the date of the Order for Relief) was **$31,759,850.84.** The Defendants collectively hold 100% of the New Notes, but one aspect of this is noteworthy. Six of the ***Plaintiffs*** that are, obviously, Seller Note holders (*i.e.,* Harold Gernsbacher, Jr., Robert N. Zintgraff, David Campbell, Reed Jackson, Andrew Scruggs and Walter Eskuri) also hold New Notes representing 7.35% of the outstanding balance of the New Notes. These individuals are named as nominal Defendants in their capacities as holders of both types of notes at issue in the Adversary Proceeding. However, these individuals have already agreed to the relief sought by the Plaintiffs in this Adversary Proceeding and are not adverse to the Plaintiffs. In other words, regardless of

---

[5] Defendants are: Glencoe Growth Closely-Held Business Fund, L.P., Stockwell Fund, L.P., Massachusetts Mutual Life Insurance Company, MassMutual High Yield Partners II, LLC, Glencoe Capital Partners II, L.P., the Estate of Thomas M. Garvin, Glencoe Capital Partners II, Thomas L. Bindley Revocable Trust, Kevin Bruce, Ed Poore, and Bill Aisenberg (collectively, the "Defendants").

[6] The *Pro Se* Palms hold Seller Notes representing 2.44% and .21%, respectively of the outstanding balance of the Seller Notes. The remaining Plaintiffs hold Seller Notes representing 97.35% of the outstanding balance of the Seller Notes.

**AMENDED MEMORANDUM OPINION**                                  **PAGE 5**

the outcome of this Adversary Proceeding, these individuals request that their New Notes be afforded the same treatment as Defendants' New Notes. For the avoidance of doubt, the Defendants who are *not* also Plaintiffs hold 92.65% of the outstanding balance of the New Notes.

With regard to this dispute over priority of payment, the holders of the Seller Notes have asserted three specific causes of action against the holders of the New Notes.[7] First, the holders of the Seller Notes have sought to recharacterize the New Notes as equity pursuant to the Fifth Circuit's holding in *Grossman v. Lothian Oil, Inc. (In the Matter of Lothian Oil, Inc.),* 650 F.3d 539 (5th Cir. 2011). As to the second and third causes of action, the holders of the Seller Notes further contend that the New Notes should be subordinated to the Seller Notes pursuant to sections 510(b) and (c) of the Bankruptcy Code. Additionally, the holders of the Seller Notes have requested a declaration that the underlying documentation evidencing the New Notes, which effectively subordinated the Seller Notes to the New Notes, is unenforceable against the holders of the Seller Notes.[8]

For the reasons articulated below, the court holds that the New Notes are properly characterized as debt and, thus, should not be "recharacterized" (under case law such as *Lothian Oil*) and are not subject to subordination under either section 510(b) or (c) of the Bankruptcy

---

[7] The current live pleadings in this proceeding are the: (1) Plaintiffs' First Amended Complaint for Equitable Recharacterization or Subordination of Claims Represented by the Debtor's 15% Junior Subordinated Notes, issued on or about March 8, 2002, filed on November 7, 2011 [DE # 39]; (2) Defendants' First Amended Answer Responding to Plaintiffs' First Amended Complaint for Equitable Recharacterization or Subordination of Claims Represented by the Debtor's 15% Junior Subordinated Notes, issued on or about March 8, 2002, filed on December 21, 2011 [DE # 44]; (3) Plaintiffs' First Amended Answer to Counterclaim of Certain Defendants, filed on January 4, 2012 [DE # 46]; and (4) Plaintiffs Michael and Shannon Palm's First Amended Answer to Counterclaim of Glencoe Defendants, filed on January 20, 2012 [DE # 50].

[8] The Defendants have not only asserted certain defenses to the Plaintiffs' various causes of action but have also counterclaimed that the holders of the Seller Notes will be unjustly enriched if they were to receive any payment on their Seller Notes before the New Notes are paid in full.

**AMENDED MEMORANDUM OPINION**                                                                 **PAGE 6**

Code.  As to the Plaintiff's declaratory judgment request, the court holds that certain of the

Plaintiffs are, in fact, entitled to *pari passu* treatment with the New Notes, due to the fact that

certain of these Plaintiffs did not execute an acceptable form of written consent to effectuate the

subordination of the Seller Notes to New Notes.  However, to the extent a Plaintiff gave adequate

consent to the subordination of the Seller Notes to the New Notes and signed documentation

evidencing such consent (in this case, through the execution of the Amended and Restated

Securities Purchase Agreement), the court believes that such Plaintiff consented to the

subordination of its Seller Notes to the New Notes and, thus, his/her Seller Notes will be treated

as such.

## II.    JURISDICTION

Bankruptcy subject matter jurisdiction exists in this Adversary Proceeding, pursuant to 28

U.S.C. § 1334(b).  This bankruptcy court has authority to exercise such subject matter

jurisdiction, pursuant to 28 U.S.C. § 157(a) and the Standing Order of Reference of Bankruptcy

Cases and Proceedings (Misc. Rule No. 33), for the Northern District of Texas, dated August 3,

1984.  "Core" matters are involved in this matter, pursuant to 28 U.S.C. § 157(b)(2)(A), (B), and

(O).  The bankruptcy court believes that it has Constitutional authority to issue a final judgment

in this matter.

Venue is proper in this district, pursuant to 28 U.S.C. § 1409(a), as the Debtor's chapter 7

case is pending in this district.

Finally, the statutes that substantively govern this dispute are primarily: 11 U.S.C. §§

502, 510(b), 510(c), and 105(a).  Federal Rules of Bankruptcy Procedure 7001(2) and 7001(8)

also apply.

## III.    FINDINGS OF FACT[9]

### A.    The SESC Roll-up and Seller Notes

1.    The Debtor, formerly known as Strategic Equipment and Supply Corporation, was engaged in the marketing, distribution and installation of commercial food service equipment and supplies.

2.    The Plaintiffs are the former owners of seven regional restaurant equipment and supply companies who sold their companies to SESC in 2000.

3.    In 1999, several of the Plaintiffs entered into discussions with the private equity firm known as Glencoe Capital, LLC ("Glencoe Capital" or "Glencoe"), pursuant to which the Plaintiffs contemplated selling their companies as a group and wanted to seek potential acquirers. In connection with this effort, certain of the Plaintiffs retained William Spalding, of the law firm of King & Spalding, as counsel, and Amy Forrestal, an investment banker, who at that time was employed with Bank of America.

4.    Glencoe Capital is a private equity firm, based in Chicago, Illinois. Defendant Glencoe Capital Partners II, LP, ("Glencoe Partners"), is a limited partnership that acts as an

---

[9] Unless otherwise noted by specific references to the Trial Record or Exhibits, the following facts are stipulated between the Plaintiffs and the Defendants pursuant to the Proposed Pre-Trial Order (See DE # 68). The *Pro Se* Palms were provided with drafts of the agreed stipulations, but did not provide any comments. The *Pro Se* Palms did submit their own proposed findings of fact (see DE # 82); however, these proposed findings were largely conclusions of law and did not contain any additional factual allegations not already contained in the Proposed Pre-Trial Order. Accordingly, to the extent the Plaintiffs stipulated to certain findings of fact, the court holds that such findings equally apply to the *Pro Se* Palms.

Any references to the Transcripts from the Trial will be referred to as [DE # _, pg. _]. The Transcripts from the Trial are located at DE ## 88, 89, 90, 100, 101, 102, 112, 113 & 114 in the docket maintained by the Bankruptcy Clerk for this Adversary Proceeding (Adv. No. 11-03362). Any references to Deposition Transcripts will be referred to as [ _ Deposition Transcript, pg. _]. All the Deposition Transcripts were submitted and admitted as Plaintiffs' Exhibits 233-241 & 243-246.

investment fund for its limited partners.[10]  Glencoe Partners was part of a group of investors consisting of itself, Ron Bane, Thomas Garvin, Glencoe Closely-Held Business Fund, L.P, the State of Michigan, as custodian for three (3) Michigan public employee retirements funds, Massachusetts Mutual Life Insurance Company, MassMutual High Yield Partners II, LLC, and MassMutual Corporate Investors (collectively, the "Glencoe Investors").[11]

5.      After a series of meetings in 1999, the Plaintiffs and Glencoe Capital mutually decided to pursue a roll-up transaction.  SESC was incorporated to act as the vehicle to acquire the various regional companies that would participate in the roll-up transaction.

6.      On January 14, 2000, SESC acquired the operations of six previously separate companies through a combination of stock and asset purchases (the "Roll-up Transaction").  In connection with the Roll-up Transaction, the Plaintiffs, with the exception of three Plaintiffs (Gene Lee, Stephen Howze and Stephen Reynolds), received in exchange for their respective ownership interests in, and the assets of, their companies aggregate consideration of **$67.6 million**, which was comprised of approximately $51.2 million in cash, $8,213,999.99 in 9% Junior Subordinated Promissory Notes (the "Seller Notes"), and SESC common stock (350,000 shares) valued at $8,213,999.99 for purposes of the transaction.[12]  The six companies acquired were Gernsbacher's, Inc., located in Fort Worth, Texas; Medley Restaurant Equipment and Supply Co., Inc., located in Albany, Georgia; Palm Brothers, Inc. located in Minneapolis,

---

[10] As of January 14, 2010, Glencoe Capital was the general partner of Glencoe Partners.  In March 2002, Glencap Managers, LLC was the general partner of Glencoe Partners, and Glencoe Capital was the manager of Glencap Managers, LLC.

[11] Beth Satterfield, who is currently a senior vice president, chief financial officer and chief operating officer of Glencoe Capital, testified that in terms of the dollars being fought over in this Adversary Proceeding, Glencoe Capital does not even have a financial interest in such funds, but rather it is the individual investors that will be affected by this lawsuit (*i.e.*, the Glencoe Investors).

[12] The purchase price of $67.6 million was derived based upon an estimate of EBITDA multiplied by 7.  DE # 113, pg. 140.

**AMENDED MEMORANDUM OPINION**                                              **PAGE 9**

Minnesota; St. Cloud Restaurant Supply, located in St. Cloud, Minnesota; Scruggs, Inc., located in Knoxville, Tennessee; and Top of the Table, Inc., located in San Antonio, Texas. All of the acquisitions were accounted for under the purchase method of accounting, which resulted in initial allocated excess of cost over the aggregate fair value of net assets acquired ("goodwill") of approximately $55 million.

7.     On September 11, 2000, SESC subsequently acquired the assets of a company owned by the remaining three Plaintiffs: W.H. Reynolds Distributor, Inc. ("W.H. Reynolds"), a Florida corporation. Plaintiffs Gene Lee, Stephen Howze and Stephen Reynolds owned W.H. Reynolds. They received consideration of $11.6 million, comprised of approximately $8.4 million in cash, $1.2 million in Seller Notes dated September 12, 2001, and SESC common stock (27,394 shares) valued at $1.2 million for purposes of the transaction.[13] In connection with the W.H. Reynolds acquisition, the other Plaintiffs were issued additional Seller Notes dated September 12, 2000 in an amount totaling $757,018.84.

8.     The total principal amount of all the Seller Notes is $15,282,825.70.[14] According to their terms, the Seller Notes earned 9% annual interest, which the Debtor was required to pay on a semi-annual basis on April 15 and October 15.[15] The Plaintiffs received one interest payment on account of the Seller Notes, and they have not received any further payments.[16]

---

[13] The purchase price of $11.6 million was derived based upon an estimate of EBITDA multiplied by 4.3, a much lower number than the multiple used in the original rollup that had occurred just eight months earlier (*i.e.*, 7). DE # 113, pg. 140.

[14] In addition to the Seller Notes referenced above, the Debtor issued additional Seller Notes in the aggregate principal amount of $5,111,816.73, on or about March 14, 2002, pursuant to the terms of the January 14, 2000 stock or asset purchase agreements and the Master Agreement of even date therewith.

[15] See Plaintiffs Exhibits 1-3, 5-7, 9-11, 13-15, 16-18, 20-22, 24-65, 67-87.

[16] DE # 89, pg. 175

**AMENDED MEMORANDUM OPINION**                                    **PAGE 10**

9.      As part of the Roll-up Transaction, the Glencoe Investors paid SESC $15.3 million at closing of the Roll-up Transaction in exchange for 65% of the Debtor's common stock.[17]  The Glencoe Investors also executed a Co-Investor Stockholders Agreement, dated January 14, 2000, (the "Co-Investor Agreement"), in which the Glencoe Investors agreed to vote their shares of stock in the Debtor in the same manner as Glencoe Partners.  Prior to March 8, 2002, the Co-Investor Agreement gave Glencoe Partners voting control of approximately 65% of Debtor's stock.

10.      After the Roll-up Transaction, SESC's shareholders contributed additional cash to SESC in August 2000, with the Glencoe Investors contributing $1.8 million and Plaintiffs contributing $1.2 million.  In September 2000, the Glencoe Investors contributed another $3 million to partially fund SESC's acquisition of W.H. Reynolds. Thus, as of the closing of the W.H. Reynolds acquisition, the Glencoe Investors had invested $20.1 million in SESC.

### B.      SESC's Additional Financing/Capital Structure

11.      The cash raised by SESC in connection with the Roll-up Transaction (the vast majority of which went to the Plaintiffs) was structured through a combination of debt and new equity, as shown below:

January 14, 2000 Cash Inflows to SESC:

$29.2 million   Senior Credit Facility (LaSalle Bank, Lead Syndication Agent)[18]
$10.0 million   Senior Subordinated Debt (purchased by Mass Mutual)
$15.3 million   Purchase of 650,000 shares (65%) by Glencoe Investors
**$54.5 million   Total Cash Provided by Initial Financing**

---

[17] The Plaintiffs received approximately 31% of the stock.  The small remainder of stock (4%) was made available to the Debtor's corporate officers as part of their compensation.

[18] There were 4 banks involved in the Senior Credit Facility: LaSalle (27.7%): Fleet (27.7%); Key (22.3%); and Heller (22.3%).  DE # 113, pg. 50 & 83; Plaintiff's Exhibit 111 & 117.

In total, SESC's initial financing and capital contributions generated $54.5 million in cash, of which $3.3 million was used to fund SESC's working capital and to pay transaction fees. Each component of SESC's debt is summarized in detail below.

12.     First, on January 14, 2000, the Company entered into a $41 million senior credit facility through a credit agreement between LaSalle and SESC, dated January 14, 2000 (the "Credit Agreement"). The credit facility initially consisted of two $10,500,000 term notes and a $19,000,000 revolving credit line. The Term A Note was payable in quarterly principal and interest installments, with a final maturity at December 31, 2004. The Term B Note was payable in quarterly principal and interest installments, with a final maturity at December 31, 2005. In connection with the later acquisition of W.H. Reynolds on September 11, 2000, the two term notes were increased $3 million each and the revolving credit line was increased to $23 million. The amount of quarterly principal and interest installments was increased with this refinancing, although the final maturities remained unchanged. This revolving credit facility matured on December 31, 2004. All such borrowings bore interest at the London Interbank Offered Rate (LIBOR), plus an applicable margin as set forth in the Credit Agreement. The senior facilities were collateralized by substantially all of SESC's assets. On a quarterly basis, the Credit Agreement required SESC to meet certain financial covenants, which included minimum earnings before interest, taxes, depreciation and amortization ("EBITDA"), minimum fixed charge coverage and senior and total debt to EBITDA ratios, among others.

13.     SESC also issued $10,000,000 of senior subordinated notes ("12% Mass Mutual Notes") on January 14, 2000 to Massachusetts Mutual Life Insurance Company, MassMutual High Yield Partners II, LLC, and MassMutual Corporate Investors (the "Mass Mutual Entities" or "Mass Mutual"). These 12% MassMutual Notes bore interest at a 12% nominal rate, payable

semi-annually. No principal payments were required under the 12% Mass Mutual Notes until final maturity at January 15, 2008. The 12% Mass Mutual Notes were issued pursuant to a January 14, 2000 Securities Purchase Agreement ("SPA") between SESC and the Mass Mutual Entities. The 12% Mass Mutual Notes were subordinated to the senior credit facility, pursuant to a Subordination Agreement, dated January 14, 2000. On a quarterly basis, the SPA required SESC to meet certain financial covenants, which include minimum earnings before interest, taxes, depreciation and amortization ("EBITDA"), minimum fixed charge coverage and senior and total debt to EBITDA ratios, among others.

### C. The Seller Subordination Agreements

14.     As part of the Roll-up Transaction, the Plaintiffs executed a January 14, 2000 Subordination Agreement with the Mass Mutual Entities (the "Seller Subordination Agreement"), which provided for the subordination of the Seller Notes to the Mass Mutual 12% Notes.[19] The Plaintiffs who owned W.H Reynolds executed a substantially similar agreement in September 2000.[20]

15.     Among other things, Section 3 of the Seller Subordination Agreement (as well as the subordination agreement executed by the Plaintiffs who owned W.H. Reynolds) provides:

> **Continued Effectiveness of this Agreement.** The terms of the Agreement, the subordination effected hereby, and the rights and the obligations of Subordinated Lenders and the Purchasers arising hereunder, shall not be affected, modified or impaired in any manner or to any extent by: (a) any amendment or modification of or supplement to the Securities Purchases Agreements, any other Operative Document or any Subordinated Loan Instrument; (b) the validity or enforceability of any of such documents; or (c) any exercise or non-exercise of any right, power or remedy under or in respect of the Senior Indebtedness or the Subordinated

---

[19] Plaintiffs' Exhibit 114.

[20] Plaintiffs' Exhibit 119.

**AMENDED MEMORANDUM OPINION**                                         **PAGE 13**

Indebtedness or any of the instruments or documents referred to in clause (a) above.[21]

16.     Recital B to the Seller Subordination Agreement signed by the Seller Noteholders in the initial Roll-up Transaction defines "Securities Purchase Agreements" as "those certain Securities Purchase Agreements dated January 14, 2000 (as the same have been and hereafter may be amended, modified or restated, the 'Securities Purchases Agreements')."[22]  However, the language is somewhat different in the Seller Subordination Agreement executed by the W.H Reynolds parties in September of 2000.  Specifically, Recital B of that Seller Subordination Agreement provided that

> The Companies and the Purchasers and have entered into those certain Securities Purchase Agreements dated as of January 14, 2000 (as amended by that First Amendment dated as of August 17, 2000 the "Securities Purchase Agreements") pursuant to which the Purchasers purchased certain notes (collectively, the "Notes") from the Companies and certain warrants (collectively, the "Warrants") from the Holding Company, subject to the terms and conditions of the Securities Purchase Agreements.  The Companies and the Purchasers now desire to enter into a Second Amendment to the Securities Purchase Agreements dated as of September 12, 2000 (the "Second Amendment").[23]

17.     The Seller Subordination Agreement also attached a form of the Seller Notes.

Each Seller Note contained a provision, entitled "Subordination," which stated that:

> By accepting this Note, the Holder, for itself and its successors and assigns, agrees that this Note is subordinate in the manner and to the extent provided in…that certain Subordination Agreement dated as of the date hereof…in connection with those certain Securities Purchase Agreements each dated as of the date hereof (the 'Securities Purchase Agreements')…as such Securities Purchase Agreements may hereafter be amended, modified, supplemented, restated, refinanced or replaced from time to time. . .[24]

---

[21] Plaintiffs' Exhibits 114 & 119, Section 3.

[22] Plaintiffs' Exhibit 114.

[23] Plaintiffs' Exhibit 119.

[24] Plaintiffs' Exhibit 114.

**AMENDED MEMORANDUM OPINION**                                                    **PAGE 14**

Thus, the court finds that there was conflicting language among the governing documents about whether or not the rights of the Seller Noteholders could be affected upon an amendment or modification of the SPA.

### D. The Operation and Management of SESC

18.     As part of the Roll-up Transaction, Glencoe Capital and SESC entered into a Management and Consulting Services Agreement, dated January 14, 2000 (the "Management Agreement") pursuant to which Glencoe Capital received a fee of $1,352,000 at the January 14, 2000 closing.  Pursuant to the Management Agreement, Glencoe Capital agreed to provide business advice and expertise to SESC in exchange for a consulting fee of $400,000 per year, plus an additional amount based upon SESC's sales.  SESC's credit agreement with the senior lenders capped this fee at $500,000 per year, not to exceed $125,000 per quarter.  As set forth in SESC's financial statements prepared by PricewaterhouseCoopers LLP, SESC paid Glencoe Capital management fees in the amount of $415,625 in 2000 and $500,000 in the years 2001 through 2004.

19.     Additionally, SESC entered into Employment Agreements with several of the Plaintiffs, calling for an annual salary of $150,000 per year plus bonuses, paid vacations, and other benefits.  Moreover, these Plaintiffs continued to manage their respective regional businesses as divisions of SESC, and SESC's upper-management would collect the financial data received from each division and consolidate that information for transmission to Glencoe Capital in a monthly financial package.[25]  Specifically, Jay Goldstein, who became the chief financial officer (the "CFO") of SESC in June 2001, credibly testified that:

> A:  the Strategic Equipment & Supply Company, as you mentioned, was the Roll-up of, I believe, seven separate companies. And initially, each company had their

---

[25] DE # 89, pgs. 20 & 182.

own IT systems, accounting systems. Eventually, we rolled them all up on a common platform. At the time that I left the company, only one of the legacy companies was not on the platform. That was Reynolds. The rest of the companies were on the common platform.

Q: All right. So when you put together that -- so you created a single -- a single integrated accounting report for the company?

A: Yes.

Q: Okay. And what did you do with that report?

A: I would -- well, I would forward it to Glencoe. It would obviously be also forwarded to various senior management members of the company.

Q: Such as Kevin Bruce?

A: Yeah, of course, yes.

Q: Sure. Sure. Why did you forward a copy of that accounting to Glencoe?

A: Well, they are the majority shareholder.[26]

Mr. Goldstein further credibly testified that as CFO, he would take direction from the chief executive officer (the "CEO") of SESC, Kevin Bruce,[27] as well as from Ron Wray (an officer of both Glencoe and SESC), Beth Satterfield (chief operating officer (the "COO") and CFO of Glencoe), and Louis Manetti (an employee of Glencoe) pursuant to the terms of the Management Agreement.[28]

20.     Pursuant to a Stockholders Agreement, dated January 14, 2000, Glencoe Partners had the right to designate six individuals to serve on SESC's nine member Board of Directors. Pursuant to the same Stockholders Agreement, the Plaintiffs received the right to designate the remaining three members of SESC's Board. Plaintiffs Harold Gernsbacher, Robert Zintgraff and

---

[26] DE # 89, pg. 18.

[27] Kevin Bruce was CEO for the majority of SESC's existence and became the CEO on June 19, 2001. DE # 101, pg. 159. However, Ron Bayne also served as CEO shortly after the company's inception until Kevin Bruce was hired. DE # 101, pg. 39-40.

[28] DE # 89, pg. 19.

**AMENDED MEMORANDUM OPINION**                                                    **PAGE 16**

Reed Jackson sat on SESC's Board in 2001 and 2002, when the Board considered and voted upon the issuance of the New Notes transaction described in detail below. [29] Glencoe Partners appointed the remaining six members of the Board. Terry Malone, who was employed by Glencoe Partners, served as chairman of the Board.

### E. The Debtor Defaults on Its Financial Covenants With Senior Lender LaSalle, Shortly After the Roll-up Transaction

21.     SESC was highly leveraged from its inception. On January 14, 2000, its first day of business, SESC had total assets of $93,139,387 and total liabilities of $68,411,122, of which goodwill and other intangibles comprised $56,715,897. Subtracting the stated value of goodwill, on its first day of business, SESC had a negative tangible net worth of $33,690,632. In fact, it was only a few months after beginning operations that SESC started to run short on cash.

22.     As stated previously, on August 17, 2000, the Seller Noteholders and the Glencoe Investors contributed $3 million in new equity capital to SESC. This was to maintain compliance with its lending covenants with SESC's senior lender, LaSalle.[30] In fact, at the time this money was contributed to SESC, Reed Jackson, one of the Seller Noteholders who contributed a portion of this $3 million, testified that he remembered being told this was due to the fact that Glencoe had paid too much to the Seller Noteholders in the original Roll-up Transaction and that, as a result, the company had already run out of working capital.[31] Despite this additional cash infusion, however, SESC's short reprieve from working capital shortfalls was short lived.

---

[29] Robert Zintgraff resigned from the Board in 2003. On September 9, 2004, Harold Gernsbacher and Reed Jackson resigned from the Board.

[30] Plaintiffs' Exhibit 115.

[31] DE # 101, pg. 274.

**AMENDED MEMORANDUM OPINION**                                    **PAGE 17**

23.     By May 22, 2001, SESC projected that it would breach certain of its lending covenants with LaSalle[32] and would require even more capital.[33]  SESC's projected FY2001 EBITDA was $11.5 million.  SESC's May 22, 2001 Board Meeting presentation indicated that SESC's first quarter 2001 EBITDA was below budget by more than 40%, as EBITDA of $1.289 million was 58.5% of the $2.204 million budget.  Why was SESC facing financial ruin so early after its inception?

24.     At the Trial, the court heard evidence that the Debtor's EBITDA was impacted by a multitude of issues including: (1) that SESC was unable to capitalize on any synergies that it potentially gained as a result of the Roll-up Transaction;[34] (2) that the September 11, 2001 tragedy had negatively impacted the hospitality industry as a whole in terms of gross earnings;[35] (3) that SESC tended to focus its business on pursuing high revenue but low-margin sales;[36] and (4) that one of the rolled-up companies (the entity owned by the Palms) had a disastrous 2001 performance.[37]  As to the factors, noted above, Jay Goldstein, SESC's CFO, credibly testified:

Q:  Did the company perform as well as its projections?

A:  No.

Q:  Why not?

A: I'll need a second to think about the answer --

---

[32] Specifically, SESC was in danger of breaching three covenants by the end of the second quarter 2001 (June 30), and four covenants by the end of 2001.

[33] Plaintiffs' Exhibit 125.

[34] DE # 90, pg. 45; *see also* DE # 101, pg. 268 (no synergies or economies of scale after merger other than eventually getting the accounting on one software system).

[35] DE # 101, pg. 258; DE # 113, pg. 56.

[36] DE # 101, pg. 259.

[37] The Palm Division had an EBITDA loss of -$700,000 in 2001 versus a $1.7 million dollar profit achieved in 2000, representing a difference of $2.4 million dollars.  In fact, SESC likely terminated Michael Palm in 2001, as a result of his division's poor performance.  DE # 102, pg. 195.

**AMENDED MEMORANDUM OPINION**                                                          **PAGE 18**

Q:  Sure.

A:   -- on that one. Why not?  You have a lot of factors that impact the performance. You had economic factors. Just overall economy of the country. We had several key management -- senior management members leave the company that had a lot of value -- brought in a lot of value for the company. We had some big customers that did not develop as many units as we originally thought they would. So you had multiple factors impacting the performance.

Q:  Did capital issues play a role as well?

A:  The capital issues played a role in terms of the bonding that we can get to do large construction jobs. Also, to a lesser degree, sometimes we had to manage our payables. We couldn't pay everybody on time so we might have lost some discounts here and there.

Q:  Okay. I want to talk a little bit about those discounts.  Would you tell the Court exactly what you mean by that because this is actually -- it's actually an important issue.

A:  Okay. Well --

Q:  You know your business --

A:  Right.

Q:  -- but she's learning.

A:  Right. Okay. When you [buy] product from suppliers, different suppliers have different terms. And sometimes the terms allow you to pay a little bit earlier to take advantage of a discount. It might be anywhere from one percent to maybe three, four or five percent off the bill.

Q:  And were those discounts important to the debtor's business?

A:  I wouldn't say they were [not] material to the company's business but they did have an impact, yes.

Q:  Okay. And would you continue telling the judge what you were saying before I rudely interrupted you?

A:  Yeah. You might have to help me with where I was going. Well, one thing that I was saying was that their cash was limited at times and we couldn't take advantage of all the discounts all the time. So we occasionally did lose discounts.

Q:  Okay. And did that affect earnings?

A: Well, it impacted earnings. I don't think it impacted earnings significantly but it did impact earnings.

Q: Okay. And what were you telling the Court about the effective capital issues on bonding?

A: Well, the -- in order to bid on large jobs, you needed to put up bonds. And there were periods of time over the course of my ten years at Strategic where we were limited to the amount of the bond that the bonding companies would put up for us. So we were effectively -- it excluded us from bidding on very large jobs. The other impact is because Strategic Equipment & Supply was a fairly leveraged company, the premiums that we had to pay for the bonds were a little bit high as well.

Q: Okay. And did those affect the company's earnings?

A: Again, I would say that it impacted it significantly but it did reduce the company earnings, yes.

Q: Okay. And did the inability to bid on certain large projects affect the company's performance?

A: Yes.

Q: And was lack of money or undercapitalization the reason why the debtor had trouble getting performance bonds?

A: I would say the reason the company had a problem getting performance bonds was just the overall leverage position of the company.

Q: Too much debt?

A: More -- the ratio of our debt to our equity was a little high.[38]

25.     As a result of these issues, SESC breached the financial covenants in its Senior

Credit Facility as of the end of the quarter ended June 30, 2001 as follows:

- The Fixed Charge Coverage Ratio (.93), was 7% below the covenant minimum of 1.0;

- The Senior Debt to EBITDA Ratio (4.08), was 36% above the covenant maximum of 3.0;

---

[38] DE # 89, pg. 43-46; *see also* DE # 101, pg. 260-263 (testimony from Reed Jackson about bonding capacity issues).

**AMENDED MEMORANDUM OPINION**                                                          **PAGE 20**

- The Total Debt to EBITDA Ratio (6.04) was 27% above the covenant maximum of 4.75; and

- Adjusted EBITDA ($9.4 million) was 16% below the covenant minimum of $11.2 million.

26.     SESC remained in breach of these same loan covenants for the fiscal quarters ending September 30, 2001 and December 31, 2001.

27.     On August 21, 2001, LaSalle Bank, acting as agent for the syndicate of lending banks, notified SESC that it had breached sections 10.6.1 through 10.6.4 (inclusive) of the Credit Agreement.   The covenants breached were:

- 10.6.1 - Fixed Charge Coverage Ratio;

- 10.6.2 - Senior Debt to Adjusted EBITDA Ratio;

- 10.6.3 - Total Debt to EBITDA Ratio; and

- 10.6.4 – EBITDA.

However, the August 21, 2001 letter from LaSalle did not impose specific penalties, but it did include a reservation of rights.[39]  As to the severity of these covenant breaches, Beth Satterfield credibly testified that:

Q:  Okay. And the actions that the bank were taking in terms of how they fall on the spectrum of the activity that the bank could take, how did you view these actions now that you were at Glencoe negotiating with the bank on these issues?

A:   Right. You know, this was certainly you know, much more of an extreme position that the bank was taking. Sometimes if a covenant is a small miss, you know, you might just send a quick letter, hey let's just get a quick -- one-page amendment. That's like on one level. And then this was very serious. I think the bank was very worried about the prospects of its loan getting paid back and you know, starting back in August, starting with its reservation of rights letters. A lot of times you don't even get those. They started there and they kept escalating their position.

Q:  Was there a concern that the bank would stop funding the revolver?

---

[39] It is also noteworthy that the Debtor was additionally in breach of its financial covenants imposed by the Mass Mutual 12% Notes in the second half of 2001.

**AMENDED MEMORANDUM OPINION**                                              **PAGE 21**

A: Yes.

Q: And if the bank -- were there discussions with the bank about that?

A: Yes.

Q: And the bank being LaSalle?[40]

Ms. Satterfield further credibly testified that:

Q: So when the defaults occurred then in June of 2001, this was not a -- this was an issue that LaSalle had been aware of in the past, the company was not meeting its plan?

A: Yes.

Q: Okay. And from the lender's perspective versus the first trip to the well or the second trip to the well, what does that mean?

A: Well, I think that this company was losing credibility with the banks. I mean even right from the beginning, the company was having working capital problems seven months after -- really less than seven months after the deal [the Roll-up Transaction] was done. And then when the Reynolds deal got done, covenants were reset to accommodate Reynolds, but also were to accommodate the fact that the company wasn't meeting its projections. And I think the bank was fairly accommodating and -- but over time, this company had the reputation of they haven't met a projection yet. And so there was a credibility issue.[41]

28.    Representatives of Glencoe Capital met with La Salle Bank on September 5, 2001.  At that time, SESC projected its 2001 EBITDA to be $9.5 million, which was $5.1 million, or 35%, below budget.

**F.    Glencoe Capital Begins Efforts to Remedy the Covenant Breaches With LaSalle**

29.    By no later than September 13, 2001, Glencoe Capital began developing a strategy to possibly recapitalize SESC.   Glencoe Capital initially considered investing the new capital in the form of an infusion of equity or preferred equity in SESC.[42]

---

[40] DE # 113, pg. 59-60.

[41] DE # 113, pg. 62.

[42] Plaintiffs' Exhibit 132.

**AMENDED MEMORANDUM OPINION**                                         **PAGE 22**

30.     On September 17, 2001, Mark Agnew[43] sent an e-mail to Beth Satterfield[44] stating as follows:

> Beth,
>
> With a somewhat back of the envelope calculation. . . . . Glencoe's returns are at 10.5% with a $3.250 million debt piece (65% of $5 million, so seller's are forking over $1.75 million, so this is conservative) which takes a total of 80% of the equity value of the company at exit.
>
> Obviously, moving parts of this analysis include Mass Sub debt warrants, management ISO, etc. . . at some point we should sit down and discuss modeling questions (assumed the traditional debt increases Goodwill on the Company) and figure out how this entire thing is going to work.
>
> On the term sheet side, I read both . . . . I am sure we will want the term sheet that designates what percent of the combined entity we want rather than a set return . . .
>
> Hope you had a nice weekend
>
> Mark

Based upon the above-quoted e-mail, the court finds that by September 17, 2001, Glencoe Capital was considering the idea of contributing more funds to SESC.

31.     On September 25, 2001, Lincoln Partners, LLC ("Lincoln Partners"), which is a corporate finance advisory firm that had previously done work for Glencoe Capital, made a presentation to Glencoe Capital regarding a possible recapitalization of SESC.[45]  In its presentation to Glencoe Capital, Lincoln Partners outlined parameters and potential options for a recapitalization of SESC.[46]  Two points addressed in that presentation were as follows: (1)

---

[43] Mark Agnew was an employee and/or principal of Glencoe Capital between September 13, 2001 and March 8, 2002.

[44] Beth Satterfield was an employee and/or principal of Glencoe Capital between September 13, 2001 and March 8, 2002.  Prior to working at Glencoe Capital, Ms. Satterfield worked for LaSalle Bank as a commercial lender.  Ms. Satterfield is also currently the COO and CFO of Glencoe Capital.  *See* Beth Satterfield Deposition Transcript, pg. 11-12, 92.

[45] Plaintiffs' Exhibit 135.

[46] *Id.*

**AMENDED MEMORANDUM OPINION**                                      **PAGE 23**

"SESC needs additional equity to reduce leverage," and (2) "How should a new round of equity capital be structured and priced?"[47] Lincoln Partners further indicated that a new round of equity capital could be invested as a subordinated promissory note with high accrual of PIK (payment in kind) interest, coupled with a rights offering. There was also a hand-written arrow on a chart of SESC's capital structure below the 12% Mass Mutual Notes and ahead of the Seller Notes.[48]

32.     On October 5, 2001, Lincoln Partners sent Glencoe Capital a draft of an engagement letter to write a fairness opinion to SESC's board of directors. The proposed transaction described by the draft engagement letter is as follows:

> In the proposed financing (the "Financing"), the Company will sell up to $10 million of newly issued senior subordinated notes (the "Senior Subordinated Notes Class B"), which will be subordinated to any senior indebtedness of the Company; have priority over the existing seller notes and common equity; have a non-cash coupon of approximately 25%; and have detachable warrants for the purchase of additional equity interest in the Company.

While the concept of new capital coming into an insolvent company and priming existing debt has been argued in this Adversary Proceeding to be somewhat unconventional, Ronald Kahn, an owner and senior member of Lincoln Partners, testified that it "happens all the time. It's what's called a down round."[49] In response to whether such transaction had to be consensual, Mr. Kahn further testified that:

> A: Not necessarily. If a company's insolvent and somebody's willing to put some money in and legally they can put it in at a layer that they won't be under water, happens all the time.

> Q: So, you're saying that in your experience you can put equity into a company and prime existing debt without the consent of those note holders?

> A: You know, whether you call it equity or debt, the fact of the matter that it goes in at a certain layer so that it is -- it is not under water, 'cuz why would anybody

---

[47] Id.

[48] Id.

[49] Ronald Kahn Deposition Transcript, pg. 47-48.

put money in that's under water, to keep a company solvent happens very frequently.

Q:  Does it only happen to companies that are insolvent?

A:  Not necessarily. It may happen for growth capital, depending upon what valuations have declined. The company might not be insolvent, but it still could happen, sure.

Q:  And are not most of those transactions done consensually; that is, the debt which is being subordinated or being made inferior to some other investment agrees to the treatment in order to keep the company alive?

A:  I don't know if that's -- if that's necessarily correct 'cuz sometimes people just run out of capital and a company needs more capital for growth, and so, it's done those times.

Q:  Can you give us any instance in which you ever saw that done?

A:  First of all, I'm not sure I could even say it for confidentiality reasons, but I've seen it with venture capital deals very often.[50]

33.     On October 8, 2001, Beth Satterfield and Ronald Wray spoke by telephone with

Robert Shettle, a representative of Mass Mutual, regarding the potential structure for a

recapitalization of SESC.   Ms. Satterfield and/or Mr. Wray explained that the new capital would

be infused into SESC in the form of notes, which would have priority over the Seller Notes and

would have a feature calculated to capture 80% of the residual value of SESC after payment of

the senior indebtedness (which residual value would also be paid ahead of the Seller Notes.)  The

October 8, 2001 discussion between Mass Mutual and Glencoe Capital is recounted in Mr.

Shettle's

e-mail to Beth Satterfield dated October 15, 2001.[51]  In the body of Mr. Shettle's e-mail, he

inquires as to the following:

. . . One question regarding the structure as you and Ron [Wray] explained it last Monday:

---

[50] *Id.* at pg. 48-49.

[51] Plaintiffs' Exhibit 143.

As we understand it, the new capital goes in some form of debt so that it is ahead of the Seller paper. It will have a PIK feature (15% was the amount mentioned last week). Aside from the PIK accumulating, I think the security has a feature so that it will be worth 80% of the residual value of the company after the senior and the sr. subordinated debt is paid off (the Mass Mutual notes). I understood it to be that the 80% residual value would be paid before the satisfaction of the seller notes and the existing equity. Is that the way it would work or would the 80% residual be after the seller notes are paid? Is it *legal* for the additional value to come before the seller notes as the seller notes are debt? . . . [52]

Based on these correspondences, the court finds that at least by October 8, 2001, Glencoe Capital had determined the basic structure of how the New Notes transaction was going to work—and it was Glencoe Capital's contemplation that the New Notes would have priority over the Seller Notes.

34.     In terms of legal representation during the course of the New Notes transaction, Scott Williams of McDermott Will & Emery ("MWE"), served as legal counsel to both SESC as well as Glencoe.[53] While on its face, this appears to be somewhat of a conflict of interest, Kevin Bruce, SESC's former CEO, pointedly testified:

Q: So the same law firm was simultaneously representing the issuer of the new notes [SESC] and the investor group that would be the largest purchaser of the new notes, correct?

A: Yes.

Q: Did you see a conflict of interest there?

A: Not directly.

Q: Why not?

A: Glencoe had given their position as -- on the board also had a very strong fiduciary responsibility to all the shareholders and stakeholders. So as such, there was – I didn't see a direct conflict with the fact that the expertise from McDermott Will & Emery would be deployed against the needs of the company at that time.

---

[52] *Id.* (emphasis added)

[53] DE # 89, pg. 22. In addition, Michael Boykins and Will Hoy also worked with Mr. Williams on SESC and Glencoe matters. Scott Williams Deposition Transcript, pgs. 17-18 & 21-22.

Q: Okay. So McDermott Will & Emery had a fiduciary responsibility to everybody?

A: I'm not sure if they had a fiduciary responsibility to everybody, though they represented the company.

Q: I misspoke. I heard what you said, and I misspoke. What I meant to say was Glencoe had a fiduciary responsibility to everybody.

A: From a board perspective, sure. Yes.

Q: Okay. Had a fiduciary responsibility to the board?

A: Um-hum, yes.

Q: A fiduciary responsibility to creditors?

A: Yes.

Q: And to the shareholders?

A: Correct.

Q: And fiduciary responsibility; that entails full disclosure, doesn't it?

A: That is a certain one requirement. Full disclosure, relying upon, you know, reasonable opinions of experts and others, in my understanding, also requires that you put the needs of the stakeholders, shareholders ahead of your own.[54]

Moreover, Scott Williams, the MWE lawyer previously mentioned, testified that while Glencoe's and SESC's interests were not "perfectly aligned," that with respect to "getting the restructuring done Glencoe and SESC had the same interests" and that "absent a recapitalization, there would have been a lot of bad things that happened to every part of the capital structure."[55]

35.    Additionally, the court heard evidence that the Board of Directors obtained separate counsel (Gardner, Carton & Douglas) that was independent to the entity SESC's counsel.[56] The court finds this to be important and an indication of prudence and sensitivity

---

[54] DE # 101, pg. 175-176.

[55] Scott Williams Deposition Transcript, pg. 90-91.

[56] Plaintiffs' Exhibit 157.

regarding fiduciary duties by those spearheading the recapitalization project. While the court heard little evidence regarding what services this law firm provided to the Board, the minutes of a Board meeting held on November 20, 2001 reflect that one of the lawyers of Gardner, Carton & Douglas, Stephen A. Tsoris, "provided guidance to the Directors on the applicable legal standards and distributed to each Director a memorandum setting forth those standards."[57]

36.     The Board held a meeting on October 8, 2001.[58] The minutes of that meeting reflect that the Board voted to appoint a Special Finance Committee, consisting of Terrance Malone, Richard Coonrod, and Thomas Bindley, to examine and develop strategies to recapitalize SESC. Terrance Malone, Richard Coonrod, and Thomas Bindley were each members of Glencoe Capital's executive network.

37.     Meanwhile, things were getting even more tumultuous with the senior lender, LaSalle. On October 10, 2001, LaSalle sent a letter to SESC demanding that SESC stop making semi-annual interest payments to the holders of the 12% Mass Mutual Notes and to the holders of the Seller Notes.[59] Additionally, on October 17, 2001, LaSalle sent SESC a letter notifying SESC of its intent to impose a default rate of interest one percentage point higher than the regular contract rate, and reserving the right to charge a default rate of interest two percentage points higher than the regular contract rate if SESC had not entered into definitive documentation of a restructuring of the Credit Agreement by December 1, 2001.[60] Consequently, on October 17, 2001, SESC sent a letter to the holders of the Seller Notes informing them that SESC would

---

[57] *Id.*

[58] Plaintiffs' Exhibit 139.

[59] Plaintiffs' Exhibit 142.

[60] Plaintiffs' Exhibit 144. While LaSalle did impose the 1% Interim Rate Increase, it did not impose the 2.00% default rate. Using SESC's December 31, 2001 senior credit agreement facility loan balance of approximately $39 million, the imposition of a 2% Default Rate Increase would have cost SESC roughly $780,000 annually.

not make the interest payment due to the Seller Noteholders on October 15, 2001, due to the defaults under the Credit Agreement.[61]

38.     On October 23, 2002, Mark Agnew (of Glencoe) sent an e-mail to Beth Satterfield (also of Glencoe) with the subject line Rights Offering Draft.  Mr. Agnew asked Ms. Satterfield the following questions:

1.) Multiple of exit (should it stay the same for each year and what should it be)

2.) How much equity are we putting in

3.) What percent of the new equity does glencoe put in

4.) What are components of new equity (PIK, at what rate? etc.)

5.) Assuming we want to use bank case (or Jay's case) with this analysis

6.) Right now model is spitting out a 16.8% IRR. . . is there a target IRR we want to hit, is this it?  Do we want to get a 20% blended IRR in each year . . . [62]

The Plaintiffs have argued that this is just one of several e-mails demonstrating that Glencoe was actually viewing its contemplated new investment as an equity contribution rather than debt. The court does not believe these e-mails merit this degree of conclusiveness.  First, Glencoe Capital was still exploring options and structure.  Moreover, Glencoe Capital was a private equity firm, and as such, any money that they invested was equity to them.  It was not equity from the perspective of SESC, but rather from the perspective of the Glencoe Investors.  As credibly stated by Beth Satterfield:

A: But you have to remember that Glencoe put -- only puts in equity from our limited partners and then we put that in in various forms. It could be debt. It could be subordinated debt. It could be preferred security. But we always put equity in.

Q: By definition, you always put equity in?

A: Well, by definition, we are a private equity firm.

---

[61] Plaintiffs' Exhibit 145.

[62] Plaintiffs' Exhibit 147.

Q: Right.

A: So we call capital from our limited partners. We discussed this at the beginning, with our Fund II investors, right.

Q: Uh-huh.

A: We call their money and then we return it to them, ultimately. That's what private equity does. But when we're holding their money --

Q: Uh-huh.

A: -- we put it into portfolio companies in various ways.

Q: Right.

A: So for us, we would never say how much debt are we putting in? It's always how much equity are we putting in because our funds send us equity.

Q: Okay.  So when he says equity, it could be equity or debt? Would it -- would it be --

A: You're -- you're confusing two concepts.

Q: Would it be more accurate to read equity as simply the word money?

A: Right.[63]

39.     Shortly after these correspondences, representatives of Glencoe Capital and

LaSalle began exchanging term sheets contemplating the restructuring of the LaSalle Credit

Agreement.  Glencoe Capital asserts that it was properly exercising the authority granted to it

under the Management Agreement to negotiate with LaSalle regarding this restructuring.

Specifically, the introductory paragraph of the Management Agreement provided that:

> Whereas, Strategic Equipment and Supply Corp. . . . desires to avail itself of the business experience and operating expertise of Glencoe Capital, L.L.C. ("Glencoe Capital") in strategic planning, negotiating and procuring contracts, tax planning, investor relations, cost controls, compensation structure, government relations and other areas of corporate management.[64]

---

[63] Beth Satterfield Deposition Transcript, pgs. 158-59.

[64] Plaintiffs' Exhibit 110.

Section 2 of the Management Agreement entitled "Services" further provided that:

> (a) Glencoe Capital shall advise the Company concerning such corporate matters as relate to strategic planning, procurement of contracts, tax planning, investor relations, costs controls, compensation structure, government relations and other management matters related to the Company's business and affairs, and as to such other matters as the parties determine to be appropriate.[65]

> (b) Glencoe Capital shall perform all such services as an independent contractor to the Company and neither Glencoe Capital nor its affiliates nor any of their respective directors, officers, consultants, agents or employees shall be liable for any advice offered or action taken by it or them in connection with this agreement. Glencoe Capital shall not, but virtue of this agreement, be considered an employee, agent or representative of the Company and will not have by virtue of the agreement any authority to set for or bind the Company without the Company's prior written consent.

The court finds that Glencoe Capital was, indeed, properly exercising its powers under the Management Agreement when it began corresponding with LaSalle on how to remedy the defaults under the Credit Agreement. As further evidence of this fact, Jay Goldstein, SESC's CFO at the time, credibly testified that Glencoe Capital managed and controlled the capital side of the business and really drove the banking relationship with LaSalle.[66] Moreover, pursuant to section 2(b) of the Management Agreement, while Glencoe Capital certainly had the implicit ability to assist in negotiations with SESC's creditors, SESC would still ultimately need written consent by its Board and officers to ultimately act on any negotiations made between Glencoe Capital and LaSalle.[67]

40.     On October 25, 2001, William Sykstus, a loan officer at LaSalle,[68] transmitted a proposed term sheet for the New Notes to Beth Satterfield of Glencoe for her review. That proposed term sheet contemplated a $7 million capital contribution in the Debtor in the form of a

---

[65] *Id.*

[66] DE # 89, pg. 23.

[67] Scott Williams Deposition Transcript, pg. 83.

[68] DE # 89, pg. 22.

**AMENDED MEMORANDUM OPINION**                                    **PAGE 31**

PIK (payment in kind) security instrument, subordinated to the LaSalle Credit Agreement and the 12% Mass Mutual Notes. Concurrently with the receipt of the proposed term sheet from LaSalle, SESC's counsel, MWE, began working on the documents that would ultimately effectuate the New Notes transaction.[69]

41.     Also on October 25, 2001, the Debtor signed an engagement letter with Lincoln Partners, retaining Lincoln Partners to prepare an opinion regarding whether the proposed New Notes were fair to the Debtor's shareholders from a financial point of view. Specifically section 1 of the engagement letter provides that

> SESC hereby engages Lincoln for the purpose of providing an opinion (the "Opinion") as to whether the price and terms of the proposed Financing (defined herein) is fair to the shareholders of the Company from a financial point of view. In the proposed financing (the "Financing"), the Company will sell newly issued senior subordinated notes . . .[70]

The court finds that the term "senior subordinated notes" implies that these New Notes would necessarily be of a higher priority than the Seller Notes, which were referred to on their face as the "15% Junior Subordinated Note."

42.     On November 5, 2001, Louis Manetti[71] sent an e-mail to Beth Satterfield and Mark Agnew (both of Glencoe) listing bullet points for discussion with LaSalle regarding the New Notes.[72] The attachment to that e-mail states that the "*Banks would like the seller notes to VOLUNTARILY PIK the seller notes, while Glencoe feels that it would be difficult to get 100% to agree to such a move. Accordingly, Glencoe feels that the banks need to pursue options under*

---

[69] Plaintiff's Exhibit 188.

[70] Plaintiffs' Exhibit 149.

[71] Louis Manetti was an employee and/or principal of Glencoe Capital between September 13, 2001 and March 8, 2002.

[72] Plaintiffs' Exhibit 150.

**AMENDED MEMORANDUM OPINION**                                            **PAGE 32**

*the current agreements.*"[73]  Based upon this e-mail, the court finds that Glencoe Capital had

formed a belief that they did not think that the Seller Noteholders would voluntarily agree to

accept PIK interest on the Seller Notes.

43.    Several additional correspondences regarding the New Notes transaction were

made on November 7, 2001.  First, Mark Agnew (of Glencoe) sent an e-mail to Robert Shettle

(of Mass Mutual), copying Louis Manetti and Beth Satterfield (both of Glencoe), transmitting a

recapitalization model depicting a $3 million capital infusion and explaining that $5 million to $7

million likely would be required to satisfy LaSalle.

44.    Also on November 7, 2001, William Sykstus (of LaSalle) sent an e-mail to Louis

Manetti (of Glencoe), transmitting an attached LaSalle Term Sheet which Mr. Sykstus referred to

as "LaSalle's latest proposal."  The attachment to the e-mail contains two proposals for treatment

of the Seller Notes:

> Accrued and ongoing interest will be voluntarily PIK'd by the subordinated
> noteholders until after repayment in full of all senior bank debt; **OR** [i]nterest
> paid to the extent permitted by Senior Credit Agreement and existing Seller
> Subordination Agreements, with any actual dollars required to be paid out by the
> Company fully funded by Glencoe and its affiliates.[74]

Louis Manetti then forwarded this e-mail to Ronald Wray, Beth Satterfield, and Mark Agnew.

45.    On November 9, 2011, William Sykstus sent an e-mail to Beth Satterfield,

transmitting a draft of the LaSalle Term Sheet for the New Notes.  Mr. Sykstus' e-mail to Ms.

Satterfield stated that the e-mail contained the LaSalle Term Sheet "reflecting what we

discussed."  The LaSalle Term Sheet attached to the e-mail proposed the following treatment of

the Seller Notes:  "Accrued and ongoing interest will not be paid."  Plaintiffs assert that this

---

[73] *Id.* (emphasis in original).

[74] (emphasis added).

change in the treatment of the Seller Notes was proposed by Glencoe Capital. Specifically,

Plaintiffs rely on certain statements made by Beth Satterfield during the Trial that:

> A: Right, but that's—LaSalle just wants the money to come into the company. That's what they care about.
>
> Q: LaSalle doesn't care how the money comes in, correct?
>
> A: Correct.
>
> Q: Right.
>
> A: Well, as long as it's subordinate to the senior sub debt and the senior bank debt, they don't care.
>
> Q: Right.[75]

Specifically, the Plaintiffs infer and argue from this testimony that LaSalle did not care about

how the New Notes transaction was structured as long as the money came in and it was

subordinate to LaSalle's debt and the Mass Mutual debt. However, if LaSalle did not care at all

about how the New Notes transaction was structured, why would it be exchanging terms sheets

with SESC and Glencoe in the first place? While the court does find that LaSalle's primary goal

was to get money infused into SESC and for such money to be subordinated to LaSalle's debt

and the Mass Mutual debt, LaSalle certainly had its reasons for providing its input on how the

New Notes transaction was to be structured, especially in light of the ongoing financial

difficulties that SESC had been experiencing. However, even if LaSalle did not care about the

structure of the New Notes transaction, the court does not find the proposed change in treatment

unusual, surprising, or problematic. *SESC was in a liquidity crunch. It was in severe financial

distress.* In any event, as pointed out by Scott Williams who was counsel for SESC, the phrases

"Accrued and ongoing interest will be voluntarily PIK'd by the subordinated noteholders until

after repayment in full of all senior bank debt" and "Accrued and ongoing interest will not be

---

[75] Beth Satterfield Deposition Transcript, pgs. 192-193.

paid" ultimately result in the same thing (the Seller Notes not getting paid interest). This court believes LaSalle was requiring that no interest be paid on Seller Notes as long as the senior bank debt was outstanding under either scenario.[76]

46.  On November 9, 2001, Mark Agnew sent an e-mail to Beth Satterfield, transmitting a draft of a "Business and Financial Update" for SESC, a final version of which was ultimately included in the Subscription Booklet (described in more detail below). The draft attached to Mr. Agnew's e-mail contains the following description of the proposed New Notes transaction under the heading "Capital Infusion":

> Glencoe is proposing to infuse a senior subordinated debt piece that is junior to the existing senior and sub debt but senior to the existing seller notes and earn-out notes. The piece will be structured to accrete PIK interest plus take a ___% the enterprise value of the Company when a sale of the Company takes place. The sub debt piece will be offered pro rata to existing shareholders of the Company. The Board of Directors hired Lincoln Partners, an investment bank, to write a fairness opinion regarding the pricing of this security at market terms. After meeting with each division head and detailed analysis on comparable trading comps and comparable transaction comps, Lincoln partners determined that the terms of the capital infusion were placed at acceptable market terms.

47.  Even though LaSalle was negotiating and working with SESC on remedying its defaults under the Credit Agreement, it nonetheless continued to notify SESC about its continuing defaults under the Credit Agreement. Specifically, on November 16, 2001, LaSalle notified SESC of its intention to impose reserves against SESC's borrowing base based upon its continuing defaults under the Credit Agreement.[77]

---

[76] Scott Williams Deposition Transcript, pg.131.

[77] Neither the Plaintiffs nor the Defendants provided any evidence at Trial on whether such reserves were actually imposed. However, it is undisputed that SESC did not miss any principal or interest payments to LaSalle, LaSalle did not sue SESC, and that LaSalle did not accelerate the indebtedness. On the other hand, it is also undisputed that LaSalle had the right to accelerate the full amount of the senior lending facility for which it served as agent due to SESC's breaches of its financial covenants.

**AMENDED MEMORANDUM OPINION**                                    **PAGE 35**

### G.   The New Notes Transaction is Presented to the Board of SESC

48.   On November 20, 2001, the Board held a meeting to discuss SESC's financial condition and the proposed New Notes transaction.  The minutes from the November 20th board meeting reflect the following:

- Mr. Malone discussed the role of the special finance committee in light of the resignation of Thomas Bindley and the association between the members of the special committee and Glencoe Capital.

- The Special Finance Committee of the Board, appointed on October 8, 2001, was dissolved.

- Beth Satterfield summarized Glencoe Capital's negotiation with LaSalle.

- The minutes of that meeting reflect that the members of the Debtor's Board in attendance included Terrence Malone, Kevin Bruce, David Evans, Richard Coonrod, Harold Gernsbacher, Jr., S. Reed Jackson, and Ronald Wray, and that Robert Zintgraff attended by telephone.

- Others in attendance included Ronald A. Kahn, Susan Wilson, and Alysia Tan of Lincoln Partners, Steven Tsoris and Nancy Laetham of Gardner, Carton & Douglas, special counsel to the Board, Scott Williams and Michael Boykin of McDermott Will & Emery, outside counsel to the Debtor, Jay Goldstein, CFO of SESC, and Beth Satterfield and Louis Manetti of Glencoe Capital.

- Robert Shettle of Massachusetts Mutual Life Insurance Company and William Hoy, of McDermott Will & Emery, attended by telephone.

Also at this Board meeting, David Evans, who was both a Board member as well as a principal at Glencoe Capital, spoke about the dire financial condition of the company and that if additional monies were not put into the company, that the  company would go bankrupt.[78]  While some of the Plaintiffs have argued that David Evans may have exaggerated the dangers SESC was facing, Reed Jackson, who had just recently joined the Board, testified credibly that the "significance of

---

[78] DE # 89, pg. 207.

**AMENDED MEMORANDUM OPINION**                                           **PAGE 36**

the financial difficulties was serious and it was real."[79] The court does not find that there was any over-dramatized displays taking place by Mr. Evans. SESC was clearly in a financial pickle.

49. After these statements by Mr. Evans, Lincoln Partners made a power point presentation to the Board which, among other things, addressed the proposed New Notes transaction. Lincoln Partners also provided the members of the Board with a draft report summarizing its analysis. Lincoln Partners reported that: (1) the new capital infusion in SESC would take the form of $6,000,000 in new senior subordinated notes (*i.e.*, the New Notes), which would bear PIK (payment in kind) interest at 15% and would come ahead of the Seller Notes in payment priority; (2) the New Notes would also have a provision requiring an additional payment to the holders of the New Notes upon a sale of the Debtor or substantially all of its assets; (3) the additional payment would be measured by 25% of the sale proceeds remaining after payment of the senior debt to LaSalle under the Credit Agreement and the 12% Mass Mutual Notes; (4) the New Notes would come with warrants for 60% of SESC's common stock; and (5) the New Notes would be offered only to SESC's existing shareholders and allocated pro rata in accordance with their respective share ownership.

50. On November 22, 2001, Reed Jackson, one of the Plaintiffs (*i.e.*, the Seller Noteholders) and a member of the Board at the time, sent an e-mail to certain Seller Noteholders regarding the proposed New Notes transaction. In this e-mail, Mr. Jackson refers to the New Notes as the "Mother of All Notes," a term dubbed by Mr. Gernsbacher (another Plaintiff and Seller Noteholder).[80] This certainly suggests to the court that there was a clear understanding (at least by Plaintiffs Jackson and Gernsbacher) of some of the significantly lucrative features of the New Notes—obviously designed to compensate for risk. Mr. Jackson also created a spreadsheet

---

[79] DE # 102, pg. 223.

[80] Defendants' Exhibit 57.

based on Lincoln Partners' modeling, depicting how the Plaintiffs' Seller Notes and the equity would be impacted by the infusion of the proposed New Notes. He noted in his message to the Seller Noteholders that "there are many variables that will [a]ffect the outcome of each scenario (*i.e.*, EBIDTA amount, multiple of EBIDTA and revolver balance on date of sale, etc). Each of these scenarios are based on assumptions in the future which obviously cannot be accurately projected." As a follow-up, on November 26, 2001, Mr. Jackson sent an e-mail transmitting a spreadsheet concerning the proposed New Notes transaction. The spreadsheet utilized numbers from Lincoln Partner's "market growth" assumptions from the November 20, 2001 draft report. Finally, on November 27, 2001, Mr. Jackson sent a correspondence to Beth Satterfield attaching a spreadsheet analysis depicting different models he had made in order to help him communicate to the shareholders the reasons that the New Notes were both a necessary and powerful new security.[81]

51. Concurrently, Mr. Gernsbacher, who was also the holder of a Seller Note and a member of the Board, began discussing and analyzing the New Notes transaction with other parties. Specifically, Mr. Gernsbacher testified that he and Jay Goldstein (SESC's then-CFO) had conversations about the New Notes.[82] Moreover, Mr. Gernsbacher also talked to other Seller Noteholders about the New Notes transaction and whether those parties were interested in investing. Specifically, Mr. Gernsbacher testified that, "In general, there was a jaundiced view of what would happen. There was a general distrust of Glencoe that had begun seeping in on the company at that point, and that most people were not going to put forth any more money towards this -- towards this opportunity."[83] However, Mr. Gernsbacher also testified that, despite these

---

[81] Defendants' Exhibit 61.

[82] DE # 89, pgs. 217-218.

[83] *Id.* at 219.

**AMENDED MEMORANDUM OPINION** **PAGE 38**

responses, he nonetheless planned on purchasing a New Note to try and protect his investment in the company as well as a belief (although he believes mistaken) that he was still a member of the management team.[84]

52.     On November 26, 2001, the Board held a telephonic meeting to discuss the proposed New Notes transaction.  The minutes of that meeting reflect that Ronald Wray summarized his understanding of the current status of the proposed transaction.  The minutes of that meeting reflect that "Mr. Gernsbacher summarized his discussions with the selling shareholder group and noted that he and Mr. Jackson had met with Lincoln Partners LLC to create a model from the perspective of the selling shareholders.  Mr. Gernsbacher noted that many shareholders are interested in hearing the Lincoln Partners' presentation that the Directors heard on November 20."[85]  The minutes of that meeting further reflect that David Evans stated that "Glencoe Capital would like to modify the amount and terms of the proposed security to provide downside protection for all participating shareholders."  Finally, the minutes of that meeting further reflect that

> [t]he Directors discussed the process necessary to complete the proposed transaction and agreed that William Spalding, counsel for Messrs. Gernsbacher, Jackson and Zintgraff, should be afforded an opportunity to speak to Mr. Kahn and Ms. Wilson of Lincoln partners regarding their analysis of the proposed transaction.  The Directors also agreed that the changes to the security proposed by Mr. Evans should be communicated to Lincoln Partners for their analysis.  The Directors discussed the appropriate time to vote on the proposed transaction.

53.     On November 30, 2001, the Board held another meeting to consider the New Notes transaction.  The minutes of that meeting reflect that Louis Manetti, of Glencoe Capital,

---

[84] *Id.* at 218.

[85] At the Trial, Mr. Gernsbacher testified that he did not believe these minutes to be entirely accurate since he and Mr. Jackson, although meeting with Lincoln Partners, never met to create any type of modeling.  DE # 89, pgs. 222-223.  However, Mr. Gernsbacher also testified that he never sent any written objections that the Board minutes were not accurate.  DE # 90, pg. 142.

**AMENDED MEMORANDUM OPINION**                                        **PAGE 39**

was appointed to the Board to replace Thomas Bindley, who had resigned. The minutes of that meeting also reflect that Lincoln Partners distributed a final version of the report of its analysis of the New Notes transaction, dated November 30, 2001, which reflected the changes in the proposed security requested on November 26, 2001 by David Evans on behalf of Glencoe Capital. Those changes included floor amounts for the "Additional Payment" due upon sale of the Debtor or substantially all of its assets. Following the inclusion of the changes requested by Glencoe Capital for this downside protection, the "Additional Payment" amount for 2002 and 2003 was to be calculated at 25% of the sale proceeds remaining after the payment of the senior debt to LaSalle and the 12% Mass Mutual Notes. After 2003, the "Additional Payment" amount would be the greater of 25% of the sale proceeds remaining after payment the senior debt and the 12% Mass Mutual Notes or the following:

| Date of Sale | Amount |
| --- | --- |
| 1/01/04-12/31/04 | $8,700,000 |
| 1/01/05/-12/31/05 | $12,400,000 |
| 1/01/06-12/31/06 | $15,500,000 |
| 1/01/07-thereafter | $17,900,000 |

54.    The minutes of the November 30, 2001 board meeting further reflect:

Mr. Jackson gave an update on communications between the selling shareholder board members and the selling shareholders. Mr. William Spalding of King & Spalding, an attorney who represents the selling shareholders, and Ms. Amy Forestall, [sic] an investment banker formerly with Bank of America, have counseled the selling shareholders. Mr. Jackson reported that Mr. Spalding and Ms. Forestall [sic] expressed the opinion that the proposed transaction is fair to the selling shareholders.[86]

---

[86] Mr. Spalding was hired as separate counsel by Harold Gernsbacher, Robert Zintgraff, Reed Jackson, and David Campbell. David Campbell worked with Mr. Jackson. DE # 102, pgs. 16-17.

Ms. Forrestal, who was also hired separately by Mr. Gernsbacher, Mr. Zintgraff, Mr. Jackson, and Mr. Campbell, spent only four (4) hours reviewing the New Notes transaction for these Plaintiffs. Plaintiffs' Exhibit 231. Mrs. Forrestal testified that she was not engaged to review alternative recapitalization strategies for SESC. DE # 102, pg. 233.

**AMENDED MEMORANDUM OPINION**                    **PAGE 40**

55.     The final written report of Lincoln Partners' analysis given to the Board at this

meeting offered certain summary conclusions, including the following:

- assuming a sale of the Company in 2007 at a multiple of 5.75x of projected 2006 EBIDTA of $14,360,000, following the payment of SESC's senior secured debt, the Mass Mutual 12% Notes and the New Notes, there would be $25,667,000 available for payment of the Seller Notes;

- "Although the new Financing is termed 'Senior Subordinated Notes', the structural features of this new security indicate that it has the risk profile of new equity which is being infused into SESC;"

- "The new Financing does not pay any current interest. The payment of current interest is a hallmark of subordinated debt. New subordinated debt issues of similar size typically pay current interest of 10.0% - 13.0%;"

- "In addition, even after the new Financing, the amount of the debt with priority to the Financing will be $43.4 million. This represents a multiple of 4.8x SESC's latest twelve month EBITDA. Per Portfolio Management Data, the average total debt/EBITDA ratio for new, highly leveraged loans for the third quarter of [] was 3.7x. The high level of debt ahead of the new Financing suggests that it is structurally new equity;"

- "The New Notes have a risk profile of an equity security. They are a hybrid that is redeemable, carries a PIK coupon of 15%, receives an additional payment of 25%, and receives a warrant of 60%. As a privately-negotiated, hybrid security, they lack a comparable benchmark," and

- "The structural features of the security determine, upon an exit or sale of the company, how the proceeds from a sale are divided after repaying the outstanding senior debt and MassMutual existing subordinated debt (the "Gross Proceeds"). The percentage of Gross Proceeds received by the Note Holders is a proxy for their fully diluted ownership in SESC."

Lincoln Partners concluded its report with the opinion that "[t]he valuation implied by the terms

of the New Notes is within our valuation range for SESC. Therefore, the price and terms of the

New Notes are fair to the shareholders of the Company from a financial point of view."

56.     Plaintiffs make much of the fact that the November 20, 2001 and November 30,

2001 written reports to the Board referenced above did not voluntarily disclose that Lincoln

Partners had made a presentation to Glencoe Capital on September 25, 2001. However, no

inquiry was ever made by any person or Board member seeking information on the date or substance of any meetings between Glencoe Capital and Lincoln Partners. Perhaps more importantly, Plaintiffs were later offered their own opportunity to meet independently with Lincoln Partners and certain Plaintiffs did so. Ronald Kahn, who was an owner and senior member of Lincoln Partners, testified that "in most of [their] engagements of privately-private equity firms, [they] usually make the presentation first to the private equity firm."[87] The court does not believe that this issue of an early meeting with Glencoe Capital (a then 65% shareholder) is highly relevant or points to any wrongdoing or secrecy on the part of Glencoe Capital.

57. On December 3, 2001, the Board held another meeting to discuss the New Notes transaction. The minutes of that meeting reflect that Terrance Malone confirmed that each Director had received the fairness opinion from Lincoln Partners which opined that the New Notes transaction was fair to SESC and its shareholders from a financial point of view. The minutes of that meeting further reflect that "Mr. Shettle indicated on behalf of Massachusetts Mutual that in connection with the amendment and restatement of the existing Securities Purchase Agreement, dated January 14, 2000 (as amended), to provide for the issuance of the new notes, Massachusetts Mutual would require that the maturity date of the existing 12% Senior Subordinated Notes be amended to January 5, 2008 to be consistent with the relative priority of the notes." The minutes of that meeting further reflect that

> Mr. Coonrod moved to approve the resolutions circulated earlier in the day by McDermott, Will & Emery, with the change of dates as discussed by Mr. Shettle above. Mr. Evans seconded the motion. There was no further discussion. On a roll call vote, each Director voted in favor of the resolutions, a copy of which (revised to reflect the proper dates) is attached hereto."

---

[87] *See* Ronald Kahn Deposition Transcript, pgs. 102-103.

## H. Drafting of the New Notes Documentation

58.  MWE, counsel for SESC and Glencoe, and Choate Hall & Stewart, counsel for

the Mass Mutual Entities and the holders of the 12% Mass Mutual Notes, did the majority of the

drafting of the underlying documentation evidencing the New Notes.  Nonetheless, there was

input being provided from multiple sources with regards to the specific business terms of the

New Notes.  Specifically, Scott Williams of MWE testified that:

> We got input from Lincoln Partners in terms of what was required from a fairness
> perspective.  We got input from the board.  We got input from management.  We
> got input from Glencoe Capital as to what they would require in order to put the
> money in to save the company.  So there were a lot of different places where – we
> got input from Mass Mutual as to what they would consent to in order to do the
> transaction.  We got input from LaSalle as to what was required for them not to
> foreclose on their loan.  So there was input from all sorts of sources.[88]

59.  On or about December 3, 2001, MWE (counsel to SESC and Glencoe) received a

draft of the Amended and Restated Securities Purchase Agreement (the "ARSPA") from Choate

Hall & Stewart (counsel to Mass Mutual).   The draft of the ARSPA sent to MWE on December

3, 2001 provided that the unanimous consent of all holders of the New Notes was required to

change the payment terms or payment amounts due on such notes.[89]  The ARSPA, in its final

form, would govern the terms of the New Notes.

60.  On or about December 12, 2001, MWE transmitted a redlined draft of the ARSPA

to Choate Hall & Stewart.  MWE inserted into that redlined draft language providing that the

holders of 80% in amount of the New Notes and the 12% Mass Mutual Notes would be required

to change, among other things, the payment terms or payment amounts due on such notes.

61.  On about January 7, 2002, Choate, Hall & Stewart transmitted to MWE a revised

redlined draft of the ARSPA that struck the language providing that 80% in amount of the 12%

---

[88] Scott Williams Deposition Transcript, pgs. 92-93.

[89] Plaintiffs' Exhibit 164, pg. 81, ¶ 19(a).

Mass Mutual Notes would be required to change the payment terms or pay any amount due on such notes (having the effect that <u>all</u> of the Mass Mutual Notes would be required to change terms), but did not strike such language with respect to the New Notes.

62. The final version of the ARSPA contained a provision on page 68, Section 19, providing that the holders of at least 80% in amount of the New Notes could, among other things, consent to a modification of the payment terms or the payment amount due with respect to the New Notes without the consent of the remaining New Noteholders. As described in more detail below, this would later be referred to by the Plaintiffs as the "80% Waiver Provision."

63. In terms of why the 80% Waiver Provision was added to the ARSPA, Scott Williams of MWE testified:

Q: Okay. And the Amended Restated Securities Purchase Agreement has different terms, correct?

A: Yes.

Q: Okay. And the terms have not changed with respect to the 12 percent Mass Mutual notes. It still requires 100 percent approval of the holders of the 12 percent notes in order to modify the payment terms, correct?

A: Yes. For Mass Mutual, it was 100 percent. There was one holder.

Q: Correct. Correct.

A: The company wouldn't have wanted to sign an agreement that said some person who owns 0.001 percent of the note could prevent one of these things from happening. That would be a stupid thing for a company to do. . . .

Q: The question is with respect to the 12 percent Mass Mutual notes, it still takes 100 percent, correct?

A: Correct. . . .

Q: And with respect to the 15 percent new notes, a majority of the 80 percent of the holders had the right to - -

A: A majority of 80 percent?

Q:  It's a super majority.  But 80 percent of the holders in amount had the right to modify the payment terms, correct, under the Amended Restated Securities Purchase Agreement?

A:  You were required to get the consent of 80 percent in order to do that, yes.

Q:  Right.  And if you got the consent of 8- percent of the holders of the new notes under the Amended Restated Securities Purchase Agreement, you could modify the payment terms of the new notes?

A:  Yes.

Q:  Okay.  Now take a look please - - and that was a change from the existing Securities Purchase Agreement?

A:  Well, you seem to be wanting to call it a change.  I view it as a new term that is reflective of the fact that you added a new tranche of notes and unlike the first tranche of notes which had a single holder where the percentage made no difference, the second tranche of notes had multiple holders so it made sense to have a less than 100 percent approval so that the company had some flexibility to get things done if it needed to . . .[90]

## I.    Approval of the New Notes Transaction & the Subscription Booklet

64.    On January 14, 2002, the Board held a meeting to discuss the New Notes

transaction.  The minutes of that meeting reflect that Board members Messrs. Malone, Bruce,

Coonrod, Jackson, Manetti, Wray and Zintgraff voted in favor of the January 11, 2002 LaSalle

Term Sheet and that Scott Williams agreed to circulate resolutions by written consent for

signature.  The minutes of that meeting further reflect that "[t]he Board considered whether the

foregoing vote should be effective if the written consent is not unanimous and concluded that it

should be."

65.    On or about January 15, 2002, all of the members of the Board signed a

Unanimous Written Consent of the Board of Directors of Strategic Equipment and Supply

Corporation, dated January 15, 2002, authorizing "the Senior Debt Term Sheet and the

---

[90] Scott Williams Deposition Transcript, pgs. 189-191.

consummation of the transactions contemplated thereby." The Senior Debt Term Sheet is substantively identical to the January 11 LaSalle Term Sheet.[91]

66.     On January 21, 2002, SESC mailed to certain shareholders[92] a subscription booklet for New Notes offering (the "Subscription Booklet"), which served as the prospectus soliciting participation in the New Notes investment.[93]  The Subscription Booklet included, among other things, the following:

- (Tab 1) Subscription Instructions for: (1) Individuals Who Choose to Participate in the Subscription; (2) Individuals Who Choose to Consent to the Transaction but Not to Participate in the Subscription; and (3) Individuals Who Choose Not to Consent to the Transaction and Not to Participate in the Subscription;

- (Tab 2) General Information about the Subscription Booklet;

- (Tab 3) Business and Financial Update, summarizing the background of the proposed New Notes transaction, recent developments, discussions with LaSalle, the structure of the capital infusion, the use of proceeds, actions by the Board of Directors; the business performance of the Debtor, and the Debtor's business strategy;

- (Tab 4) Summary Terms for Senior Subordinated Notes (the New Notes);

- (Tab 5) Term Sheet: LaSalle;

- (Tab 6) Capitalization Table;

- (Tab 7) Pro Rata Allocation of New Notes and Warrants;

- (Tab 8) Projected Application of Gross Proceeds upon sale of Debtor;

- (Tab 9) Lincoln Partners Opinion Letter;

- (Tab 10) Consolidated Financial Statements of the Company for the Fiscal Year Ended December 31, 2000;

---

[91] As of January 15, 2002, the Debtor had not missed any payments to LaSalle, but it owed the October 15, 2001 interest payments to the holders of the 12% Mass Mutual Notes.

[92] The distribution list in the Subscription Booklet indicates that Subscription Booklet was mailed to Plaintiffs holding more than 95% of the outstanding amount of the Seller Notes.

[93] Plaintiffs' Exhibit 171.

**AMENDED MEMORANDUM OPINION**                                    **PAGE 46**

- (Tab 11) Consolidated Financial Statements of the Company for the Eleven Month Period Ended November 30, 2001;

- (Tab 12) Form of Subscriber Questionnaire and Agreement and Written Consent of Stockholders; and

- (Tab 13) Form of Action by Written Consent of at Least a Majority in Interest of the Stockholders of Strategic Equipment and Supply Corporation.

67.     The Subscription Booklet included several key forms.  First, the Subscription Booklet included a Tab 13, a form titled "Action by Written Consent of at Least a Majority in Interest of the Stockholders of Strategic Equipment and Supply Corporation" (the "Shareholder Consent"), which shareholders were asked to sign if they approved of the New Notes transaction (in their capacity as shareholders) but did not wish to participate.  This form provides that:

> The Company intends to issue, in the aggregate, $6,000,000 in Senior Subordinated Notes (the "Notes") and Warrants to purchase, in the aggregate 2,749,403.0458 shares of the Company's common (the "Warrants") on the terms set forth at Tab 4 of the Subscription Booklet, dated January 2002, delivered to the undersigned (the "Subscription Booklet") pursuant to an Amended and Restated Securities Purchase Agreement (the "Securities Purchase Agreement" and, collectively with the Notes and the Warrants and the other documents and instruments executed in connection therewith, the "Transaction").
>
> …
>
> RESOLVED, that the undersigned hereby consents to and approves the Transaction.[94]

Second, contained at Tab 12, was a form titled "Subscriber Questionnaire and Agreement and Written Consent of Stockholders" (the "Subscriber Questionnaire"), to be completed by those shareholders who elected to participate in the offering and purchase New Notes.

68.     The Business and Financial Update at Tab 3 of the Subscription Booklet described the structure of the proposed New Notes and the use of proceeds therefrom and states

---

[94] Plaintiffs' Exhibit 171.

**AMENDED MEMORANDUM OPINION**                                    **PAGE 47**

that "[t]he terms of the New Notes are more fully described at Tab 4 of the Subscription

Booklet."

69.    Moreover, Tab 4 to the Subscription Booklet stated that the New Notes would be

"a new tranche of Senior Subordinated Notes issued pursuant to the Securities Purchase

Agreements dated January 14, 2000 (amended and modified) related to the issuance of the

Company's $10 million 12% Mass Mutual Notes."  Tab 4 to the Subscription Booklet further

stated that the New Notes "**will be senior in right of payment to the payment of the Seller**

**Notes.**"[95]  Tab 4 of the Subscription Booklet further provided, in part:

**Additional Payments:**

If the sale of SESC occurs prior to 12/31/03, the holders of the New Notes shall
receive 25% of all sales proceeds, on a pro rata basis, remaining after payment in
full of all senior indebtedness of the Company, the Existing Subordinated Notes
(the 12% MassMutual Notes) and the New Notes (the "Additional Payment").  If
the sale of SESC occurs after 12/31/03, the holders of the New Notes shall receive
the greater of the Additional Payment or the following:

| Date of Sale | Amount |
|---|---|
| 1/01/04-12/31/04 | $8,700,000 |
| 1/01/05-12/31/05 | $12,400,000 |
| 1/01/06-12/31/06 | $15,500,000 |
| 1/01/07-thereafter | $17,900,000 |

. . . .

**Change of Control And Sale of Assets:**

Upon the occurrence of a change in control or sale of all or substantially all of the
assets or equity interest of the Company, the Company shall redeem all of the
New Notes at a price equal to 100% of the aggregate principal, together with
accrued and unpaid interest to date and the Additional Payment.

70.    Additionally, the Subscription Booklet disclosed that the terms of the New Notes

would be governed by the ARSPA, but stated that the ARSPA would only be sent to

---

[95] *Id.* (emphasis added).

shareholders who elected to participate in the offering.[96]  Thus, the ARSPA was not attached to or sent with the Subscription Booklet.

71.    On or about January 31, 2002, the Board executed a Unanimous Written Consent of the Board of Directors of Strategic Equipment and Supply Corporation, dated January 31, 2002, authorizing shareholders to purchase less than their full pro rata allocation of New Notes.

72.    On February 1, 2002, SESC delivered to the shareholders a six-page Supplement No. 1 to the Subscription Booklet, dated January 21, 2002 (the "Supplement").  The Supplement provided updated financial information for the Debtor through December 31, 2001, replaced the original Tab 8 with a new table "showing an example of the application of gross proceeds upon a sale of the Company," and informed shareholders that they would be permitted "to purchase less than all of the stockholder's pro rata allocation of the New Notes and Warrants."

73.    The revised Tab 8 sets forth the calculations behind the content in the Lincoln Partners report which, assuming a sale of the Company in 2007 at a multiple of 5.75x of projected 2006 EBIDTA of $14,360,000, following the payment of SESC's the senior secured debt, the 12% Mass Mutual Notes and the New Notes, stated there would be $25,667,000 available for payment of the Seller Notes.  Tab 8 stated below the footnotes in font larger than the footnotes that, "The numbers set forth herein are examples only and do not represent predictions of actual performance or results.  Actual results may vary materially from those indicated."

74.    This same table also included a calculation assuming a sale of SESC using projected 2004 EBITDA of $11,812,000 and a multiple of 5.75x for an enterprise value of $67,916,000, and Gross Proceeds available for distribution to the holders of the New Notes and

---

[96] Plaintiffs' Exhibit 171, pgs. 9-11.

**AMENDED MEMORANDUM OPINION**                                    **PAGE 49**

Seller Notes in the amount of $35,208,000, following the payment of SESC's senior debt and

Mass Mutual 12% Notes, for which the total outstanding balance was projected to be

$33,309,000 (this also factored in $600,000 in available cash). Under this calculation, it was

estimated that there would be $17,383,000 available for distribution to the holders of the Seller

Notes, meaning that the Seller Notes would not be paid in full.[97]

**J.      Documents Signed by Certain Plaintiffs Relating to the New Notes Transaction**

75.      The Shareholder Consent (referenced above) was signed by the following eleven

(11) Plaintiffs: (1) Richard F. Palm, (2) Reuben N. Palm, (3) Cynthia M. Jackson, (4) Robert N.

Zintgraff, (5) Lynda Medley Campbell, (6) James G. Palm, (7) Mark R. Palm, (8) Thomas L.

Palm, (9) Jeffrey A. Grandy, (10) Eugene O. Lee, Jr., and (11) Stephen R. Howze. Other

shareholders who executed the Shareholder Consent included Massachusetts Mutual Life

Insurance Company, MassMutual High Yield Partners II, LLC, Ronald L. Bane. Thomas M.

Garvin, and Jay Goldstein. These shareholders owned approximately 30.5% of the outstanding

Debtor shares in early 2002.

76.      In signing the Shareholder Consent, these shareholders "consent[ed] and

approve[ed]" the "Transaction," which term was defined therein as "the Corporation intends to

issue, in the aggregate, $6,000,000 in Senior Subordinated Notes (the "Notes") and Warrants to

purchase, in the aggregate, 2,749,403.0458 shares of the Corporation's common [stock] (the

---

[97] The assets of SESC were actually sold in February 2005. The cash component of such sale was $46,520,000. According to the Debtor's audited financial statements, SESC's EBITDA for year end 2004 was $10,862,013. The sale did not use a multiple 5.75x EBIDTA; the multiple was instead lower than 5.00. These figures are less than the projections set forth in Tab 8 to the Supplement. Moreover, $43,664,613.65 of the monies paid to acquire the Debtor's assets in 2005 were paid to LaSalle and the Mass Mutual Entities. Tab 8 estimated that this amount was going to be $33,309,000. In light of the lower EBITDA, lower multiple of EBIDTA, and higher senior debt balances associated with the actual sale of SESC in 2005, as compared to the projections for these same items in Tab 8, there was less money available for distribution to the holders of the New Notes and Seller Notes than projected in Tab 8 of the Supplement.

"Warrants") on the terms set forth at Tab 4 to the Subscription Booklet, dated January, 2002 delivered to the undersigned (the "Subscription Booklet") pursuant to an Amended Restated Securities Purchase Agreement." Tab 4 further provided that the New Notes "will be senior in right of payment to the payment of the Seller Notes."

77.     Five (5) Plaintiffs who also elected to purchase New Notes completed and signed a "Subscriber Questionnaire and Agreement and Written Consent of Stockholders" (the "Questionnaire and Shareholder Consent") dated as of February 2002. Pursuant to the Questionnaire and Shareholder Consent, these shareholders "consent[ed] and approve[ed]" the "Transaction," which term was defined therein as "Strategic Equipment and Supply Corporation (the "Company") intends to issue $6,000,000 aggregate principal amount of Senior Subordinated Notes (the "Notes") and Warrants to purchase, in the aggregate, 2,749,403.0458 shares of the Company's Common Stock (the "Warrants") on the terms set forth at Tab 4 to the Subscription Booklet, dated January 2002, in which this agreement is included and delivered to the undersigned (the "Subscription Booklet") pursuant to an Amended Restated Securities Purchase Agreement." The five (5) Plaintiffs who signed the Questionnaire and Shareholder Consent were the following: (1) David Campbell, (2) Harold Gernsbacher, Jr., (3) Walter Eskuri, (4) Andrew Scruggs, and (5) S. Reed Jackson.[98] The five (5) Plaintiffs who signed the Questionnaire and Shareholder Consent hold Seller Notes which account for 34.1% of the outstanding balance of the Seller Notes. Other shareholders who executed the Questionnaire and Shareholder Consent included the Thomas L. Bindley Revocable Trust dated November 5, 1975, Glencoe Capital Partners II, L.P., Glencoe Growth Closely-Held Business Fund L.P., the State Treasurer of the State of Michigan as Custodian of the Michigan Public Schools Retirement System, State

---

[98] The court would note that even though the stipulated facts provide that Robert Zintgraff did not execute the Questionnaire and Shareholder Consent, he did, nonetheless, purchase a New Note.

Employees' Retirement System and Michigan State Police Retirement System. The total shareholders who executed the Questionnaire and Shareholder Consent collectively owned approximately 65.3% of the outstanding shares in the Debtor prior to the issuance of the New Notes.[99]

78.     After signing the Shareholder Consent and the Questionnaire, certain of the Plaintiffs also signed Signature Pages for the ARSPA.[100]  SESC instructed all purchasers of New Notes, including Plaintiffs/nominal defendants Harold Gernsbacher, Robert Zintgraff, S. Reed Jackson, David Campbell, Walter Eskuri, and Andrew Scruggs, to return two (2) executed signature pages for the ARSPA and their money for the New Notes by March 6, 2002.  Harold Gernsbacher, Robert Zintgraff, S. Reed Jackson, David Campbell, Walter Eskuri, and Andrew Scruggs all subsequently signed two (2) signature pages for the ARSPA and returned their signature pages to the Debtor.  Plaintiffs/nominal defendants Harold Gernsbacher, Robert Zintgraff, S. Reed Jackson, David Campbell, Walter Eskuri, and Andrew Scruggs collectively hold Seller Notes which account for 48.56% of the outstanding balance of the Seller Notes.

79.     Certain Plaintiffs' did not sign the Shareholder Consent or the ARSPA.  The following twelve (12) Plaintiffs did not sign the Shareholder Consent, the Questionnaire and

---

[99] Prior to March 8, 2002, the Debtor did not send a copy of the ARSPA to the Plaintiffs who returned Shareholder Consents but elected not to purchase New Notes.

[100] There was conflicting testimony at the Trial about whether certain of the Plaintiffs who returned Signature Pages for the ARSPA ever received a full copy of the ARSPA.  First, at least one Plaintiff, Reed Jackson, testified that he never received a copy of the ARSPA and had not seen a copy of the ARSPA before 2005. DE # 102, pg. 74.  However, in their Original State Court Petition, several of the Plaintiffs (Harold Gernsbacher, Reuben N. Palm, Michael N. Palm, Shannon Palm, James G. Palm, Susan Palm, Mark R. Palm, Pamela Palm, Thomas L. Palm, Maureen Palm, Richard F. Palm, Kristen Palm, and Robert N. Zintgraff) admit to receiving the ARSPA 45 days after subscribers to the New Notes paid their money.  Defendants' Exhibit 10, pgs. 14 & 15 [Note that this Exhibit was discussed at the Trial (see DE # 101, pgs. 84-85 & 146-147), but not formally offered and admitted into evidence, however, the court may and does take judicial notice of this pleading pursuant to Fed. R. Evid. 201].  Moreover, Kevin Bruce, SESC's CEO, testified that he sent a copy of the ARSPA to the holders of the New Notes along with a cover letter sometime after February 28, 2002.  DE # 101, pg. 228.  For purposes of this Trial, the court finds that the Plaintiffs did not receive a copy of the ARSPA prior to February 28, 2002.

Shareholder Consent, or the ARSPA: (1) Lee Scruggs, (2) William Scruggs, (3) James Scruggs, (4) Jeffrey Vreeland, (5) Roger Vang, (6) Michael Palm, (7) Shannon Palm, (8) Susan Palm, (9) Maureen Palm, (10) Pamela Palm, (11) Kristin Palm, and (12) Stephen Reynolds. These twelve (12) Plaintiffs owned approximately 4.2% of the Debtor's outstanding shares prior to the issuance of the New Notes.

### K. Consummation of the New Notes Transaction

80.     On or about February 14, 2002, Beth Satterfield, Ronald Wray, Louis Manetti, and Mark Agnew, of Glencoe Capital, sent a Memorandum (with attachments) to Glencoe Partners Investment Committee regarding the New Notes transaction. The memo stated: "It is the deal team's opinion that Glencoe Capital Partners II, L.P. will likely have the opportunity to invest, in the aggregate, approximately $3,000,000 in this security." The memo contains the following conclusion:

> **Conclusion:**
>
> It is the deal team's recommendation that Glencoe Capital Partners II, L.P. invest in this security. The projected IRR for the security, with exit at 12/31/06, is 63.2% with upside potential. The deal team further recommends that Glencoe purchase up to its concentration limit of its allocation of the unsubscribed portion the $6 million security to enhance Glencoe Capital Partners II, L.P.'s blended returns.

The ninth (9th) page of the memorandum compared Glencoe Partners' anticipated returns from the New Notes against its total equity investment in SESC. In each scenario, the model showed that Glencoe Partners would achieve a "blended return" on its prior equity contribution if it purchased up to its concentration limit of the New Notes.[101] The tenth (10th) page of the memorandum depicted a waterfall showing how funds would be distributed to the various tiers of

---

[101] Plaintiffs' Exhibit 176, pg. 9.

**AMENDED MEMORANDUM OPINION**                                        **PAGE 53**

debt and equity upon a sale of SESC in 2004, 2005, or 2006, assuming a 6.7X exit multiple.[102]
That page also compared the anticipated realization from Glencoe Partners' "Original Common
Equity Investment," to the anticipated realization on its "Recapitalization Investment" (*i.e.*, the
New Notes).  That page showed that, in a sale of SESC in 2006, if Glencoe Partners purchased
$3 million in New Notes, it would realize a profit of $23.6 million with an 18.1% internal rate of
return (IRR) on its total investment of old equity and New Notes.  Thus, in looking at its IRR,
Glencoe Partners was anticipating a future sale of SESC.  Additionally, the court finds that even
though Glencoe Partners was including its prior equity contribution in its IRR, it was doing so
merely to give its Investment Committee a picture of how their entire investment in SESC was
going to look if and when a future sale occurred.

81.     On February 19, 2002, the Board held another meeting.  The minutes of that
meeting reflect that Beth Satterfield summarized the current state of negotiations with respect to
the New Notes transaction and the amendment to the Credit Agreement.  The minutes of that
meeting reflect that Ms. Satterfield noted that $1,567,915.3752 in New Notes were not elected to
be purchased by the existing shareholders and the Board should reallocate that amount for
purchase.  The minutes of that meeting reflect that the Board approved a motion to offer the
unsubscribed portion of the New Notes to the following entities in the following amounts:

| | |
|---|---|
| Glencoe Capital Partners II, L.P. | $1,187,200 |
| Massachusetts Mutual Entities | $90,357.6876 |
| State of Michigan | $90,357.6876 |
| Kevin Bruce | $150,000 |
| Jay Goldstein | $15,000 |
| Bill Aisenberg | $10,000 |
| Ed Poore | $25,000 |

---

[102] Plaintiffs' Exhibit 176, pg. 10.  This was much higher than the multiple used by Lincoln
Partners (5.75X).

**AMENDED MEMORANDUM OPINION**                                        **PAGE 54**

The minutes of that meeting further reflect that the Board further authorized "that to the extent Glencoe Growth Closely-Held Business Fund, L.P. ("Fund I") does not purchase its full pro rata allocation of 15% Notes, the difference between the full pro rata allocation and the amount actually purchased by Fund I shall be allocated equally between the State of Michigan and the Massachusetts Mutual entities."

82.     The New Notes transaction was consummated on March 8, 2002.[103]  On March 8, 2002, SESC and its senior lenders entered into the Second Amended and Waiver to Credit Agreement ("Second Amendment").  Pursuant to Section 3 of the Second Amendment, the senior lenders (which included LaSalle and the other three lenders mentioned previously) waived SESC's breaches and financial covenants for the fiscal quarters ending June 30, 2001, September 30, 2001 and December 31, 2001.  The lenders agreed to waive the penalty interest rate increase due to SESC's breach of the financial covenants of its Credit Agreement.

83.     The lenders also agreed to relax the financial covenants which SESC had breached in the preceding fiscal quarters.  For example, Section 2 of the Second Amendment allowed for a fixed charge coverage ratio or .90:1.00 for the quarter ending March 31, 2002, and a ratio of 1:1 for the quarter ending June 30, 2002 and thereafter.  Prior to the Second Amendment, the minimum fixed charge coverage ratio for the quarter ending March 31, 2002 was 1:05:1, and it increased in increments up to 1.20:1.00 by September 30, 2003.

84.     The lending banks also agreed to revise three EBITDA-related covenants, which were changed from the "Old" covenants to the "Modified" covenants as follows:

•   The "Senior Debt to Adjusted EBITDA Ratio" was relaxed as follows:

| **Period Ending** | **Old Covenant** | **Modified Covenant** |
|---|---|---|

---

[103] It is undisputed that at the time the New Notes transaction was consummated, it was highly unlikely that any outside commercial lender would lend the Debtor $6 million.

June 30, 2002         2.50 to 1.00      4.70 to 1.00
September 30, 2002    2.50 to 1.00      4.35 to 1.00
December 31, 2002     2.00 to 1.00      4.00 to 1.00
…
December 31, 2004     1.25 to 1.00      2.30 to 1.00

- The "Total Debt to Adjusted EBITDA Ratio" was relaxed as follows:

| Period Ending | Old Covenant | Modified Covenant |
|---|---|---|
| June 30, 2002 | 4.50 to 1.00 | 8.45 to 1.00 |
| September 30, 2002 | 4.50 to 1.00 | 7.80 to 1.00 |
| December 31, 2002 | 4.00 to 1.00 | 7.50 to 1.00 |
| … | | |
| December 31, 2004 | 3.25 to 1.00 | 2.30 to 1.00 |

- The Minimum EBITDA covenant was relaxed as follows:

| Period Ending | Old Covenant | Modified Covenant |
|---|---|---|
| March 31, 2002 | $13,500,000 | $ 5,350,000 |
| June 30, 2002 | $13,950,000 | $ 6,110,000 |
| September 30, 2002 | $14,350,000 | $ 7,555,000 |
| December 31, 2002 | $14,930,000 | $ 8,045,000 |
| … | | |
| December 31, 2004 | $16,700,000 | $10,765,000 |

85.     The senior lenders also agreed to a modify the amortization schedule for the Term

A and Term B loans, as shown below:

| Year | Original Amortization (9/11/00 Agreement) | | | Amended Amortization (LI 04166) |
|---|---|---|---|---|
| | Term A | Term B | Original (A Plus B) | |
| **2002** | $3,530,000 | $135,000 | $3,665,000 | $2,135,000 |
| **2003** | $3,870,000 | $135,000 | $4,005,000 | $2,835,000 |
| **2004** | $2,435,000 | $5,400,000 | $7,835,000 | $5,039,000 |
| **2005** | $0 | $7,590,000 | $7,590,000 | $10,690,000 |
| **Totals** | $9,835,000 | $13,260,000 | $23,095,000 | $20,699,000 |

The modified amortization schedule reduced principal repayments in the amount of $1,530,000

in 2002, $1,170,000 in 2003, and $2,796,00 in 2004, and increased the repayment of principal in

2005 by $2,796,000.

**AMENDED MEMORANDUM OPINION**                              **PAGE 56**

86.     As demonstrated above, the New Notes transaction allowed SESC to enter into much more favorable terms with its senior lenders.  In fact, Jay Goldstein, SESC's CFO, testified that "from the company's perspective, the company was better off after the issuance of the new notes than it was right before."[104]

87.     The ARSPA was also made effective as of March 8, 2002.  Section 29 of the ARSPA, contains the following language: "Each Purchaser under this Agreement or the Other Securities Purchase Agreements, in its capacity as a holder of Securities and Seller Notes, as the case may be, hereby expressly agrees and reaffirms that (a) each of Subordination Agreement and the Junior Subordination Agreement remains in full force and effect with respect to it on and after the Closing date, (b) the Securities and the Seller Notes constitute "Junior Debt" (as defined in the Subordination Agreement) and are subject to the terms and conditions of the Subordination Agreement, and (c) the Seller Notes constitute "Subordinated Indebtedness" (as defined in the Junior Subordination Agreement), the Notes and any amounts payable in connection therewith constitute "Senior Indebtedness" (as defined in the Junior Subordination Agreement) and each of the Seller Notes and the Notes are subject to the terms and conditions of the Junior Subordination Agreement."

88.     Section 19(a) of the ARSPA also contained language providing that the holders of 80% in amount of the New Notes could waive payment of any and all amounts due on the New Notes without the consent of the holders of the other 20% in amount of the New Notes (the "80% Waiver Provision").[105]  It is undisputed that the minutes of the meetings of the Debtor's Board of Directors held prior to March 8, 2002 do not mention the 80% Waiver Provision.  It is also undisputed that the Lincoln Partners' report did not mention the 80% Waiver Provision. Finally,

---

[104] DE # 89, pg. 121.

[105] Plaintiffs' Exhibit 179, pg. 74, Section 19(a).

**AMENDED MEMORANDUM OPINION**                                    **PAGE 57**

it is undisputed that the Subscription Booklet and the Supplement did not mention the 80% Waiver Provision. The Plaintiffs have argued that this was a material provision which should have been disclosed in a more obvious fashion than just being interlaced within a 200+ page document (*i.e.*, the ARSPA), and have further argued that Glencoe Capital purposely inserted the 80% Waiver Provision in order to gain decision making control over when the New Notes were paid. However, when asked if he thought whether a reasonable investor would want to know about this provision before investing in the New Notes, Scott Williams, the lawyer for SESC and Glencoe Capital, who, along with the attorneys at Mass Mutual, drafted the ARSPA, credibly testified that:

> I think a reasonable investor would read the entire agreement before they sign that purchase agreement and send in their money. You know, I don't think it's something that anybody would base their decision on because I think it's a very common and typical provision in an agreement with multiple note holders that it's less than a 100 percent approval to amend things.
>
> I'm not so sure that the 80 percent provision even comes into play with respect to this waiver of the change of control because that is a waiver of a provision. It's not an amendment. There was a 51 percent approval requirement for waivers other than specific things. And this was not a change of the provision. This was a waiver of an event that lead to a payment obligation. . . I just think that's a pretty common provision when you have multiple note holders to allow for things to be changed with less than all of the people consenting.[106]

On the reasoning behind not disclosing the 80% Waiver Provision, Scott Williams further credibly testified that:

> A: I don't believe that that was something that needed to be disclosed.
>
> Q: Okay. But someone made the decision not to put that disclosure into the subscription booklet, correct?
>
> A: Well, someone decided what went into the subscription booklet. I don't ever recall anyone specifically considering whether or not to include the amendment provision. I just -- I've said this before. To me, it's such a common provision that

---

[106] Scott Williams Deposition Transcript, pgs. 238-40.

it didn't get that much thought as far as disclosure. I'm sorry, that's just my view of it.

Q: Such a common provision Lincoln Partners didn't even mention it?

A: Yeah. I just don't think it's uncommon to have supermajority amendment provision.

Q: So common that Kevin Bruce didn't know about it?

A: I don't know what Kevin knew or didn't know.

Q: So common Jay Goldstein didn't know about it.

A: I don't know what Jay knew or didn't know.

Q: Is it your testimony that nobody made the decision not to put the eighty percent waiver provision in the amended 24 restated securities purchase agreement?

A: Yes. I don't think there was an affirmative decision, let's not put that in.

Q: Okay. Just -- no one decided that it was important enough to put it in.

A: Correct.[107]

Moreover. Beth Satterfield, a principal at Glencoe Capital credibly testified:

Q: All right. Ms. Satterfield, we've talked about this before. This is the eighty-percent waiver provision. You've seen that. Did you instruct McDermott Will & Emery to put this provision into the document?

A: No.

Q: Okay. Did -- all right. If you didn't, who did?

A: I don't -- I didn't -- I don't believe anybody instructed them to do it.

Q: Did anyone suggest that they do it?

A: I'm going to assume no.

Q: Okay. Now, this provision allows the holders of eighty percent an amount of the new notes to consent to waive the debtor's obligation to pay the instrument, right?

---

[107] DE # 112, pgs. 252-253.

A: Consent to waive it at that time --

Q: Yes.

A: -- not permanently.

Q: Well, waive it at that time, right?

A: Yes.

Q: And there's no limit on how long it could be waived, right?

A: Correct.

Q: All right. Now, in your view, this provision was just too trivial to mention to the board of directors, right?

A: Are you quoting me?

Q: Yes.

A: Did I say "trivial"?

Q: Yes.

A: Okay. Then yes.

. . .

Q: And wouldn't a reasonable investor have wanted to know about this provision before investing in the new notes?

A: I think a reasonable investor would want to make sure, in a large group, that one -- a one-percent holder couldn't affect the -- a long-term outcome of an investment.

. . .

Q: Ms. Satterfield, wouldn't a reasonable investor -- particularly a reasonable minority investor -- want to know that the holders of eighty percent an amount could vote to postpone his right to payment indefinitely?

A: I think -- I -- I don't agree.

Q: Okay.

A: This is immaterial.

Q: Okay. Provision's not material? That's your testimony?

**AMENDED MEMORANDUM OPINION** **PAGE 60**

A: Correct.[108]

Based on the totality of the evidence (including this and other testimony), the court does not find that the 80% Waiver Provision was material enough to warrant specific discussions at the Board meetings or even inclusion in Tab 4 of the Subscription Book (which was a summary of the terms of the New Notes). In particular, the court finds Scott Williams' testimony on the issue of materiality convincing, and that under the circumstances, the inclusion of this type of provision made good business sense and was a common provision in note instruments where there were to be multiple holders. Moreover, the court cannot find that the Plaintiffs have demonstrated that Glencoe Capital was the reason for placing this provision in the ARSPA, but rather finds that the provision was ultimately included based upon MWE's belief that it was in the best interest of the SESC entity to do so.

89.     Finally, as part of the New Notes transaction, two new Subordination

Agreements were also executed:

a)     Junior Subordination Agreement, dated March 8, 2002, by among Strategic Equipment and Supply Corporation, Gernsbacher's, Inc., Medley Restaurant Equipment & Supply, Inc., Palm Brothers, Inc., Top of the Table, Inc., Scruggs, Inc., St. Cloud Restaurant and Supply Company, and LaSalle, N.A., as Administrative Agent (the "March Junior Subordination Agreement"); and

b)     Subordination Agreement, dated March 8, 2002, among Strategic Equipment and Supply Corporation, Gernsbacher's, Inc., Medley Restaurant Equipment & Supply, Inc., Palm Brothers, Inc., Top of the Table, Inc., Scruggs, Inc., St. Cloud Restaurant and Supply Company, W.H. Reynolds Distributor, Inc., W. David Campbell, S. Reed Jackson, Andrew Scruggs, Walter Eskuri, Harold Gernsbacher, Jr., Ronald L. Bane, Thomas M. Garvin, Zintgraff Investments, Ltd., Kevin P. Bruce, Ed Poore, Bill Aisenberg, Jay Goldstein, Thomas L. Bindley Revocable Trust, Glencoe Capital Partners, II, L.P., State of Michigan, Massachusetts Mutual Life Insurance Company, MassMutual Yield Partners, II, LLC, MassMutual Corporate Investors, and MassMutual Participation Investors (the "March 8 Subordination Agreement).[109]

---

[108] DE # 113, pgs. 225-228

[109] Plaintiffs' Exhibits 180 & 181.

**AMENDED MEMORANDUM OPINION**                                    **PAGE 61**

However, the court finds that neither of these two subordination agreements provides for the subordination of the Seller Notes to the New Notes. Rather, the March Junior Subordination Agreement subordinated the New Notes to the LaSalle debt, and the March 8 Subordination Agreement subordinated the New Notes to the Mass Mutual debt.

### L. Terms and Characteristics of the New Notes in Their Documented Form

90.     The New Notes were issued pursuant to the ARSPA, which was an "amendment and restatement" of the SPA governing SESC's issuance of the 12% Mass Mutual Notes in January of 2000.[110] The instruments evidencing the New Notes on their face state they are "15% Junior Subordinated Notes Due January 8, 2002." The New Notes appear in SESC's audited financial statements in the section titled Long-Term Debt. The New Notes were fully subordinated to outside senior secured lenders and the Mass Mutual 12% Notes. SESC did not establish or fund a sinking fund for purposes of making any payments under the New Notes. Prior to February 2005, the New Notes were not secured by a lien. The New Notes did not call for periodic interest payments and instead called for PIK interest at a 15% per annum interest rate which was to accrue until maturity or until a change in control or sale event. The New Notes did not require any periodic repayment of the principal amounts of the Note prior to maturity. The New Notes had a scheduled maturity date. All of the holders of the New Notes were SESC shareholders. The New Notes were offered to SESC's shareholders in direct proportion to their equity interests in SESC.

91.     The New Notes also provided for a minimum Additional Payment as follows:

If the sale of SESC occurs prior to 12/31/03, the holders of the New Notes shall receive 25% of all sales proceeds, on a pro rata basis, remaining after payment in full of all senior indebtedness of the Company, the Existing Subordinated Notes (the 12% MassMutual Notes) and the New Notes (the "Additional Payment"). If

---

[110] Plaintiffs' Exhibit 179.

the sale of SESC occurs after 12/31/03, the holders of the New Notes shall receive the greater of the Additional Payment or the following:

| Date of Sale | Amount |
|---|---|
| 1/01/04-12/31/04 | $8,700,000 |
| 1/01/05-12/31/05 | $12,400,000 |
| 1/01/06-12/31/06 | $15,500,000 |
| 1/01/07-thereafter | $17,900,000 |

92.     The holders of the New Notes also received warrants for 2,749,403.0446 shares of common stock in the Debtor, which shares represented 60% of the fully diluted equity of the company.[111]  Prior to the New Notes transaction, the Glencoe Investors held 66.60% of the stock of SESC.[112]  As a result of the New Notes transaction, the Glencoe Investors held 82.26% of the stock in SESC.[113]

**M.     The New Notes Sources and Uses of Funds**

93.     The following persons and entities purchased New Notes on or about March 8, 2002 in the following principal amounts:

| | |
|---|---|
| David Campbell | $60,000 |
| S. Reed Jackson | $60,000 |
| Robert N. Zintgraff     (Zintgraff Investments)[114] | $75,000 |
| Andrew Scruggs | $40,000 |
| Walter Eskuri | $6,000 |
| Harold Gernsbacher | $200,000 |
| Glencoe Growth Closely Held Business Fund | $45,000 |
| State of Michigan | $1,221,354.43 |
| Massachusetts Mutual Life Ins. Company | $610,387.64 |
| MassMutual High Yield Partners II, LC. | $252,696.79 |
| Ronald L. Bane | $77,771.24 |
| Thomas M. Garvin | $9,962.98 |
| Glencoe Capital Partners II, L.P. | $3,124,999.87 |

---

[111] Plaintiffs' Exhibit 185.

[112] Plaintiffs' Exhibit 186.

[113] Plaintiffs' Exhibit 187.

[114] Mr. Zintgraff testified that he purchased a New Note in order to protect his ownership in the company.  DE # 101, pg. 37.

**AMENDED MEMORANDUM OPINION**                                               **PAGE 63**

| | |
|---|---|
| Jay L. Goldstein[115] | $16,992.59 |
| Thomas L. Bindley Revocable Trust 11/5/1975 | $14,944.46 |
| Kevin Bruce[116] | $150,000 |
| Ed Poore | $25,000 |
| Bill Aisenberg | $10,000 |

94.     As reflected in the top six entries above, six Plaintiffs purchased New Notes that aggregated to 7.35% of the total principal amount of New Notes, *e.g.*, $441,000.  However, a total of 33.27% of the total principal amount of the New Notes were made available for purchase by such Plaintiffs.

95.     Subsequent to the New Notes transaction, the State of Michigan transferred its New Note to Stockwell Fund, L.P., which is the current holder of such New Note.  On March 17, 2006, Glencoe Partners acquired the New Note originally held by Jay L. Goldstein.  On June 26, 2008, Glencoe Partners acquired the New Note originally held by Ronald L. Bane.

96.     The $6 million in proceeds from the sale of the New Notes were used as follows: (a) $2.4 million was used to reduce the senior indebtedness owed to LaSalle; (b) approximately $1.9 million to SESC for general corporate purposes; (c) $633,499.97 was used to pay interest owed the holders of the 12%; Mass Mutual Notes, and pay fees and expenses; (d) $375,000 was used to pay past due management fees to Glencoe Capital; (e) $644,126.80 was used to pay fees and expenses other than MWE's legal fees; and (f) $196,121.49 was paid to MWE for legal fees for the time period October 1, 2001 through February 28, 2002.

---

[115] Jay Goldstein testified that he bought a New Note for two reasons: (1) as CFO he thought it was politically the right thing to do and that he needed to show Glencoe and his boss that he believed in the future of the company; and (2) he thought it was a good investment.  DE # 89, pg. 30.

[116] Mr. Bruce testified that he purchased a New Note because he thought it was a good investment and that also senior officers should want to have "skin in the game."  DE # 101, pg. 168.

**AMENDED MEMORANDUM OPINION**                                    **PAGE 64**

**N.** **SESC's Financial Performance Both Before and After the Issuance of the New Notes**

97.    To better understand how the New Notes transaction was reflected on SESC's

books and records, the following chart sets forth a summary of SESC's long-term liabilities as

set forth in the SESC's audited financial statements, including after the addition of the New

Notes:

| Date | 01/14/00 | 12/31/00 | 2001 | 2002 | 2003 | 2004 |
|---|---|---|---|---|---|---|
| Term A Senior note, maturing 2004 | $10,500,000 | $12,250,000 | $9,835,000 | $5,435,000 | $2,735,000 | $1,185,000 |
| Term B Senior note, maturing 2005 | $10,500,000 | $13,395,000 | $13,260,00 | $13,125,000 | $12,990,000 | $11,490,000 |
| Senior revolving credit facility, maturing 2004 | $8,223,406 | $10,000,000 | $16,000,000 | $13,000,000 | $15,000,000 | $20,300,000 |
| 12% Senior subordinated promissory notes, maturing 2008 | $10,000,000 | $10,000,000 | $10,000,000 | $10,000,000 | $10,000,000 | $10,000,000 |
| 15% Senior subordinated promissory notes, maturing 2008 | N/A | N/A | N/A | $6,000,000 | $6,770,000 | $7,799,604 |
| 9% Junior subordinated promissory notes, maturing 2008-2010 | $8,214,000 | $10,170,266 | $15,282,838 | $15,282,838 | $15,282,838 | $15,282,838 |
| Other | $41,693 | | | | $478,777 | $545,801 |
| Less: debt discount related to warrants issued | ($1,703,000) | ($1,723,194) | ($1,484,354) | ($1,240,346) | ($996,338) | ($752,330) |
| Subtotal | $45,776,099 | $54,092,072 | $62,893,485 | $61,602,492 | $62,260,277 | $65,850,913 |
| Less: current maturities | ($9,612,856) | ($12,550,000) | ($2,135,000) | ($2,835,000) | ($20,490,701) | $41,266,816 |
| Long-term debt | $36,163,243 | $41,542,072 | $60,758,484 | $58,767,492 | $41,769,576 | $24,584,097 |

98.    The figures above do not include the accrued interest on the Seller Notes or

Additional Payment required on the New Notes upon a change in control or sale event.

99.     The following chart sets forth a summary of SESC's total debt, adding the current liabilities (including, among other things, trade debt and current maturities) to the long term debt, as reflected on SESC's audited consolidated balance sheets for years 2000 through 2004:

| Date | 01/14/00 | 12/31/00 | 2001 | 2002 | 2003 | 2004 |
|---|---|---|---|---|---|---|
| Long-term debt | $36,163,243 | $41,542,072 | $60,758,484 | $58,767,492 | $41,769,576 | $24,584,097 |
| Current Liabilities | $31,159,879 | $35,522,473 | $19,065,509 | $27,356,751 | $48,285,105 | $81,384,099 |
| Other Liabilities | $1,088,000 | $815,880 | $727,295 | -- | -- | -- |
| Total Debt | $68,411,122 | $77,910,159 | $80,551,288 | $86,124,243 | $90,054,681 | $105,968,196 |

100.     The following chart sets forth SESC's tangible net worth calculation through December 31, 2004:

| Date | 01/14/00 | 12/31/00 | 12/31/01 | 12/31/02 | 12/31/03 | 12/31/04 |
|---|---|---|---|---|---|---|
| Stockholder Equity | $23,015,265 | $30,146,864 | $26,347,878 | $26,843,464 | $11,207,267 | ($19,225,222) |
| Less Goodwill and Other Intangible Assets | ($56,715,897) | ($61,207,922) | ($62,543,496) | ($62,775,840) | ($46,857,166) | ($14,792,958) |
| Tangible Net Worth | ($33,700,632) | ($31,061,058) | ($36,175,618) | ($33,932,376) | ($35,649,899) | ($34,018,180) |

101.     Moreover, SESC's EBIDTA for 2000-2004 was $10,902,611, $6,937,537, $9,197,881, and $10,862,013, respectively.

**O.     The February 2005 Brazos Transaction**

102.     Subsequent to March 8, 2002, SESC continued to fail to meet its financial projections.  In late 2004, SESC engaged the financial firm BB&T to offer all or substantially all of SESC's assets for sale to potential purchasers.  During that same time period, certain of the Seller Noteholders sent a letter to Terry Malone, who was chairman of the Board of SESC at the

time, discussing the possibility of acquiring a controlling interest in SESC as an option in the event that there was no offer forthcoming from the efforts by BB&T.[117]

103.    However, the so-called Brazos Transaction ultimately ended up going forward and, specifically, Strategic Acquisition, Inc., a new entity formed by Brazos Private Equity Partners, acquired substantially all SESC's assets on February 14, 2005, for $46,520,000 in cash, which amount was sufficient to pay the senior debt owed to LaSalle, the 12% Mass Mutual Notes, and to return approximately $646,608.49 in cash to SESC, which ceased operations.  At closing, Kevin P. Bruce, the former CEO of SESC appointed by Glencoe Capital, received a bonus payment in the amount of $825,000.00.[118]  MWE received $825,000.00 in fees and expenses for its role as SESC's counsel.[119]  Glencoe Capital also obtained the right to receive a management fee in the amount of $1 million, paid in annual installments over ten years, by New Strategic.[120]

104.    Strategic Acquisition, Inc. continued the business of SESC and changed its name to Strategic Equipment and Supply Corporation, the name under which the Debtor had previously operated ("New SESC").  SESC changed its name to Equipment Equity Holdings, Inc., which is the Debtor's current name.

105.    In addition to the $46,520,000, the purchase price consideration included the receipt by SESC of 26% of the stock in New SESC, which has subsequently been reduced to approximately 11% to 15%, depending on certain rights held by third parties.

---

[117] Defendants' Exhibit 148 (the actual letter), although discussed at Trial (*see* DE # 90, pgs. 132-135), was not formally offered and admitted into evidence.  However, as demonstrated by the Transcript, the court is relying on the testimony of Harold Gernsbacher in finding this fact.

[118] See Plaintiffs' Exhibit 217.

[119] *Id.*

[120] Plaintiffs' Exhibits 214 & 215.

106.    Subject to the terms of the ARSPA, this transaction triggered SESC's obligation to redeem the New Notes and pay the principal, accrued interest, and the Additional Payment amount.  Certain of the New Noteholders, however, executed a Standstill and Amendment Agreement, dated February 14, 2005, in which the New Noteholders agreed to forebear from exercising their rights and remedies pursuant to the SPA to collect all obligations due as a result of the sale until the earliest of the following occur: (a) December 31, 2007, (b) the exercise by any holder of 9% Seller Notes of any of his, her or its rights or remedies to collect any amount under the 9% Seller Notes prior to the irrevocable payment in full of the 15% notes, (c) any Event of Default shall have occurred under Section 16.1 (e), (f), or (g) of the SPA, (d) the 15% noteholders are determined not to be in a perfected first priority lien position in the assets of SESC, (e) SESC's sale, transfer or other disposition of any of its assets including, without limitation, any of the Rollover Equity or the Earnout Payments without the prior written consent of the Majority 15% Holders (noteholders representing 80% of outstanding principal), (f) the occurrence of any breach of this agreement (the "Standstill and Amendment Agreement") by SESC, or (g) delivery of written notice by the Majority 15% Holders to SESC that the Standstill and Amendment Agreement is terminated.  Interestingly, two of the Plaintiffs in this case executed the Standstill and Amendment Agreement (Andrew Scruggs and Walter Eskuri).

107.    Certain of the New Noteholders also executed a Release, dated February 14, 2005, which provides that the holders of the New Notes release each of SESC's operating companies and each subsidiary guarantor from any and all obligations arising from or related to the New Notes.  The release did not extend to SESC.

108.    On February 14, 2005, SESC executed a Security Agreement giving the holders of the New Notes a security interest in all assets of SESC, including dividends and proceeds

from SESC's stock in New Strategic. The Plaintiffs did not sign the Security Agreement. Beth Satterfield executed the Security Agreement on behalf of SESC as its Vice President, and on behalf of Glencoe Capital, as a secured party. Robert Shettle executed the Security Agreement on behalf of the Mass Mutual entities, as secured parties, in their capacities as holders of New Notes.

109.    On or about February 17, 2005, SESC sent a letter for which all Plaintiffs were included in the distribution list stating as follows: "Holders of greater than 80% of the principal amount of the 15% Notes have agreed to forebear from the exercise of any collection actions regarding the amount due on the 15% notes until the disposition of SESC's retained interest in Recapitalized SESC (or such other time as they reasonably determine to be necessary to protect their rights or remedies.) This forbearance provides all stakeholders with the opportunity to potentially share in any growth in the value of SESC's retained interest in the Recapitalized SESC." At least three Plaintiffs (Harold Gernsbacher, Jr., Robert Zintgraff and Reed Jackson) testified that this was the first time that they learned of the existence of the 80% Waiver Provision.[121]

110.    Following the sale of SESC's assets to New SESC, various Plaintiffs, including Gernsbacher, Zintgraff, and members of the Palm family demanded payment of their New Notes and/or their Seller Notes. SESC informed them that more than 80% of the holders of the New Notes had exercised the 80% Waiver Provision. In August 2005, Mr. Gernsbacher, Mr. Zintgraff, and various members of the Palm family sued SESC, Glencoe Capital, LLC, Glencoe Capital Partners II, L.P., and various former officers and directors of the Debtor in State District

---

[121] DE # 90, pg. 18, DE # 101, pg. 50; DE # 102, pg. 75. Interestingly, Mr. Gernsbacher also testified that he had not read the entirety of the ARSPA and, thus, would not have noticed the inclusion of the 80% Waiver Provision regardless. DE # 90, pgs. 174-175.

**AMENDED MEMORANDUM OPINION**                    **PAGE 69**

Court in Tarrant County, Texas for alleged damages and fraudulent transfer liability related to the New Notes transaction. That lawsuit was still pending when the involuntary petition was filed on December 1, 2009.

111. In November 2007, SESC received $2,757,000 as a result of a recapitalization dividend from New SESC. Approximately $1 million of that amount was held in an escrow account at Bank of America as collateral for obligations owed by New SESC, and was not distributed to SESC at that time. The Debtor did not disclose the receipt of the recapitalization dividend to any of the Plaintiffs until after the involuntary petition in bankruptcy was filed. Plaintiffs did not request this information from the Debtor prior to that time. Between November 2007 and May 25, 2010, SESC spent approximately $1.5 million of the recapitalization dividend on various expenses, including fees and costs incurred in connection with the state court litigation with Messrs. Gernsbacher, Zintgraff, and members of the Palm family.

**P.     The Bankruptcy Proceedings**

112. On December 1, 2009, certain Plaintiffs—Michael N. Palm, Shannon Palm, Kristin Palm, Harold Gernsbacher, Jr., Robert N. Zintgraff, and Zintgraff Investments, Ltd.— filed an involuntary petition in bankruptcy against SESC. Following six (6) months of litigation, SESC consented to the entry of an Order for Relief, which was entered on May 25, 2010. The Debtor immediately converted its Chapter 7 case to a case under Chapter 11, and converted it back to Chapter 7 on August 24, 2010. Shortly thereafter, Robert Yaquinto, Jr. (the "Trustee") was appointed as Chapter 7 Trustee.

**Q.     The Adversary Proceeding**

113. The Plaintiffs in this proceeding are all of the holders of the Seller Notes. Each of the Defendants holds one or more New Notes. As previously stated, this Adversary Proceeding

**AMENDED MEMORANDUM OPINION**                                                        **PAGE 70**

is a dispute about payment priority between the holders of the Seller Notes and certain holders of the New Notes.

## IV.    CONCLUSIONS OF LAW

114.    The Plaintiffs have essentially asserted two broad theories for elevating the Seller Notes ahead of the New Notes: (1) various subordination/recharacterization theories; and (2) a theory that Plaintiffs are entitled to a declaratory judgment regarding unenforceability of documents.  Within the first category, the Plaintiffs have first sought to equitably subordinate the New Notes pursuant to section 510(c) of the Bankruptcy Code, or alternatively to recharacterize the New Notes as equity under the case law doctrine of recharacterization.  The Plaintiffs have also asked the court to subordinate the New Notes pursuant to section 510(b) of the Bankruptcy Code.  However, to the extent the court does not find that recharacterization or subordination of the New Notes is appropriate, the Plaintiffs have pursued a second avenue to elevate the Seller Notes to the New Notes.  Specifically, the Plaintiffs have sought a declaratory judgment that the documentation which effectively subordinated the Seller Notes to the New Notes (*i.e.*, the ARSPA) is unenforceable against the Seller Noteholders, and, thus, that the Seller Notes were not ever legally subordinated to the New Notes.[122]  The court will first address the various subordination/recharacterization claims.

### A.    The Plaintiffs' Equitable Subordination (Section 510(c)) and Recharacterization Theories

115.    Generally speaking (and as described further herein), ***equitable subordination*** is a long-recognized doctrine whereby a creditor's claim might be subordinated in payment to other

---

[122] Arguably, should the court find that the documentary evidence supporting the subordination of the Seller Notes to the New Notes is not enforceable against one or all of the Plaintiffs, while also holding not to subordinate or recharacterize the New Notes, then the holders of these particular Seller Notes would share *pari passu* with the New Notes in terms of priority of payment.

claims if the creditor engaged in misconduct that injured the debtor or other creditors. In the oft-cited case of *Pepper v. Litton*, 308 U.S. 295, 305 (1939), the United States Supreme Court famously wrote about the judicially-created doctrine of equitable subordination, stating that bankruptcy courts, as courts of equity, have inherent authority to ensure "that substance will not give way to form, [and] that technical considerations will not prevent substantial justice from being done." The doctrine of equitable subordination, was later codified in section 510(c) of the Bankruptcy Code, and it largely developed as a policy against fraud and the breach of the duties imposed on a fiduciary of the bankrupt.[123] In fact, the doctrine is often applied to "insider"-creditors of an entity. However, notably, section 510(c) codified the general principle that money loaned by corporate insiders is as green as the money loaned by non-insiders, and that absent inequitable conduct, their claims should be treated *pari passu* with the claims of non-insider lenders.[124]

116. To be clear, when section 510(c) of the Bankruptcy Code was enacted in 1978, Congress endorsed and codified existing Supreme Court case law, including *Pepper v. Litton*, and specifically gave bankruptcy courts authority "under principles of equitable subordination" to subordinate insider or non-insider claims to claims of other creditors.[125]

---

[123] *Id.* at 310-311.

[124] James M. Wilton & Stephen Moeller-Sally, *Debt Recharacterization Under State Law*, 62 BUS. LAW. 1257, 1258 (Aug. 2007).

[125] *Id.* In fact, the legislative history of section 510(c) supports such an assertion. Specifically, the bill first introduced in the House of Representatives as House Bill 31 (H. R. 31, 94th Cong. (1976)) and introduced in the Senate as Senate Bill 236 (S. 236, 94th Cong. (1975)) contained a blanket subordination of all claims of insiders and their affiliates. However, Congress ultimately rejected this statutory language and the concept of a blanket subordination of all claims of insiders. In the report accompanying the final bill, Congress endorsed existing case law and affirmed the equitable power of the bankruptcy courts to subordinate claims in circumstances consistent with prevailing authority: "This Section is intended to codify case law such as *Pepper v. Litton*, 308 U.S. 295 (1939) ... and is not intended to limit the court's power in any way.... The court's power is broader than the general doctrine of equitable subordination, and encompasses subordination on any equitable grounds." H.R. REP. NO. 95-595, at 359 (1978).

**AMENDED MEMORANDUM OPINION**                                   **PAGE 72**

117.     Since the enactment of section 510(c) of the Bankruptcy Code, courts have sometimes utilized a similar remedy known as ***recharacterization***, which permits a court to recharacterize a loan, whether from an insider or non-insider, as an equity contribution, even where such lender has engaged in no inequitable conduct.  Thus, while both doctrines entail the altering of priority of payment for a creditor's claim in the Bankruptcy Code's distribution scheme, the doctrines themselves are distinct.  Equitable subordination is applicable when equity demands that the payment priority of the claim of an otherwise legitimate creditor must be changed to fall behind those of other claimants.[126]  In contrast, the focus of a recharacterization inquiry is whether "a debt actually exists," or, put another way, what is the proper legal characterization of an investment in the first instance.[127]  Here, for the reasons articulated below, the court finds that neither equitable subordination nor recharacterization is appropriate under the facts of this case.

### 1.     *Equitable Subordination Under Section 510(c) of the Bankruptcy Code*

118.     Equitable subordination under section 510(c) is an extraordinary remedy, to be sparingly employed.[128]  This is because:

> Wrongful or unpredictable subordination spawns legal uncertainty of a particular type: the risk that a court may refuse to honor an otherwise binding agreement on amorphous grounds of equity.  If a court wrongly subordinates a claim, other investors are sure to take heed.  An investor will see that the chance she might not

---

[126] *Cohen v. KB Mezzanine Fund II, LP (In re SubMicron Sys., Corp.)*, 432 F.3d 448, 454 (3d Cir. 2006) (citing *Citicorp Venture Capital, Ltd. v. Comm. of Creditors Holding Unsecured Claims*, 160 F.3d 982, 986-87 (3d Cir.1998) & *Bayer Corp. v. MascoTech, Inc. (In re AutoStyle Plastics, Inc.)*, 269 F.3d 726, 749 (6th Cir.2001)).

[127] *Id.* at 748.

[128] *Holt v. F.D.I.C. (In re CTS Truss, Inc.)*, 868 F.2d 146, 148-49 (5th Cir. 1989) ("this case does not fall within any of the classic patterns of conduct that led courts to fashion the extraordinary remedy of equitable subordination"); *U.S. Abatement Corp. v. Mobil Exploration & Producing U.S., Inc. (In re U.S. Abatement Corp.)*, 39 F.3d 556, 561 (5th Cir. 1994) ("Equitable subordination is a remedial, not penal, measure which is used only sparingly").

**AMENDED MEMORANDUM OPINION**                                          **PAGE 73**

get her money back has gone up slightly. She will be less willing to lend or invest in the future; and the cost of credit will rise for all.[129]

119. Equitable subordination, first recognized at common law, is codified in Section 510(c) of the Bankruptcy Code. Section 510(c) provides, in relevant part:

> after notice and a hearing, the court may . . . under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest . . .[130]

120. The elements of equitable subordination have been articulated in the Fifth Circuit as follows: (1) the claimant must have engaged in inequitable conduct; (2) the misconduct must have resulted in injury to the creditors or conferred an unfair advantage to the claimant; and (3) equitable subordination of the claim must not be inconsistent with the provisions of the Bankruptcy Code.[131] If any of these elements are not satisfied, equitable subordination is inappropriate.[132] Further, "[e]quitable subordination is remedial, not penal, in nature, and in the absence of actual harm, equitable subordination is inappropriate."[133] Equitable subordination is, therefore, proper only to the extent necessary to offset the harm suffered as a result of the conduct in question.[134]

---

[129] *Nat'l Emergency Servs. v. Williams*, 371 B.R. 166, 170 (W.D. Va. 2007) (citing *In re Lifschultz Fast Freight*, 132 F.3d 339, 347 (7th Cir. 1997)).

[130] 11 U.S.C. § 510(c).

[131] *Wooley v. Faulkner (In re SI Restructuring, Inc.)*, 532 F.3d 355, 360 (5th Cir. 2008).

[132] *Id.*; *see also Benjamin v. Diamond (In re Mobile Steel Co.)*, 563 F.2d 692, 706 (5th Cir. 1977) (denying subordination because there was "no factual showing that any of these purported improprieties injured either Mobile Steel or its creditors").

[133] *SI Restructuring, Inc.*, 532 F.3d at 361.

[134] *Id.*

**AMENDED MEMORANDUM OPINION**        **PAGE 74**

121. When reviewing equitable subordination claims, courts impose a higher standard on the conduct of insiders.[135] Indeed, "[a] claim arising from the dealings between a debtor and an insider is to be rigorously scrutinized by the courts."[136] Therefore, "if the claimant is an insider, less egregious conduct may support equitable subordination."[137] While this court must apply careful scrutiny in its review of the equitable subordination claim, the court will continue to use caution in applying the remedy because "equitable subordination is an unusual remedy which should be applied in limited circumstances."[138] This general language continues to apply to claims involving both insiders and non-insiders, and the mere existence of an insider relationship alone is insufficient to warrant subordination."[139] In fact, claims involving insiders "are not automatically subordinated" since "insiders are the persons most interested in restoring and reviving the debtor, and such bona fide efforts should be viewed with approval."[140] Thus, insider transactions should be more closely scrutinized, not because the insider relationship makes them inherently wrong, but because insiders "usually have greater opportunities for ... inequitable conduct."[141] Moreover, the presence of insider status goes only to establishing the standard to apply in reviewing the insider's conduct.[142] Specifically, in order to equitably

---

[135] *Bayer Corp. v. MascoTech, Inc. (In re AutoStyle Plastics, Inc.)*, 269 F.3d 726, 744-45 (3d Cir. 2006).

[136] *Id.* (citing *Fabricators, Inc. v. Technical Fabricators, Inc. (In re Fabricators, Inc.)*, 926 F.2d 1458, 1465 (5th Cir.1991)).

[137] *AutoStyle Plastics*, 269 F.3d at 745 (citing *Summit Coffee Co. v. Herby's Foods, Inc. (In re Herby's Foods, Inc.)*, 2 F.3d 128, 131 (5th Cir.1993)); *see also Fabricators*, 926 F.2d at 1465 ("If the claimant is not an insider, then evidence of more egregious conduct such as fraud, spoilation or overreaching is necessary").

[138] *AutoStyle Plastics*, 269 F.3d at 745 (citing *Fabricators*, 926 F.2d at 1464).

[139] *Blasbalg v. Tarro (In re Hyperion Enters., Inc.)*, 158 B.R. 555, 563 (D.R.I. 1993).

[140] *Id.*

[141] *Fabricators*, 926 F.2d at 1465.

[142] *Id.* at 1467.

**AMENDED MEMORANDUM OPINION** **PAGE 75**

subordinate an insider claim, the insider must actually use its power to control to its own advantage or to the other creditors' detriment.[143]

122.    With these standards in mind, the court must first determine whether the Defendants[144] engaged in inequitable conduct, and, then, if so, whether there was actual harm caused to either the Debtor or unsecured creditors as a result of such inequitable conduct.

### *a)    Inequitable Conduct*

123.    In general, courts tend to recognize three categories of misconduct which may constitute inequitable conduct: (1) fraud, illegality, and breach of fiduciary duties; (2) undercapitalization; or (3) claimant's use of the debtor as a mere instrumentality or alter ego.[145]

### (1)    Fraud, Illegality, and Breaches of Fiduciary Duties

124.    Plaintiffs first assert that certain of the Defendants engaged in inequitable conduct in the form of fraud, illegality, or breaches of fiduciary duties.  First, as to the issue of fraud, the Plaintiffs assert that certain of the Defendants committed fraud by: (1) putting on an "elaborate dog and pony show"—including through the creation of a "sham special finance committee" and the use of misleading documents created by Lincoln Partners—to persuade Plaintiffs

---

[143] *Comstock v. Group of Institutional Investors*, 335 U.S. 211, 229 (1948).

[144] A claim cannot be equitably subordinated based on the inequitable conduct of other persons. *See generally, Wooley v. Faulkner (In re SI Restructuring, Inc.)*, 532 F.3d 355, 360 (5th Cir. 2008) (citing the equitable subordination test, which requires a complaining creditor to demonstrate the claimant engaged in inequitable conduct).  Rather, a complaining creditor must demonstrate that the claimant itself engaged in the inequitable conduct in question. *See, e.g., Nat'l Emergency Servs. v. Williams*, 371 B.R. 166, 169-70 (W.D. Va. 2007) (affirming bankruptcy court's order granting motion to dismiss where, in part, plaintiff failed to plead sufficient to demonstrate that claimant himself engaged in inequitable conduct).  Here, the Plaintiffs have offered no evidence that the Defendants Massachusetts Mutual Life Insurance Company, MassMutual High Yield Partners II, LLC, the Estate of Thomas M. Garvin, Thomas L. Bindley Revocable Trust, Kevin Bruce, Ed Poore, and Bill Aisenberg engaged in any of the alleged inequitable conduct that forms the basis of their equitable subordination claim.  Accordingly, these Defendants' New Notes are not subject to equitable subordination under section 510(c) of the Bankruptcy Code.

[145] *Fabricators, Inc. v. Technical Fabricators, Inc. (In re Fabricators, Inc.)*, 926 F.2d 1458, 1467 (5th Cir.1991) (citing *Wilson v. Huffman (In re Missionary Baptist Found. of Am., Inc.)*, 712 F.2d 206, 212 (5th Cir.1983)).

**AMENDED MEMORANDUM OPINION**                                      **PAGE 76**

Gernsbacher, Zintgraff and Jackson to approve the New Notes transaction in their capacity as members of the Board and to "sell" the transaction to other Board members, (2) falsely representing to the Board that LaSalle had threatened to put SESC into bankruptcy within 30-45 days if the New Notes transaction was not approved as structured, and (3) falsely representing to the Board that Glencoe Capital would shut down SESC's Texas-based divisions and put SESC into bankruptcy if the New Notes transaction was not approved quickly.

125.     Based upon the courts findings above, the court concludes that no fraud has occurred here.  There is no dispute that SESC was under serious financial distress in late 2001 and early 2002.  By the summer of 2001, SESC was in breach of multiple financial covenants set forth in SESC's January 14, 2000 Credit Agreement with its lenders.  Matters worsened as the year progressed.  The tragic events of September 11, 2001 further contributed to the delay of many of SESC's customers' capital projects.  For the fiscal quarters ending June 30, 2001, September 30, 2001 and December 31, 2001, the degree to which the covenants had been breached increased quarter to quarter to quarter.  SESC's credit agreement with its senior lenders required SESC to, among other things, achieve a minimum EBITDA of $13,200,000 in 2001. SESC's actual EBITDA in 2001 was $6,937,537.  Its fixed charge coverage ratio as of December 31, 2001 was only .68:1.00, 32% below the minimum required.  Given these breaches, the senior lenders required an infusion of funds into SESC.  SESC needed the funds raised from the New Notes transaction to resolve its covenant breaches and to obtain amendments to its senior lending facility to give SESC the opportunity to reverse its dismal performance.

126.     Moreover, the Plaintiffs' overwhelmingly supported the issuance of the New Notes at a very difficult time in SESC's history.  Several of the Plaintiffs retained reputable, experienced counsel (King & Spalding) and an investment banker (Amy Forestall) to review the

transaction.  The Plaintiffs were sophisticated individuals who had already received millions of

dollars from this company just months before SESC's downward spiral.  These Plaintiffs were

not duped.  The Plaintiffs have not proven that false representations were ever made.  They have

not presented any contemporaneous record from 2001 or 2002 referencing the alleged false

representations above and, as such, the court makes no findings of fraud in this case.

127.    As far as potential "illegalities," the Plaintiffs next argue that certain of the

Defendants committed violations of securities laws.  Specifically, they assert that certain of the

Defendants failed to adequately disclose the existence of the 80% Waiver Provision of the New

Notes, and that such failure was a per se violation of Section 10(b) of the federal Securities

Exchange Act of 1934, 15 U.S.C. § 78j(b), Rule 10b-5, 17 C.F.R. 240.10b-5, and Texas

securities laws, Tex. Civ. Stat. art. 581-33(A).

128.    First, and most importantly, the Plaintiffs have not tied this alleged omission to

any particular Defendant.  In fact, Beth Satterfield credibly testified that Glencoe had not made

the decision to include the 80% Waiver Provision in the ARSPA.  Additionally, the court heard

extensive testimony from Scott Williams, SESC's attorney, about his reasons for inserting the

80% Waiver Provision into the ARSPA and the reasons why such provision was not brought up

at Board meetings or included in the Summary of the New Notes terms in Tab 4 of the

Subscription Booklet.  As such, the court found that the 80% Waiver Provision was a common

provision in note instruments where there were to be multiple holders and was inserted by

SESC's counsel, who believed it to be in the best interest of SESC.  As such, the court does not

believe that there was any deception or violations of securities laws by the Defendants, and that

insertion of the 80% Waiver Provision was not inequitable conduct.

129. Finally, the Plaintiffs argue that certain of Defendants committed breaches of fiduciary duties by: (1) consummating a New Notes transaction that was allegedly structured to divert the value of SESC away from the Plaintiffs to other shareholders, (2) failing and refusing to provide the Plaintiffs with information regarding a proposed sale of SESC in 2004, and (3) improperly spending money received as a recapitalization dividend on account of its stock in New SESC on attorneys' fees and costs associated with the dispute between Plaintiffs and Defendants.

130. The court rejects these arguments and claims. The New Notes were necessary to the survival of SESC. SESC was in dire straits. It needed a lifeline. The New Notes were structured in a way that was consistent with the high risk that was associated with the lending. Moreover, all the Plaintiffs had the opportunity to invest in the New Notes.

131. Not only is the evidence unsupportive of the notion that the Defendants breached fiduciary duties by consummating the New Notes transaction, but the evidence likewise does not support the notion that the Defendants breached fiduciary duties by nondisclosure of potential sales of SESC in 2004 or by spending recapitalization dividend funds on legitimate expenses such as legal fees. There is simply no credible evidence that there was a failure to disclose at any level or that this was a breach of fiduciary duties.

(2)     Undercapitalization

132. Plaintiffs next argue that the Defendants engaged in inequitable conduct by virtue of undercapitalization, plus "overreaching." When a corporation is undercapitalized, a court may be more skeptical of loans made to it because they may, in reality, be infusions of capital.[146] Moreover, undercapitalization may create circumstances in which inequitable conduct is more

---

[146] *Bayer Corp. v. MascoTech, Inc. (In re AutoStyle Plastics, Inc.)*, 269 F.3d 726, 746-47 (3d Cir. 2006).

**AMENDED MEMORANDUM OPINION**                                                   **PAGE 79**

likely to occur.[147]  However, undercapitalization alone is insufficient to justify the subordination of insider claims.[148]  "A finding of inequitable conduct requires more than a showing of undercapitalization.  There must be evidence of other inequitable conduct."[149]  "This is because 'any other analysis would discourage loans from insiders to corporations facing financial difficulty and would be unfortunate because it is the shareholders who are most likely to have the motivation to salvage a floundering company.'"[150]  Thus, a court may equitably subordinate a claim if there is "some showing of suspicious, inequitable conduct beyond mere initial undercapitalization of the enterprise."[151]  Such conduct may include "fraud, spoliation, mismanagement or faithless stewardship."[152]

133.    On this record, the court cannot make a finding or conclusion of inequitable conduct based solely on undercapitalization.  Frankly, SESC was always undercapitalized (including at the time of the Roll-up Transaction, when the Plaintiffs not only received their Seller Notes, but also more than $50 million of cash out of the company).  Moreover, even though it is undisputed that there was undercapitalization here, the court has not found, nor have the Plaintiffs shown, that there was any further inequitable conduct by the Defendants beyond this fact.  Accordingly, the court concludes that equitable subordination based upon undercapitalization is not appropriate.

---

[147] *Id.* at 747.

[148] *Id.*

[149] *Id.* (quoting *Blasbalg v. Tarro (In re Hyperion Enters., Inc.)*, 158 B.R. 555, 563 (D.R.I. 1993)).

[150] *AutoStyle Plastics,* 269 F.3d at 747 (quoting *Braas Sys., Inc. v. WMR Partners (In re Octagon Roofing)*, 157 B.R. 852, 858 (N.D. Ill. 1993)).

[151] *AutoStyle Plastics,* 269 F.3d at 747 (quoting *Wood v. Richmond (In re Branding Iron Steak House)*, 536 F.2d 299, 302 (9th Cir.1976)).

[152] *AutoStyle Plastics,* 269 F.3d at 747 (quoting *Octagon Roofing*, 157 B.R. at 858)).

(3)     Claimant's Use of the Debtor as a Mere Instrumentality of Alter Ego

134.     A claimant's actual use of the debtor as a mere instrumentality or alter ego may constitute inequitable conduct.[153]  It is not, however, sufficient that the claimant possessed the ability to control the debtor, but, rather, the claimant must have actually used such control to advantage itself to the detriment of the debtor or creditors.[154]  As the Supreme Court has stated in *Comstock v. Group of Institutional Investors*, 335 U.S. 211, 229 (1948), "[i]t is not the mere existence of an opportunity to do wrong that brings the rule into play; it is the unconscionable use of the opportunity afforded by the domination to advantage itself at the injury of the subsidiary that deprives the wrongdoer of the fruits of his wrong."

135.     Here, the Plaintiffs have argued that the Defendants exercised excessive control over SESC.  According to Plaintiffs, the Defendants unilaterally negotiated on SESC's behalf to secure transaction terms that were most favorable to it, and used its control of the Board to obtain approval of the transaction.  As to the first contention, the court has already found that Glencoe had authority under the Management Agreement to negotiate with LaSalle and Mass Mutual regarding the terms of the New Notes transaction.  More importantly, however, the terms that Glencoe Capital negotiated with the lenders were presented to the Board and approved *unanimously*.  The three members of the board who Plaintiffs appointed – Plaintiffs Harold Gernsbacher, Reed Jackson and Robert Zintgraff – voted unanimously in favor of the March 2002 New Notes transaction, and these Plaintiffs themselves bought New Notes (after consulting

---

[153] *Smith v. Assocs. Commercial Corp. (In re Clark Pipe & Supply Co.)*, 893 F.2d 693, 699 (5th Cir. 1990).

[154] *Id.* ("Upon reconsideration, we have concluded that we cannot say that the sort of control [the insiders] asserted over Clark's financial affairs rises to the level of unconscionable conduct necessary to justify the application of the doctrine of equitable subordination"); *Branding Iron Steak House*, 536 F.2d at 302 (requiring showing, with respect to fiduciary claimant, not only of ability and intent to control the debtor, but actual exertion of such control to the detriment of other creditors).

with sophisticated advisors). Here, the court cannot conclude that there was an abuse of control by any of the Defendants in this case, and, accordingly, equitable subordination would not be appropriate.

>                    *b)*        ***Actual Harm to the Debtor***

136.    However, even if there was inequitable conduct in this case, the Plaintiffs' request to equitably subordinate the New Notes pursuant to section 510(c) of the Bankruptcy Code also fails because here, the court does not believe there was sufficient evidence to support a finding of actual harm to SESC and its unsecured creditors. As stated above, equitable subordination is remedial, not penal, in nature, and in the absence of actual harm, equitable subordination is inappropriate."[155] Courts have determined that this requirement is not satisfied where a claimant's infusion of funds enables the company to stave off financial difficulties for a period of time.[156] This is true even where such efforts ultimately fail and the corporation is forced to seek bankruptcy protection.[157]

137.    In *Wooley v. Faulkner (In re SI Restructuring, Inc.)*, 532 F.3d 355, 357-358 (5th Cir. 2008), John and Jeffrey Wooley made two loans (a $1 million and $2.5 million loan) to Schlotzsky's in the year 2003 at a time when they were officers, directors, and the largest shareholders of the entity, due to the fact that Schlotzsky's was facing a cash crunch (*i.e.*, an inability to make payroll and also was likely to default on secured debt) and other financing options had not materialized. The Wooleys resigned their positions with the company in mid-2004 and Schlotzsky's ultimately filed for bankruptcy in August 2004.[158] The Wooleys filed

---

[155] *Wooley v. Faulkner (In re SI Restructuring, Inc.)*, 532 F.3d 355, 361 (5th Cir. 2008).

[156] *Cohen v. KB Mezzanine Fund II, LP (In re SubMicron Sys., Corp.)*, 432 F.3d 448, 462-63 (3d Cir. 2006).

[157] *Am. Twine LP v. Whitten*, 392 F. Supp. 2d 13, 21, 23 (D. Mass. 2005).

[158] *SI Restructuring*, 532 F.3d at 358.

secured claims in connection with the 2003 loans in the bankruptcy case and a liquidating trustee sought to have the claims subordinated to the status of unsecured creditors.[159] In determining whether the debtor or other creditors were harmed by the Wooleys' loans, the Fifth Circuit held that the loan proceeds had been used to pay unsecured creditors and otherwise keep the company afloat and that this did not harm creditors.[160] It is also noteworthy that, while the liquidating trustee in *SI Restructuring* argued that the creditors of the company had been harmed in that the value of the company deteriorated as a result of the Wooleys' loans, thus decreasing the amount available for creditors (*i.e.*, causing "deepening insolvency"), the Fifth Circuit rejected such argument as a valid theory for damages, stating that there were no facts suggesting that the loans caused deepening insolvency.[161]

138.    Similarly, in *Cohen v. KB Mezzanine Fund II, LP (In re SubMicron Sys., Corp.)*, 432 F.3d 448, 452 (3d Cir. 2006), a debtor issued a series of notes to various lenders in exchange for new capital infusions.  The court held in *SubMicron Sys.* that it was understood that if the debtor had failed to secure such financing and a sale of assets, it would have been forced to liquidate, generally "leaving secured creditors…with pennies on the dollar and unsecured creditors and shareholders with nothing."[162]  Under those circumstances, the court held that the lenders' conduct (*i.e.*, staving off liquidation by infusing the company with capital) did not result in any harm to creditors or unfair advantage to the lenders.[163]  Indeed, the court noted that the

---

[159] *Id.*

[160] *Id.* at 361-62.

[161] *Id.* at 362-63.

[162] *SubMicron Sys.*, 432 F.3d at 453.

[163] *Id.* at 462-63.

lenders' actions actually benefitted unsecured creditors "by enabling [the company] to pay operating expenses and to avoid a Chapter 7 liquidation."[164]

139.    Here, SESC was in a similar financial position as the companies in *SI Restructuring* and *SubMicron Sys.*  As set forth in the findings of fact above, the New Notes bestowed multiple benefits on SESC in an effort to provide SESC with at least an opportunity to prosper when its future hung in the balance.  Specifically, this court finds and concludes that the New Notes conferred a number of benefits on SESC.  Specifically, the New Notes provided funds to SESC, increased SESC's cash flow by over $5.4 million between 2002 through 2004 due to more favorable amortization terms, avoided the imposition of a default interest rate on SESC's $39 million debt to senior lenders, decreased SESC's other debt by over $3 million, and allowed SESC to obtain a waiver of its breaches of its loan covenants.  The New Notes provided a "life line" in the midst of rapid decline.  On balance, while SESC was not miraculously transformed by the New Notes infusion, neither SESC nor unsecured creditors were harmed by the issuance of the New Notes.  They gave SESC a reprieve.  In summary, the Plaintiffs did not present evidence showing that either the Debtor or that unsecured creditors were harmed by the issuance of the New Notes, and, thus, equitable subordination pursuant to section 510(c) of the Bankruptcy Code is not appropriate.

### 2.    *Recharacterization*

140.    The second theory that the Plaintiffs have asserted is "recharacterization." Recharacterization (like equitable subordination) is a doctrine that originated in case law but, unlike equitable subordination, has not been legislatively added to the Bankruptcy Code. Equitable subordination and recharacterization are similar doctrines and are frequently confused,

---

[164] *Id.* at 463, n. 18.

but—not only is one codified in Title 11 and one not—but they are doctrines that are aimed at *different conduct* and have *different remedies* (although sometimes based on the same facts).

141. Specifically, with regard to the different "conduct" that is implicated, with equitable subordination, it is the *creditor's behavior* that is at issue in connection with either the creditor's creation or enforcement of its loan. On the contrary, with recharacterization, it is more of a "substance versus form" analysis (*i.e.,* did the parties call a funding instrument one thing and truly intend another?).[165] Unlike equitable subordination under section 510(c) of the Bankruptcy Code, a claim for recharacterization has been described by some courts as being a "no fault" cause of action that does not require proof or findings of misconduct[166] (thus, recharacterization can be easier to prove than equitable subordination).[167] Finally, with regard to the different "remedies" that each doctrine implicates, recharacterization involves treating what is likely labeled as a "debt" as an equity interest ("if it looks like a duck and quacks like a duck, it must be a duck"), whereas equitable subordination involves either subordinating for purposes of distribution one claim to another claim, or one interest to another interest, or even ordering that a lien securing a claim be transferred to the bankruptcy estate.[168]

142. The doctrine of recharacterization, as it has evolved across United States jurisdictions, unfortunately imposes inconsistent and, arguably, sometimes *irrational* results (particularly for insiders or other nontraditional lenders of last resort) who provide financial

---

[165] *Fairchild Dornier GMBH v. Official Comm. of Unsecured Creditors (In re Official Comm. of Unsecured Creditors for Dornier Aviation (N. Am.), Inc.),* 453 F.3d 225, 232 (4th Cir. 2006) (while recharacterization "rests on the substance of the transaction giving rise to the claimant's demand," equitable subordination, in contrast, rests on a court's "assessment of the creditor's behavior" (emphasis in original)).

[166] James M. Wilton & Stephen Moeller-Sally, *Debt Recharacterization Under State Law*, 62 BUS. LAW. 1257 (Aug. 2007).

[167] *Id.*

[168] 11 U.S.C. § 510(c).

support to a business in financial distress.[169] Courts tend to use multi-factor checklists to analyze the substance of a transaction and, thus, whether, recharacterization is warranted. In fact, this court has identified at least four different standards (mostly involving formulaic checklists) that are utilized among the federal circuit courts in determining whether to apply the doctrine of recharacterization.

143. First, the Eleventh Circuit has adopted an amazingly broad, alternative two-prong test. Specifically, the Eleventh Circuit in *Estes v. N & D Properties, Inc. (In re N&D Properties, Inc.)*, 799 F.2d 726, 733 (11th Cir. 1986), held that shareholder loans may be deemed capital contributions in one of two circumstances: (1) where the trustee proves initial under-capitalization; or (2) where the trustee proves that the loans were made when no other disinterested lender would have extended credit. While this test is clearly a minority approach (and some might even argue draconian), it has been cited as precedent by several lower courts in the Eleventh Circuit.[170]

144. Second, the Ninth Circuit B.A.P. in *Unsecured Creditors' Comms. of Pac. Express, Inc. v. Pioneer Commercial Funding Corp. (In re Pac. Express, Inc.)*, 69 B.R. 112, 115 (9th Cir. B.A.P. 1986), took a vastly different approach the same year, basically rejecting the concept of recharacterization in the bankruptcy courts and holding that bankruptcy courts lack the authority to recharacterize insider loans as capital contributions. Specifically, the Ninth Circuit B.A.P stated that:

> [w]hile the Code supports the court's ability to determine the amount and the allowance or disallowance of claims, those provisions do not provide for the characterization of claims as equity or debt. The result achieved by such a determination, *i.e.* subordination, is governed by 11 U.S.C. Section 510(c). Where

---

[169] *Id.*

[170] *See, e.g., Diasonics, Inc. v. Ingalls*, 121 B.R. 626, 631 (Bankr. N.D. Fla. 1990); *Mukamal v. Bakes*, 383 B.R. 798, 829 (S.D. Fla. 2007).

**AMENDED MEMORANDUM OPINION**                                          **PAGE 86**

there is a specific provision governing these determinations, it is inconsistent with the interpretation of the Bankruptcy Code to allow such determinations to be made under different standards through the use of the court's equitable powers.[171]

Note that at least one district court in the Ninth Circuit has chosen not to follow *Pac. Express*, and instead adopted the multi-factor test described in detail below.[172]

145.    Third (and by far the majority approach), courts in the Third, Fourth, Sixth, and Tenth Circuits have relied upon section 105(a) of the Bankruptcy Code[173] as authority to recharacterize a loan as equity.  In conducting a recharacterization analysis, the Third, Fourth, Sixth, and Tenth Circuits have adopted multi-factor checklists or tests.[174]  While the specific number of factors utilized by each circuit varies,[175] the tests largely overlap as to the factors considered and are very similar, if not completely identical.[176]  By way of example, both the Third Circuit and Sixth Circuit have adopted an 11-factor test, which considers the following factors in making an analysis of whether debt should be recharacterized as equity: (1) the names given to the instruments, if any, evidencing the indebtedness; (2) the presence or absence of a

---

[171] *Unsecured Creditors' Committees of Pac. Express, Inc. v. Pioneer Commercial Funding Corp. (In re Pac. Express, Inc.)*, 69 B.R. 112, 115 (9th Cir. B.A.P. 1986).

[172] *See, e.g., Daewoo Motor Am., Inc. v. Daewoo Motor Co., Ltd. (In re Daewoo Motor Am., Inc.)*, 471 B.R. 721, 734 (C.D. Cal. 2012).  *But see Straightshot Commc'ns. Inc. v. Telekenex, Inc.*, No. C10-268Z, 2010 WL 4793538, at *1-2 (W.D. Wash. Nov. 19, 2010) ("In the Ninth Circuit ... bankruptcy courts do not have the power to adjudicate a claim for debt recharacterization" citing *Pacific Express*); *Official Comm. of Unsecured Creditors v. Hancock Park Capital II, L.P. (In re Fitness Holdings Int'l., Inc.)*, No. CV 10-0647, 2011 WL 7763674, at *5 (C.D. Cal. Aug 31, 2011) (disallowing claim for debt reharacterization citing *Pacific Express*).

[173] Section 105(a) of the Bankruptcy Code allows a court to "issue any order, process or judgment that is necessary or appropriate to carry out the provisions of the Code."

[174] See *Bayer Corp. v. MascoTech, Inc. (In re Autostyle Plastics, Inc.)*, 269 F.3d 726, 747-53 (6th Cir. 2001); *Roth Steel Tube Co. v. Comm'r of Internal Revenue*, 800 F.2d 625, 630 (6th Cir. 1986); *Cohen v. KB Mezzanine Fund II, LP (In re SubMicron Sys. Corp.)*, 432 F.3d 448, 455 n.8 (3d Cir. 2006); *Fairchild Dornier GMBH v. Official Comm. of Unsecured Creditors (In re Official Comm. of Unsecured Creditors for Dornier Aviation (N. Am.), Inc.)*, 453 F.3d 225, 233-34 (4th Cir. 2006); *Sender v. The Bronze Group, Ltd. (In re Hedged-Invs. Assocs., Inc.)*, 380 F.3d 1292, 1298 (10th Cir. 2004).

[175] *See, e.g., SubMicron Sys.*, 432 F.3d at 455 n.8 (noting use of eleven-factor, thirteen-factor, and seven-factor tests in certain cases).

[176] *Fairchild*, 453 F.3d at 234.

---

**AMENDED MEMORANDUM OPINION**                                      **PAGE 87**

fixed maturity date and schedule of payments; (3) the presence or absence of a fixed rate of interest and interest payments; (4) the source of repayments; (5) the adequacy or inadequacy of capitalization; (6) the identity of interest between the creditor and the stockholder; (7) the security, if any, for the advances; (8) the corporation's ability to obtain financing from outside lending institutions; (9) the extent to which the advances were subordinated to the claims of outside creditors; (10) the extent to which the advances were used to acquire capital assets; and (11) the presence or absence of a sinking fund to provide repayments.[177]  However, as noted by the Third Circuit in *Submicron*:

> [n]o mechanistic scorecard suffices. And none should, for Kabuki outcomes elude difficult fact patterns. While some cases are easy (*e.g.*, a document titled a "Note" calling for payments of sums certain at fixed intervals with market-rate interest and these obligations are secured and are partly performed, versus a document issued as a certificate indicating a proportional interest in the enterprise to which the certificate relates), others are hard (such as a "Note" with conventional repayment terms yet reflecting an amount proportional to prior equity interests and whose payment terms are ignored). Which course a court discerns is typically a commonsense conclusion that the party infusing funds does so as a banker (the party expects to be repaid with interest no matter the borrower's fortunes; therefore, the funds are debt) or as an investor (the funds infused are repaid based on the borrower's fortunes; hence, they are equity). Form is no doubt a factor, but in the end it is no more than an indicator of what the parties actually intended and acted on.[178]

In other words, while a formulaic checklist certainly aids the court in analyzing whether a loan should be regarded as debt or equity, courts utilizing a factor test must contextualize the facts giving rise to the loan and keep in mind the economic realities surrounding such loan.

146.    Certainly, contextualizing the facts—and not blindly adhering to multifactor tests—seems appropriate and desirable.  Why?  As will be further discussed herein, the multi-factor tests that courts so often use largely derived from tax court precedents, which are very

---

[177] *SubMicron Sys., Corp.*, 432 F.3d at 456 (citing *Roth Steel*, 800 F.2d at 630 & *Autostyle Plastics*, 269 F.3d at 749-50).

[178] *SubMicron Sys. Corp.*, 432 F.3d at 456.

different contextual settings than priority disputes in bankruptcy cases.[179]  In tax courts, the context and focus is typically upon whether a transaction between an investor and corporation should be deemed to be a debt, so as to generate a tax benefit to the investor (such as deductibility of interest or allowance of a bad debt deduction as an ordinary loss rather than a capital loss).  Tax cases usually involve solvent corporations and the choice between debt and equity in the financing transaction was a matter of tax planning for the investor; the repayment of the funds to the insider is not the question.  This seems very different than deciding in a bankruptcy case whether an "investor" that provided a loan to a company in financial straits should be treated senior to, on a parity with, or subordinate to other creditors.  Moreover, much of modern financing would seem to fall on a continuum between debt and equity.  For example, it is not uncommon for a company to obtain zero interest coupon bonds that do not require periodic interest payments.  It is also not unusual (particularly when a company may have cash flow constraints) for debt instruments to provide for deferral of interest through use of payment-in-kind or "PIK" interest.  Also, certain very high-yield debt is not uncommon and is sometimes referred to as "mezzanine debt" because it falls between debt and equity.  Convertible debt is also not uncommon.  It would seem irrational to blindly adhere to a multi-factor checklist and treat some of these financing vehicles as equity, simply because they have *features* of equity (where there was no inequitable conduct involved).  Contextualizing the facts giving rise to the loan, considering economic realities, and considering whether overreaching was genuinely involved or not seems paramount.

147.    Finally, the Fifth Circuit (which this court is bound to follow) has articulated a fourth legal standard *vis-à-vis* recharacterization.  The Fifth Circuit, in a case called *Lothian Oil*,

---

[179] James M. Wilton & Stephen Moeller-Sally, *Debt Recharacterization Under State Law*, 62 BUS. LAW. 1257, 1265 (Aug. 2007).

has recognized the vitality of the doctrine of recharacterization in bankruptcy and, specifically, has held that the authority of bankruptcy courts to recharacterize debts is derived from the authority to allow or disallow claims under section 502(b) of the Bankruptcy Code rather than from the general equitable powers of bankruptcy courts under section 105(a) of the Bankruptcy Code.[180] Section 502(b) provides that a bankruptcy court "shall allow such claim, except to the extent that…such claim is unenforceable…under any agreement or applicable law…"[181] "Applicable law" within the meaning of section 502(b) refers to state law.[182] Accordingly, the Fifth Circuit in *Lothian Oil* held that a bankruptcy court must look to the applicable state law to determine whether the Defendants' claims may—or should—be recharacterized. In *Lothian Oil*, the Fifth Circuit ultimately applied Texas law, which recognizes recharacterization, and utilizes a multi-factor analysis, which is similar to the multi-factor analyses utilized by the Third, Fourth, Sixth and Tenth Circuits (as described in detail above).[183] The Fifth Circuit also cited to two multi-factor tests that had been previously utilized in tax cases in the Fifth Circuit.[184] While not specifically adopting one factor checklist over the other, the court simply noted that in applying

---

[180] *Grossman v. Lothian Oil Inc. (In re Lothian Oil Inc.)*, 650 F.3d 539, 542-44 (5th Cir. 2011).

[181] 11 U.S.C. § 502(b).

[182] *Lothian*, 650 F.3d at 543.

[183] *Id.* at 544.

[184] *See Estate of Mixon v. United States*, 464 F.2d 394, 402 (5th Cir.1972) (13–factor checklist looking at (1) the names given to the certificates evidencing the indebtedness; (2) the presence or absence of a fixed maturity date; (3) the source of payments; (4) the right to enforce payment of principal and interest; (5) participation in management flowing as a result; (6) the status of the contribution in relation to regular corporate creditors; (7) the intent of the parties; (8) "thin" or adequate capitalization; (9) identity of interest between creditor and stockholder; (10) source of interest payments; (11) the ability of the corporation to obtain loans from outside lending institutions; (12) the extent to which the advance was used to acquire capital assets; and (13) the failure of the debtor to repay on the due date or to seek a postponement); *Jones v. United States*, 659 F.2d 618, 622 n. 12 (5th Cir.1981) (11–factor test looking at the (1) name of the instrument memorializing the transaction; (2) definitiveness of maturity date; (3) source of payments; (4) right to enforce payment; (5) participation in management; (6) relationship of would be "creditors" to general creditors; (7) intent of the parties; (8) adequacy of capitalization; (9) identity of ownership; (10) source of interest payments; and (11) ability of corporation to obtain loans elsewhere).

either checklist, the court should "consider all the factors and weigh the evidence favoring characterization of the [interest] as debt or equity, while realizing that the various factors are not of equal significance and that no one factor is controlling."[185]  Accordingly, this court concludes that, to the extent Texas law would apply in the case at bar, the factor test condoned by the Fifth Circuit is essentially the same as the factor tests articulated in the Third, Fourth, Sixth, and Tenth Circuits.

148.    With this background, the court now begins its recharacterization analysis in this case.  First, this bankruptcy court (sitting in the Fifth Circuit) must follow the legal standard articulated by the Fifth Circuit in *Lothian Oil*.  Specifically, this means that this court shall recognize that recharacterization is a doctrine available to it by virtue of section 502(b) of the Bankruptcy Code if "applicable [state] law" dictates that the New Notes should be recharacterized.  Second, the court must decide *what state law* is the "applicable law" for the purposes of evaluating the Plaintiffs' recharacterization argument.   Under Texas law (the state where this court sits), the parties' contractual choice of law will be given effect if the contract bears a reasonable relationship to the chosen state and no countervailing public policy of the forum demands otherwise.[186]  Here, the relevant contracts—the New Notes, the SPA, and the ARSPA—all contain a provision stating that they will be governed by *Massachusetts* law.[187]

---

[185] *Lothian*, 650 F.3d at 544 (citing *Mixon*, 464 F.2d at 402).

[186] *See, e.g., Midwest Med. Supply Co., L.L.C. v. Wingert*, 317 S.W.3d 530, 536 (Tex. App.—Dallas 2010, no pet.).

[187] While the Plaintiffs have argued that certain of the relevant contracts (*i.e.*, the New Notes and the ARSPA) are not enforceable against the Plaintiffs, such argument is being addressed below with regard to the Plaintiffs' request for a declaratory judgment and the court does not believe this argument relevant with regard to its recharacterization analysis.  Specifically, the court believes that, as part of its recharacterization analysis, it must consider the underlying documentation supporting the issuance of the New Notes and since such documentation contains a Massachusetts choice of law provision, such provision is relevant.  Moreover, all of the Plaintiffs signed the original SPA, which also contained a Massachusetts choice of law provision, and, thus, it seems reasonable to the court that the Plaintiffs be

---

**AMENDED MEMORANDUM OPINION**                                    **PAGE 91**

Because the Mass Mutual Entities (based in Massachusetts) loaned SESC monies pursuant to all such documents, there is a reasonable relationship between the relevant contracts and Massachusetts.[188] The court, therefore, concludes that the applicable state law for purposes of this recharacterization analysis is Massachusetts law.

149. Under Massachusetts law, a loan or advance made by an investor may, in certain circumstances, be treated as an equity contribution rather than a loan.[189] The leading case discussing Massachusetts law is *American Twine Ltd. P'ship v. Whitten*, 392 F. Supp. 2d 13 (D. Mass. 2005). It states whether an advance should be treated as an equity contribution to, rather than creating a debt of, an entity depends upon, broadly, two main factors (1) the objective intent of the contributor; and (2) whether, in the particular circumstances, equitable considerations require treatment of the advance as an equity contribution.[190] Interestingly, Massachusetts injects "equitable considerations" into the analysis as opposed to blindly adhering to a substance over form approach, as some courts are wont to do. More on this to follow.

---

bound to such provision, especially in light of the fact that the issuance of the New Notes was effectuated out of an amendment to the SPA (*i.e.*, the ARSPA).

The court would also note that the state law applicable to the enforcement of a debt is typically the governing law specified in the promissory note or other loan documentation; however, if a defense to the enforcement of debt is that an advance must be recharacterized as equity, an argument can also be made that the appropriate governing state law is the law of the jurisdiction of organization of the "borrower" organization. James M. Wilton & Stephen Moeller-Sally, *Debt Recharacterization Under State Law*, 62 Bus. Law. 1257, 1276 n. 90 (Aug. 2007). Here, this would require the application of Texas law. However, even if this court were to apply Texas law (*i.e.*, application of a multi-factor test), the court believes the result would be the same (as explained in further detail below) and that recharacterization of the New Notes would not be warranted.

[188] *Chase Manhattan Bank, N.A., v. Greenbriar N. Section II*, 835 S.W.2d 720, 725-28 (Tex. App.—Houston [1st Dist.] 1992) (fact that party to contract's headquarters and principal place of business were in New York held sufficient to support contractually-agreed upon choice of New York law).

[189] *Am. Twine Ltd. P'ship v. Whitten*, 392 F. Supp. 2d 13, 21 (D. Mass. 2005).

[190] *Id.* at 22 (citing *Yankee Microwave v. Petricca Commc'ns. Sys., Inc.*, 53 Mass. App. Ct. 497, 522 (Mass. App. Ct. 2002)).

### a) *The Objective Intent of the Defendants*

150.    As to the first broad requirement in Massachusetts law, the United States District

Court for the District of Massachusetts in *American Twine* defaulted—one might say—to some

of the formulaic checklists employed by federal bankruptcy courts in evaluating

recharacterization requests, for guidance as to the "objective intent" of the contributor.[191]

Specifically, the district court in *American Twine* looked to the following factors in determining

whether to recharacterize an alleged loan as equity:  (1) the adequacy of capital contributions; (2)

the ratio of shareholder loans to capital; (3) the amount or degree of shareholder control; (4) the

availability of similar loans from outside lenders; (5) whether the ultimate financial failure was

caused by undercapitalization; (6) whether the note included fixed payment provisions and a

fixed maturity date; (7) whether a note or other debt document was executed; (8) whether

advances were used to acquire capital assets; and (9) how the debt was treated in business

records.[192]  The district court considered these factors in the aggregate and found that no one

factor was determinative.[193]  Thus, in determining the objective intent of the lender,

Massachusetts courts first apply a multi-factor test, similar to the multi-factor tests that have

been utilized by the Third, Fourth, Fifth, Sixth, and Tenth Circuits.

151.    Because there are a number of factual similarities between the facts and

circumstances present in *American Twine* and those present in this case, the facts of *American*

---

[191] *Am. Twine*, 392 F. Supp. at 21-22.

[192] *Id.* at 22 (citing *Aquino v. Black (In re AtlanticRancher)*, 279 B.R. 411, 433-34 (Bankr. D. Mass. 2002)).  Specifically, the bankruptcy court in *AtlanticRancher* applied a 9-factor test that was in accord with the multi-factor approaches used by tax courts.  *See Hyperion Enterprises,* 158 B.R. 555, 561-62 (D.R.I. 1993).  It is worth nothing that the court in *AtlanticRancher* also applied the 2-factor test articulated by the Eleventh Circuit in *Estes v. N & D Properties, Inc. (In re N&D Properties, Inc.)*, 799 F.2d 726, 733 (11th Cir. 1986), in addition to the nine *Hyperion* factors noted above; however, the district court in *American Twine* did not examine the Eleventh Circuit test in its decision.  *Atlantic Rancher*, 279 B.R. at 434-438.

[193] *Am. Twine,* 392 F. Supp. at 22.

---

*Twine* merit some discussion.  *American Twine* concerned a technology company, Northern

Light Technology, Inc. ("INC"), located in the State of Massachusetts. [194]  Between its formation

in 1995 and 1999, INC conducted several rounds of equity financing during which certain of the

plaintiffs, Gregory and Ruth Whitten (the "Whittens"), purchased shares of INC stock.[195]

152.    For the entire term of its existence, INC's expenses consistently exceeded its

revenues and INC was never profitable.[196]  INC projected positive net income for the year 2002,

but ultimately suffered a net loss during that year.[197]  In late 1999 and early 2000, INC's Board

of Directors and management considered conducting an initial public offering ("IPO") to raise

additional capital but, as a consequence of the burst of the internet bubble, ultimately concluded

that the prospects for an IPO were dismal.[198]  By the fourth quarter of 2000, INC was

"desperately in need of a cash infusion."[199]

153.    In the fourth quarter of 2001, INC began to negotiate a strategic partnership or

acquisition agreement with a third party.[200]  After failing to raise sufficient capital through an

additional round of equity financing, however, INC faced the possibility of exhausting its

available funds before the consummation of any sale agreement.[201]  To provide INC with

funding pending a sale, the parties discussed the possibility of the Whittens contributing

additional funds to INC (the "Bridge Loan").[202]  In the course of negotiations, the parties

---

[194] *Id.* at 15.

[195] *Id.* at 15-16.

[196] *Id.* at 15.

[197] *Id.*

[198] *Id.* at 16.

[199] *Id.*

[200] *Id.*

[201] *Id.*

[202] *Id.*

considered a number of potential structures for the contribution, including equity, debt secured

by a convertible debenture with 8% annual interest, and straight debt.[203]  The terms of the Bridge

Loan which were ultimately agreed upon between the parties included a 35% per annum interest

rate and a prepayment premium requiring a minimum of one year of interest be paid, even if the

Bridge Loan was outstanding for less than a year.[204] Moreover, the Bridge Loan was convertible

if INC were to engage in any future equity financing rounds.  Normal formalities in documenting

the Bridge Loan were followed (*i.e.*, the Bridge Loan was approved by INC's board of directors

(including the option of allowing other shareholders to participate), promissory notes were

issued, and Uniform Commercial Code financing statements were filed in respect of security

interests granted).[205]  While a sale of all of INC's assets was ultimately consummated, the LLC

(which assumed the Bridge Loan), ultimately failed and was forced to sell its assets to another

company (Divine) in exchange for Divine stock.[206]  Divine ultimately filed for bankruptcy and a

former unpaid landlord of the LLC filed a recharacterization lawsuit in Divine's bankruptcy case

to recharacterize the Bridge Loan as an equity investment.[207]

154.    Applying Massachusetts law (and the two part test articulated above), the district

court in *American Twine* concluded that recharacterization was inappropriate.[208]  In reaching that

conclusion, the court held that at the time the Bridge Loan was executed: (1) INC was

undercapitalized; (2) INC had little capital of significance and the ratio of shareholder loans to

capital was, therefore, greater than one to one; and (3) the Whittens were minority shareholders

---

[203] *Id.* at 17.

[204] *Id.*

[205] *Id.*

[206] *Id.* at 19.

[207] *Id.* at 13.

[208] *Id.* at 22.

**AMENDED MEMORANDUM OPINION**                                                **PAGE 95**

who did not control INC (although occasionally attending board meetings and more involved with the company than most shareholders).[209]  Moreover, the district court found that: (1) INC was unable to attract a similar loan from any other investor although many other potential investors had the opportunity to participate in the Bridge Loan; (2) INC's ultimate failure was not caused by undercapitalization, but rather by its poor business model, astronomical expenses, a competitively unattractive product, and outside forces such as the burst of the internet "bubble;" (3) the Bridge Loan contained repayment provisions and a fixed maturity date and all of the formalities associated with creating a valid loan agreement were followed (including execution of promissory notes and a security agreement); (4) the Bridge Loan advances were used primarily for operational expenses, although some of the proceeds were used to acquire capital equipment; and (5) the Bridge Loan was treated as debt in INC's business records.[210]  On balance, the district court held that, while some of the factors favored treating the Bridge Loan as capital, in the aggregate, an analysis of the factors lead convincingly, but not overwhelmingly, to the conclusion that the Bridge Loan should be treated as debt.[211]  Moreover, the district court noted, with little explanation, that "equitable considerations" did not require treatment of the Bridge Loan as a capital contribution (which goes to the second requirement of the broad two-part Massachusetts test).[212]

155.    This Court will now apply the facts of this case to each of nine factors identified in *American Twine*.[213]

---

[209] *Id.*

[210] *Id.* at 22-23.

[211] *Id.* at 23.

[212] *Id.* at 22.

[213] The bankruptcy court in *Atlantic Rancher* noted that the 9-factor test that was ultimately applied was similar to the 11-factor test utilized in *Autostyle*.  *Aquino v. Black (In re AtlanticRancher)*,

(1)    The Adequacy of Capital Contributions

156.    The court concludes that the Debtor was undercapitalized at the time the New Notes were issued.  Neither the Plaintiffs nor the Defendants dispute this fact.

(2)    The Ratio of Shareholder Loans to Capital

157.    The New Notes were only offered to SESC's shareholders, in direct proportion to their equity interests in SESC, but because not all the shareholders actually bought New Notes, the final allocation of the New Notes was not in direct proportion to the existing shareholder's equity interests.  Nonetheless, the court does find that there was a tight correlation with the various parties' equity interests and the values associated with the issuance of the New Notes.

(3)    The Amount or Degree of Shareholder Control

158.    Glencoe Partners controlled 65% of SESC's stock and controlled six (6) of the nine (9) seats on SESC's Board.  The facts clearly show that Glencoe, and its affiliates, had significant presence (albeit not unfettered control) in SESC.

(4)    The Availability of Similar Loans from Outside Lenders

159.    The evidence presented showed that it was "highly unlikely" that any third-party lending institution would have loaned SESC $6 million at the time the New Notes were issued.[214] Moreover, Lincoln Partners also disclosed in its November 30, 2001 presentation to SESC's Board that "it would be difficult, if not impossible, to attract new senior lenders to the bank

---

279 B.R. 411, 434  n. 14 (Bankr. D. Mass. 2002).  Thus, cases applying any form of a multi-factor checklist are still somewhat relevant to this court's analysis, as these checklists are merely a tool to help this court engage in an objective analysis of whether a purported debt instrument has the economic characteristics of equity.

    [214] Plaintiffs' Exhibit 225, Response to Interrogatory No. 20.

**AMENDED MEMORANDUM OPINION**                                    **PAGE 97**

syndicate" and that "it would be difficult, if not impossible, to attract new subordinated lenders to the Company."[215]

       (5)     Whether the Ultimate Financial Failure was Caused By Undercapitalization

160.    Here, the evidence showed that, while undercapitalization certainly was a contributing factor to the Debtor's demise, there were other elements that played a part.  First, as to the issue of undercapitalization, the court has earlier found that SESC was undercapitalized from its inception.[216]  However, this was not the only problem that plagued SESC.  Specifically, the court found that SESC's EBITDA was greatly impacted by a multitude of issues including: (1) that the Debtor was unable to capitalize on any synergies that it potentially gained as a result of the Roll-up Transaction;  (2) that the September 11th tragedy had negatively impacted the hospitality industry as a whole in terms of gross earnings;  (3) that SESC tended to focus its business on pursuing high revenue but low-margin sales;  and (4) that one of the rolled-up companies (the entity owned by the Palms) had a disastrous 2001 performance.

       (6)     Whether the Note Included Fixed Payment Provisions and a Fixed Maturity Date;

161.    The New Notes did not require any periodic repayment of the principal amounts of the Notes prior to maturity, but did have a fixed maturity date.  With respect to interest, the New Notes did not call for periodic interest payments and instead called for PIK interest which

---

[215] Plaintiffs' Exhibit 161, pg. 51.

[216] This undercapitalization may have been due to the Seller Noteholders being overpaid as part of the original Roll-up Transaction.  *See* Footnote 13 & DE # 101, pg. 274.  From a pure numbers standpoint, the original Seller Noteholders were paid $67.6 million as part of the Roll-up Transaction. The purchase price of $67.6 million was derived based upon an estimate of EBITDA multiplied by 7. However when the W.H. Reynolds entity was purchased only eight months later, the purchase price of $11.6 million was derived based upon an estimate of EBITDA multiplied by 4.3, a much lower number than the multiple used in the Roll-up Transaction (*i.e.*, 7).  Finally, the revised Tab 8 of the Subscription Booklet set forth the calculations behind the content in the Lincoln Partners report which assumed a future sale of the Company in 2007 at 5.75 multiplied by projected 2006 EBIDTA, again much lower than the multiple used as part of the Roll-up Transaction (*i.e.*, 7).

was to accrue until maturity or until a change in control or sale event. The IRS considers such interest as ordinary income and the Plaintiffs who bought New Notes were required to pay federal income taxes on the PIK interest each year.

(7)     Whether a Note or Other Debt Document Was Executed

162.    The instruments evidencing the New Notes on their face state they are "15% Junior Subordinated Notes Due January 8, 2002."

(8)     Whether Advances Were Used to Acquire Capital Assets

163.    The terms of the New Notes, as approved by the Debtor's Board of Directors, state that, of the $6 million contributed to acquire the New Notes, "(i) $2.4 million will be used to permanently reduce senior bank debt, and (ii) $3.6 million will be used to provide for the working capital and general corporate purposes of SESC."[217]  In total, $1.6 million went toward payment of interest, lender fees, legal fees, Glencoe Capital's management fees, and Lincoln Partners' fees for its services.[218]  Thus, of the $6 million contributed to SESC for the purchase of New Notes, at most $1.9 million would have been available for working capital, and according to Tab 4 of the Subscription Booklet, $1.6 million of that amount was permitted to be used to acquire a new IT system for SESC (a capital asset).

(9)     How the Debt was Treated in Business Records

164.    It is undisputed that the New Notes appear in the Debtor's audited financial statements in the section titled Long-Term Debt.

165.    Considering all the factors outlined above, and realizing that each factor is not of equal significance and that no one factor is controlling, the court concludes that the New Notes

---

[217] Plaintiffs' Exhibit 168, pg. 1.

[218] *See* Plaintiffs' Exhibit 183 (showing the funds flow to SESC from the New Notes, omitting the fees of McDermott Will & Emery); & Plaintiffs' Exhibit 188 (containing an invoice for $196,000 from McDermott Will & Emery for legal services rendered to SESC through March of 2002).

should be characterized as debt.  First, because the New Notes had a fixed maturity date (weighing in favor of treating the New Notes as debt), but had PIK interest (which weighs in favor of treating the New Notes as equity), the court believes the sixth factor in the multi-factor analysis (*i.e.*, "whether the note included fixed payment provisions and a fixed maturity date") to be neutral and not determinative as to whether the New Notes should be treated as debt or equity. However, as to those factors in the multi-factor analysis, which generally weigh in favor of characterizing the New Notes as equity (the first, second, third, and fourth factor), the court does not think such factors should be given as much weight in the aggregate compared to those factors which weigh in favor of treating the New Notes as debt (the fifth, seventh, eighth, and ninth factor) as explained in detail below.

166.    As to the first factor (*i.e.*, the "adequacy of capital contributions") while undercapitalization may be considered in determining whether an advance is debt or equity, an advance may still properly be characterized as debt notwithstanding the fact that a corporation was undercapitalized at the time when the advance was extended.[219]   The court agrees, and provides the following rationale.  Specifically, where a corporation is solvent but thinly capitalized, this factor may have some bearing on the investor's intent on whether it was providing debt or equity; however, where a corporation is clearly insolvent (which SESC was at the time of the New Notes Transaction), the court does not believe that a rational investor would ever choose to buy equity that is basically "out of the money" and more than likely worthless and, thus, this factor becomes less indicative of the objective intent of the parties.  While some

---

[219] *See, e.g., Am. Twine Ltd. P'ship v. Whitten*, 392 F. Supp. 2d 13, 22 (D. Mass. 2005) (rejecting recharacterization where "INC had little capital of significance").

**AMENDED MEMORANDUM OPINION**                                             **PAGE 100**

courts have given weight to this factor in its recharacterization analysis, this court chooses not to give much weight to such factor in this case.[220]

167.    As to the second factor (*i.e.*, the "ratio of shareholder loans to capital"), where stockholders make advances in proportion to their respective stock ownership, an equity contribution is indicated.[221]  While the advances made pursuant to the New Notes were closely related to each of the New Noteholders' current equity interests, the court does not think this was necessarily indicative that the New Notes were intended to be treated as an equity investment, especially in light of the fact that other debt associated with SESC was structured in a similar way (*i.e.*, the Seller Notes were issued in direct proportion to the amount of the Seller Noteholder's equity in the Debtor).  Thus, while this factor does weigh in favor of treating the New Notes as equity, the court does not give it much weight.

168.    As to the third factor (*i.e.*, the "amount or degree of shareholder control"), a court may consider the amount and degree of shareholder control in determining whether recharacterization is appropriate.[222]  Where the claimant is a majority shareholder, attends board meetings, and is more involved than other shareholders, this factor would weigh in favor of treating the contribution as equity.[223]  Here, the court concludes that, while the Glencoe related entities certainly had influence when it came to making decisions for SESC based upon the number of positions they held on the Board and its majority ownership of SESC, the court does not believe that these entities abused such power.  Participation on–and even majority control of–

---

[220] *See, e.g., Bayer Corp. v. MascoTech, Inc. (In re Autostyle Plastics, Inc.)*, 269 F.3d 726, 751 (6th Cir. 2001); *Friedman's Liquidating Trust v. Goldman Sachs Credit Partners, L.P.*, 452 B.R. 512, 522 (Bankr. D. Del. 2011).

[221] *Autostyle Plastics*, 269 F.3d at 751-752.

[222] *Am. Twine*, 392 F. Supp. 2d at 22.

[223] *Id.*

**AMENDED MEMORANDUM OPINION**                                              **PAGE 101**

a company's board does not, in and of itself, support an equity characterization.[224]  Indeed, it is not unusual for lenders to have designees on a company's board, particularly when a company is distressed.[225]  Here, there were no facts presented which showed that any of the non-Glencoe Board members or shareholders were coerced or threatened into consenting to the New Notes transaction.  In fact, the Board voted **_unanimously_** to approve the issuance of the New Notes and over 85% of the shareholders consented to the issuance of the New Notes.

169.    As to the fourth factor (*i.e.*, the "availability of similar loans from outside lenders"), the court recognizes that the fact that a corporation is unable to attract similar loans from other investors may weigh in favor of recharacterization.[226]  Notwithstanding this fact, advances may properly be–and often are–characterized as debt even where a corporation may have difficulty attracting similar loans.[227]  Indeed, "when existing lenders make loans to a distressed company, they are trying to protect their existing loans and traditional factors that lenders consider (such as capitalization, solvency, collateral, ability to pay cash interest and debt capacity ratios) do not apply as they would when lending to a financially healthy company."[228]  Moreover, as noted by the Fourth Circuit in *Dornier* "[i]n many cases, an insider will be the only

---

[224] *Cohen v. KB Mezzanine Fund II, LP (In re SubMicron Sys., Corp.),* 432 F.3d 448, 457-58 (3d Cir. 2006) (concluding that lenders' control of 3/4 of seats on company Board did not support equity characterization).

[225] *Id.*

[226] *Am. Twine*, 392 F. Supp. 2d at 22.

[227] *Id.* (refusing to recharacterize claim despite fact that company was unable to attract similar loan from other investors); *In re Micro-Precision Technologies, Inc.*, 303 B.R. 238, 247 (Bankr. D.N.H. 2003) (refusing to recharacterize debt as equity despite fact that debtor had difficulty getting outside loans); *Farr v. Phase-I Molecular Toxicology, Inc. (In re Phase-I Molecular Toxicology, Inc.)*, 287 B.R. 571, 578 (Bankr. D.N.M. 2002) (same).

[228] *See  SubMicron*, 432 F.3d at 457; *see also Official Comm. of Unsecured Creditors of Radnor Holdings Corp. v. Tennenbaum Capital Partners, LLC (In re Radnor Holdings Corp.)*, 353 B.R. 820, 839 (Bankr. D. Del. 2006) (citing *SubMicron* with approval and refusing to recharacterize despite allegations that "no prudent lender" would have extended credit to company).

party willing to make a loan to a struggling business, and recharacterization should not be used to discourage good-faith loans."[229] Here, this court is quite convinced that SESC had no viable alternative options to address the issues raised by LaSalle other than the issuance of the New Notes in March 2002. Plaintiffs offered no evidence that any SESC shareholder or other person would have invested $6 million to obtain equity in SESC in late 2001 or early 2002. Thus, the court concludes that, while SESC was unable to secure a loan from an outside source, the court *must* consider the position SESC was in at the time the New Notes were issued and that such issuance was done to *save the company*. As such, the court does not think this factor dispositive.

170.   In contrast, the court finds that application of the fifth, seventh, eighth, and ninth factors weigh in favor of treating the New Notes as debt, and that in the aggregate, should be given more weight than the above factors, which generally weighed in favor of treating the New Notes as equity. First, as to the fifth factor (*i.e.*, "whether the ultimate financial failure was caused by undercapitalization"), the fact that undercapitalization caused the failure of the company may weigh in favor of characterization of an advance as equity.[230] On the other hand, if other factors caused the failure of the company, this reality would weigh against recharacterization.[231] Here, the evidence showed that, while undercapitalization certainly was a contributing factor to the Debtor's demise, there were many other elements that contributed to SESC's financial distress. Specifically, the court noted in its findings that SESC's poor financial performance was impacted by a multitude of issues including: (1) that SESC was unable to capitalize on any synergies that it potentially gained as a result of the Roll-up Transaction; (2)

---

[229] *Fairchild Dornier GMBH v. Official Comm. of Unsecured Creditors (In re Official Comm. Of Unsecured Creditors for Dornier Aviation (N. Am.), Inc.)*, 453 F.3d 225, 234 (4th Cir. 2006)

[230] *Am. Twine*, 392 F. Supp. 2d at 22.

[231] *Id.* (holding the fact that failure was caused not by undercapitalization but by poor business model, astronomical expenses, competitively unattractive product and outside forces such as burst of internet "bubble" weighed against recharacterization).

**AMENDED MEMORANDUM OPINION** **PAGE 103**

that the September 11th tragedy had negatively impacted the hospitality industry as a whole in terms of gross earnings; (3) that SESC tended to focus its business on pursuing high revenue but low-margin sales; and (4) that one of the rolled-up companies (the entity owned by the Palms) had a disastrous 2001 performance. Thus, this factor would clearly weigh in favor of treating the New Notes as debt.

171. Second, as to the seventh (*i.e.*, "whether a note or other debt document was executed") and ninth (*i.e.*, "how the debt was treated in business records") factors (which the court finds are related), the absence of notes or other instruments of indebtedness, as well as not treating such instruments as debt in the company's books and records, are typically strong indications that advances are capital contributions and not loans.[232] On the other hand, the fact that the parties executed a document or documents to memorialize the debt and such debt is treated as debt in the company's books and records weighs in favor of characterization as a loan.[233] The court places great weight on these two factors, due to the fact that the circumstance that is most commonly present, in cases in which loans have been recharacterized as equity, is where belated, unconventional or inadequate loan documentation exists.[234] Here, the court

---

[232] *Id.* at 22-23; *Bayer Corp. v. MascoTech, Inc. (In re Autostyle Plastics, Inc.),* 269 F.3d 726, 750 (6th Cir. 2001). *But see SubMicron Sys.*, 432 F.3d at 458 (debtor's failure to issue notes for one tranche of a multiple year financing and other "numerous mistakes and errors when generating notes" did not warrant debt recharacterization); *In re Internet Navigator, Inc.*, 289 B.R. 133, 137 (Bankr. N.D. Iowa 2003) (refusing to recharacterize insider debt, finding lack of promissory notes or other loan documentation "not surprising" given the debtor's status as a small, closely held corporation).

[233] *Am. Twine*, 392 F. Supp. 2d at 19 (fact that defendants had followed formalities associated with loans by executing debt documents weighed in favor of characterization as loan).

[234] James M. Wilton & Stephen Moeller-Sally, *Debt Recharacterization Under State Law*, 62 BUS. LAW. 1257, 1264 (Aug. 2007); *see also Dornier Aviation*, 453 F.3d at 236 (recharacterizing long-term inter-company debt as equity where prepetition audit had failed to validate an internal reconciliation of accounts and post-audit transactions had been conducted on the same basis); *In re Cold Harbor Assocs.*, 204 B.R. 904, 916-17 (Bankr. E.D. Va. 1997) (noting "troubling lack of formalities" where notes were drawn up seven months after advances were made, notes were payable on demand but contained superfluous provisions related to acceleration of maturity date, and notes were not asserted as basis for

places substantial significance on the efforts taken by Glencoe to make the New Notes transaction both transparent and fair, including sending out the Subscription Booklet to solicit shareholder approval and having the Board vote on the New Notes transaction, which the Board approved of unanimously. This bears on, arguably, a multitude of factors but, among them what was intended as far as how the New Notes would be treated by SESC. Moreover, certain formalities were followed in documenting the New Notes transaction, including the issuance of a New Note instrument as well as the drafting of the ARSPA. Finally, the New Notes were treated as debt in SESC's books and records. Accordingly, the court finds that these factors weigh *heavily* in favor of treating the New Note as debt.

172. Next, as to the eighth factor (*i.e.*, "whether advances were used to acquire capital assets"), courts have held that advances for operational expenses are indicative of debt.[235] This is true even if a portion of the advance was used to fund capital expenditures.[236] Here, almost $1.9 million of the New Notes proceeds were made available for working capital purposes. Moreover, the issue of the New Notes resulted in a decrease of: (1) SESC's liabilities under Term Loan A of the senior credit facility for which LaSalle was the agent by $2.4 million; (2)

---

debt until a year and a half after commencement of the bankruptcy case); *In re The Villas at Hacienda Del Sol, Inc.*, 364 B.R. 702, 708 (Bankr. D. Ariz. 2007) (evidence that alleged debt was originally treated on debtor's books as equity coupled with insider creditor's failure to document claim warranted recharacterization); *In re Union Meeting Partners*, 160 B.R. 757, 774 (Bankr. E.D. Pa. 1993) (partners' "loans" to partnership not documented by notes, and contemporaneous financial statements of the debtor did not list advances as debt); *Leesa Bunch & McMasker Enters., Inc. v. J.M. Capital Fin., Ltd. (In re Hoffinger Indus., Inc.)*, 327 B.R. 389, 410-11 (Bankr. E.D. Ark. 2005) (purported loans "poorly, inaccurately, and incompletely documented"); *Algonquin Power Income Fund v. Ridgewood Heights, Inc. (In re Franklin Indus. Complex, Inc.)*, No. 01-67459, Adv. No. 06-80254, 2007 WL 2509709, at *16 (Bankr. N.D.N.Y. Aug. 30, 2007) (lack of documentation evidencing debt and existence of loan covenants prohibiting incurrence of the insider debt "argue strongly" against dismissal of complaint); *In re Newfound Lake Marina, Inc.*, No. 04-12192-MWV, 2007 WL 2712960, at *5-7 (Bankr. D. N.H. Sept. 14, 2007) (recharacterizing insider debt where "tax returns do not jibe with the ledgers, and the balance sheets do not always jibe with the tax returns").

[235] *Am. Twine*, 392 F. Supp. 2d at 22.

[236] *Id.* (holding that recharacterization was inappropriate where "advances were used primarily for operational expenses, although some of the proceeds were used to acquire capital equipment").

---

SESC's liability to Glencoe Partners by $375,000; and (3) SESC's liability to the Mass Mutual Entities by $633,499.97. In other words, the New Notes replaced other debt and, thus, should be treated as debt.

173.     In summation, the court believes that, considering all the above factors in the aggregate (with factors 1, 2, 3, and 4 weighing in favor of treating the New Notes as equity and factors 5, 7, 8, and 9 weighing in favor of treating the New Notes as debt),[237] the latter factors carry more weight under the facts of this case and that the New Notes should be characterized as debt.

### b)     *Equitable Considerations*

174.     The court believes that the interjection of this second consideration under Massachusetts law[238] (*i.e.*, the "equitable considerations" analysis) both underscores and ameliorates the hazards inherent in blindly using multi-factor tests when considering whether recharacterization is appropriate.  Specifically, as noted earlier, one problem with applying multi-factor tests is that the tests largely derive from decisions in tax court cases which are in a very different context than priority disputes in bankruptcy cases.  As earlier mentioned, in the tax court cases, the context and focus is typically upon whether a transaction between an investor and corporation should be deemed to be a debt, so as to generate a tax benefit to the investor (such as deductibility of interest or allowance of a bad debt deduction as an ordinary loss rather than a capital loss).[239]  Moreover, tax cases usually involve solvent corporations and the choice between debt and equity in the financing transaction was a matter of tax planning for the

---

[237] The sixth factor was neutral.

[238] *Am. Twine*, 392 F. Supp. 2d at 22 (citing *Yankee Microwave v. Petricca Commc'ns. Sys., Inc.*, 53 Mass. App. Ct. 497, 522 (Mass. App. Ct. 2002)).

[239] James M. Wilton & Stephen Moeller-Sally, *Debt Recharacterization Under State Law*, 62 BUS. LAW. 1257, 1265 (Aug. 2007).

investor; the repayment of the funds to the insider is not the question.   This seems very different than deciding in a bankruptcy case whether an "investor" that provided a loan to a company in financial straits should be treated senior to, on parity with, or subordinate to other creditors. Thus, interjecting an evaluation of "equitable considerations" allows a court to focus on the all-important **context**: does the fact that the distressed company would have failed but for the alleged loan transaction make a difference?  Here, the court believes that it does indeed.   These Defendants were the only ones willing to lend money to SESC, and all existing shareholders had an opportunity to participate.  Moreover, the court has found that SESC was in a very tenuous situation with LaSalle, and that without a contribution of funds, SESC was not going to survive for much longer.

175.    Finally, the court would note that Congress has already placed statutes in the Bankruptcy Code to address problematic conduct, among them:  (a) Section 510 of the Bankruptcy Code, which addresses inequitable conduct; and (b) Section 548(a)(1)(B) of the Bankruptcy Code, which allows avoidance as a fraudulent transfer of a loan made within 2 years of a bankruptcy filing, for which the debtor received less than reasonably equivalent value in exchange, and was insolvent or rendered insolvent (to address the situation when imprudent loans are made while a debtor is insolvent or thinly capitalized and such loans do not provide reasonable value to the debtor) .  From these statutes, one might reasonably infer that we need to "set the bar higher" than simply adopting a formulaic checklist.  The "equitable considerations" analysis applied in the Massachusetts courts, indeed, seems to "set the bar higher" and require pragmatic and equitable balancing, rather than rigid computation of factors in a checklist.

176.    In conclusion, when considering both the multi-factor test, as well as taking into account certain "equitable considerations" under the Massachusetts broad two-prong test, this

court believes that the New Notes are properly characterized as debt. They were intended to be debt, everyone knew it, and everyone had the opportunity to participate. The intention was to "throw the Debtor a lifeline" and try to save the company. Accordingly, the Plaintiffs' request for recharacterization of the New Notes as equity is denied. As such, the objections to the Defendants' various Proofs of Claim are hereby overruled.[240]

### B.    Subordination Under Section 510(b) of the Bankruptcy Code

177.    The Plaintiffs' third theory is that the New Notes should be automatically subordinated pursuant to Section 510(b) of the Bankruptcy Code. Section 510(b) provides, in relevant part:

> For the purpose of distribution under this title, a claim arising from rescission of purchase or sale of a security of the debtor or of an affiliate of the debtor, for damages arising from the purchase or sale of such a security, or for reimbursement or contribution allowed under Section 502 on account of such a claim, shall be subordinated to all claims or interests that are senior to or equal the claim or interest represented by such security, except that if such security is common stock, such claim has the same priority as common stock.[241]

178.    The Fifth Circuit has observed that "Section 510(b) requires the subordination of three distinct categories of claims: (1) a claim arising from rescission of a purchase or sale of a security of the debtor (the rescission category); (2) a claim for damages arising from the purchase or sale of a security of the debtor (the damages category); and (3) a claim for reimbursement or contribution allowed under 11 U.S.C. § 502 on account of either (1) or (2)."[242]

---

[240] This court cannot help but wonder "what might have been" if not for the funding of the New Notes. It is easy to surmise—when playing the "what if" game—that SESC might have filed bankruptcy sometime in 2002 and, if it had, a bankruptcy trustee or other estate representative might have sued the Seller Noteholders for fraudulent transfers or equitable subordination, given the fact that they received rich consideration in the Roll-up Transaction ($50M+ cash) and SESC was in financial straits just a few months later. Indeed, ironic, that this scenario was averted with the New Notes transaction and now it is the New Noteholders being sued.

[241] 11 U.S.C. § 510(b).

[242] *SeaQuest Diving LP v. S&J Diving Inc. (In re SeaQuest Diving LP)*, 579 F.3d 411, 418 (5th Cir. 2009).

**AMENDED MEMORANDUM OPINION**                                              **PAGE 108**

179.    The claims of the New Noteholders are claims to enforce the New Notes and, accordingly, are not within the scope of any of the Section 510(b) categories above.  As a leading bankruptcy treatise has explained:

> [A]ll claims of security holders are not subordinated under Section 510(b).  For example, claims of noteholders for payments required by the note, based upon the instrument itself, are not claims 'for damages arising from the purchase or sale of such a security' and are accordingly not subject to subordination under section 510(b).[243]

180.    The Plaintiffs nevertheless argue that automatic subordination is appropriate under section 510(b), citing *SeaQuest Diving LP*.  Specifically, Plaintiffs argue that the New Notes were intended to "claw back" Defendants' prior equity investments in SESC.  Plaintiffs assert that the New Notes achieved this goal through the inclusion of the "Additional Payment" provision, which they claim was engineered to ensure the return of the Glencoe Investors' $20 million equity contribution in SESC.  For support, Plaintiffs point primarily to several "models" that they claim demonstrate that the Glencoe Investors analyzed the likely returns from their contributions in SESC in terms of the "blended returns" that they would achieve from the combined original equity investment and the New Notes with inclusion of the "Additional Payment" provision.  This court has previously considered and rejected this contention in its findings of fact above.

181.    Even if this was the intent of the Glencoe Investors, however, *SeaQuest* is inapposite and does not compel the mandatory subordination of the New Notes under section 510(b).  *SeaQuest* involved a rescission of an equity investment through a settlement agreement,

---

[243] 4 COLLIER ON BANKRUPTCY, § 510.04[6] (Alan N. Resnick & Henry J. Sommer eds., 16th ed.); *see also Montgomery Ward Holding Corp. v. Schoeberl (In re Montgomery Ward Holding Corp.),* 272 B.R. 836, 842 (Bankr. D. Del. 2001), *abrogated on other grounds by Baroda Hill Invs., Ltd. v. Telegroup, Inc. (In re Telegroup, Inc.),* 281 F.3d 133, 142 (3d Cir. 2002); *Wash. Bancorporation v. F.D.I.C. (In re Wash. Bancorporation),* Civil Action No. 95-1340, 1996 WL 148533, at *20 (D. D.C. March 19, 1996) (Section 510(b) does not apply to a claim seeking to recover on commercial paper where the claim seeks only recovery on the debtor's debt obligations).

**AMENDED MEMORANDUM OPINION**                                          **PAGE 109**

which followed the initial issuance of the securities at issue.[244]  One of the purposes of the
settlement agreement was to "claw back" the claimants' initial equity contribution.[245]  The court
held that the rescission category noted above covers a rescission premised on a party's conduct
following the purchase or sale of a security.[246]  In this context, the court noted Congress' concern
regarding the efforts of disaffected stockholders to recapture their investments from debtors
based on claims relating to the issuance of their equity interest or post-purchase or sale
conduct.[247]  In short, the court concluded that, if the initial security was in the form of equity and
the transaction is rescinded, the resulting claim is subject to mandatory subordination and cannot
be treated as an unsecured debt.[248]

182.  Here, there has been no rescission of the Glencoe Investors' initial equity
interests.  Unlike *SeaQuest*, where the claimant simply sought a return of funds contributed to
the debtor, the holders of the New Notes infused $6 million of new capital into SESC in March
2002.  In return, they received New Notes and the rights associated with those New Notes.  After
the purchase or sale of the New Notes, they continued to own any SESC shares that they
previously owned prior to the date of the New Notes transaction.  They still hold all such
interests.  No rescission has occurred.  Under these facts, Plaintiffs claims under section 510(b)
must be rejected.

---

[244] *SeaQuest Diving LP*, 579 F.3d at 414-18.

[245] *Id.* at 425.

[246] *Id.* at 422, 425.

[247] *Id.* at 421-22.

[248] *Id.* at 422.

**C.** **Contract Interpretation/Declaration Regarding the Enforceability of the New Notes**

183. Finally, as stated above, the Plaintiffs have also requested a declaration, pursuant to Federal Rule of Civil Procedure 57 and Bankruptcy Rule 7001(9), that any of the documents executed on March 8, 2002, in connection with the New Notes, including specifically the ARSPA "are unenforceable against the Seller Noteholders." In support of that request, they make two primary arguments: (i) the documents entered into in connection with the New Notes are unenforceable under Section 3 of the Seller Subordination Agreement, and (ii) they are barred by the doctrines of fraudulent inducement, failure of consideration, duress, mistake and undue influence. The Defendants assert that, while they believe that the underlying documentation is enforceable against *all* of the Plaintiffs, they, nonetheless, conceded pre-Trial that those holders of Seller Notes who did not consent to the New Notes transaction should be permitted to share *pari passu* with the New Noteholders.[249]

184. In arguing that the documentation evidencing the New Notes is unenforceable, the Plaintiffs point to Section 3 of the Seller Subordination Agreements, which provides, in relevant part that: "the subordination effected hereby, and the rights and obligations of the Subordinated Lenders . . .arising hereunder, shall not be modified or impaired in any manner or to any extent by . . . any amendment or modification of or supplement to the Securities Purchase Agreements, any other Operative Document or any Subordinated Loan Instrument."[250] That provision, Plaintiffs contend, makes the subordination of the Seller Notes to the Notes effectuated by the ARSPA unenforceable against the Plaintiffs.

---

[249] DE # 68, pg. 6.

[250] The court noted that there was conflicting language in the body of the Seller Subordination Agreements and the Seller Notes themselves on whether the subordination of the Seller Notes would remain effective in the event the SPA was amended.

185.    As noted in the stipulated facts, six of the Plaintiffs (Harold Gernsbacher, Bob

Zintgraff, Andrew Scruggs, David Campbell, Reed Jackson, and Walter Eskuri) who purchased

New Notes, signed the ARSPA , which provided that their Seller Notes were subordinated to the

New Notes.  These Plaintiffs hold Seller Notes representing approximately 49% of the

outstanding balance of the Seller Notes.  Subordination provisions, like the ones at issue in this

case, effect a waiver of rights and remedies, and such waivers are expressly preserved and

deemed enforceable under section 510(a) of the Bankruptcy Code.  Section 510(a) states that a

"subordination agreement is enforceable in a case under this title to the same extent that such

agreement is enforceable under applicable non-bankruptcy law."[251]  Indeed, as one court

observes, "[v]alid contractual subordination agreements have been uniformly enforced according

to their terms by bankruptcy courts without proof of reliance by senior claimants."[252]  Here, since

the ARSPA specifically provided for the subordination of the Seller Notes to the New Notes and

these six Plaintiffs signed the ARSPA, the court must find that these Plaintiffs' Seller Notes must

be treated junior to the New Notes.

186.    Plaintiffs holding Sellers Notes representing approximately 36% of the

outstanding balance of the Seller Notes (Richard F. Palm, Reuben N. Palm, Cynthia M. Jackson,

Lynda Medley Campbell, James G. Palm, Mark R. Palm, Thomas L. Palm, Jeffrey A. Grandy,

Eugene O. Lee, Jr., Stephen R. Howze) voted in their capacity as *shareholders* to approve the

Debtor's offering of the New Notes to willing participants, but, nonetheless elected not to

participate in the New Notes.  None of them signed the ARSPA or a new subordination

agreement.  While the Defendants have argued that subordination of their Seller Notes was

---

[251] 11 U.S.C. § 510(a); *see also Trinity Nat'l Bank v. Bobby Boggs, Inc. (In re Bobby Boggs, Inc.)*, 819 F.2d 574, 579-80 (5th Cir. 1987).

[252] *In re Gen. Homes Corp. FGMC*, 134 B.R. 853, 864 (Bankr. S.D. Tex. 1991).

**AMENDED MEMORANDUM OPINION**                                      **PAGE 112**

effectuated pursuant to a provision in the Seller Notes themselves, which provides that the notes are subordinated to any debt issued pursuant to the SPA as amended,[253] there is conflicting language in the Seller Note Subordination Agreement itself, which essentially states that further subordination cannot be effectuated by an amendment to the SPA. Thus, this court does not believe that their approval of the New Notes transaction in their capacity as shareholders constitutes an agreement to subordinate their Seller Notes to the New Notes, or otherwise be bound by the terms of the New Notes documents, which did not yet exist and which these individuals never signed. Rather, these Plaintiffs would have had to either sign the ARSPA (or a rider thereto) or sign a new subordination agreement. Accordingly, the court holds that these particular Plaintiffs' Seller Notes (again, constituting 36% of the Seller Notes) should be treated *pari passu* with the New Notes.

187. The remaining Plaintiffs (Lee Scruggs, William Scruggs, James Scruggs, Jeffrey Vreeland, Roger Vang, Michael Palm, Shannon Palm, Susan Palm, Maureen Palm, Pamela Palm, Kristin Palm, and Stephen Reynolds) neither consented nor objected to the issuance of the New Notes (and hold roughly 15% of the remaining Seller Notes), and should also be treated *pari passu* with the New Notes.[254]

188. Plaintiffs have also argued that the documents evidencing the subordination of the Seller Notes to the New Notes cannot be enforced because they are barred by the doctrines of fraudulent inducement, failure of consideration, duress, mistake and undue influence. The court does not believe there to be a basis in the record supporting such allegations, and, accordingly, such requests are hereby overruled.

---

[253] Scott Williams Deposition Transcript, pg. 203.

[254] Counsel for the Defendants made a representation on the record at the first day of Trial that they were no longer taking the position that the Seller Noteholders who did not consent are subordinated, and agreed that such noteholders should be treated *pari passu* with the New Notes. *See* DE # 88, pg. 110.

### D. Defendant's Various Waivers and Defenses

189.    The Defendants asserted multiple defenses to the Plaintiffs' claims including: (a) waiver; (b) quasi-estoppel; (c) unclean hands; (d) laches; (e) failure to state a claim upon which relief can be granted; and (f) standing.  To the extent not already addressed herein such defenses are overruled.

190.    Moreover, the Defendants have asserted a counterclaim for unjust enrichment to the extent that any of the Seller Notes are not subordinated to the New Notes.  While certain of the holders of the Seller Notes will now be treated *pari passu* with the New Notes, the court does not believe such payments will amount to unjust enrichment, and as such, denies the Defendant's counterclaim of unjust enrichment.

## V.    CONCLUSION

In summation, the court concludes that based upon the evidence presented at the nine-day Trial, the Plaintiffs' claims for equitable subordination of the New Notes pursuant to section 510(c) of the Bankruptcy Code, recharacterization of the New Notes as equity pursuant to the doctrine of recharacterization, and subordination of the New Notes pursuant to section 510(b) of the Bankruptcy Code, should all be **DENIED**.  However, as to the Plaintiffs' request for a declaratory judgment regarding the enforceability of certain documents evidencing the New Notes transaction, the court concludes that certain of the New Notes documents (specifically, the ARSPA) did not effectuate a subordination of the Seller Notes to the New Notes as to certain of the Seller Noteholders (*i.e.*, those who did not sign the ARSPA), that no other document operated to subordinate these Seller Noteholders, and that these Seller Noteholders are now entitled to *pari passu* treatment with the New Noteholders.  It is therefore

**ORDERED** that counsel for the Defendants shall separately upload a form of Judgment consistent with this court's Memorandum Opinion above.

### ### END OF MEMORANDUM OPINION ###